# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WATERS CORPORATION AND WATERS TECHNOLOGIES CORPORATION | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 18-01450-MN |
| AGILENT TECHNOLOGIES INC., | ) ) | |
| Defendant. | ) ) | |

## AGILENT TECHNOLOGIES INC.'S RESPONSES TO WATERS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS (NOS. 1-87)

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and the objections contained herein, Defendant Agilent Technologies Inc. ("Agilent") hereby responds to Plaintiffs' First Set of Requests for Production of Documents (Nos. 1-87), served by Plaintiffs Waters Corporation and Waters Technologies Corporation (collectively, "Waters" or "Plaintiffs").

## GENERAL OBJECTIONS

1.      Agilent hereby objects to Plaintiffs' Requests on the ground that they are overly broad and use undefined terms.

2.      Agilent objects generally to the Definitions and Instructions in Plaintiffs' Requests to the extent that they seek to impose obligations on Agilent that are inconsistent with or beyond the scope of those imposed or authorized by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Delaware, and any other applicable laws and case law pertaining thereto.

3.      Agilent objects to Plaintiffs' Requests insofar as they seek production of communications, or information contained in communications, that is privileged or confidential by reason of common law, statute, or otherwise, including, but not limited to, the attorney-client

privilege and the work product privilege.   Such information will not be produced.   Any inadvertent disclosure of information to which a privilege applies shall not be deemed a waiver of any privilege with respect to such information or of any work-product doctrine that may attach thereto.

4.      Agilent objects to Plaintiffs' Requests, and the Definitions and Instructions thereto, insofar as they seek production of the confidential information of a third party or information Agilent is otherwise precluded by agreement from disclosing.   Agilent will not disclose such information without such third party's consent, and if such consent cannot be obtained, Agilent will advise Plaintiff as to whether any documents have been withheld on this basis.

5.      Agilent objects to Plaintiffs' Requests, and the Definitions and Instructions thereto, to the extent they are vague, ambiguous, overly broad, unduly burdensome, unreasonably cumulative or duplicative, disproportionate to the needs of the case, or seek information that is more conveniently or less expensively obtained from another source.

6.      Agilent objects to Plaintiffs' Requests to the extent they fail to describe the requested information with reasonable particularity, are indefinite as to time or scope or otherwise not limited to a time frame or geographic location relevant to this litigation, and are therefore unduly burdensome, oppressive, overly broad, and not proportionate to the needs of the case.

7.      Agilent objects to Plaintiffs' Requests as unduly burdensome to the extent they request documents or information already in Waters' possession, custody, or control, or to the extent it seeks information that is available in the public domain, and therefore is equally

accessible to Waters, on the grounds that such Request subjects Agilent to unreasonable burden and undue expense.

8.      Agilent objects to each Request to the extent it seeks production of the opinions, mental impressions, legal conclusions and/or legal theories of Agilent, its counsel, and/or their representatives and/or information or documents prepared in anticipation of litigation or trial. Agilent further objects to each Request to the extent it purports to oblige Agilent to perform legal or other analysis in connection with responding to such Request.

9.      Agilent generally objects to all of Plaintiffs' Requests and the Definitions and Instructions that accompany them, on the ground and to the extent they call for the production of information from any person or entity other than Agilent. Agilent answers each Request below on behalf of itself and no other person or entity.

10.      Agilent objects to Plaintiffs' Requests as lacking proper limitations on time and scope to the extent they purport to require the provision of information relating to conduct or events prior to Agilent's acquisition of ProZyme.

11.      Agilent objects to Plaintiffs' Requests to the extent they purport to require the production of information allegedly relevant to damages occurring prior to the issuance date of the '234 patent. *See, e.g.*, *Rosebud LMS Inc. v. Adobe Sys. Inc.*, 812 F.3d 1070, 1073 (Fed. Cir. 2016).

12.      Agilent objects to the Definitions to the extent that they purport to enlarge, expand, or alter in any way the plain meaning and scope of any specific Request, on the ground that such enlargement, expansion, or alteration renders the Request vague, ambiguous, unintelligible, unduly broad, and uncertain.

RLF1 21144998v.1

13.     Agilent objects to Waters' definition number 2 for "Defendant," "You," "Your," and Agilent as vague, overly broad, unduly burdensome, unlimited in time and scope, not described with reasonable particularity, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case, and because it purports to include entities other than Defendant Agilent Technologies Inc.

14.     Agilent objects to Waters' definition number 6 for "Accused Product" on the ground that it purports to include any products made, used, offered for sale, sold, exported, or imported not by Agilent but by non-party ProZyme prior to the acquisition of ProZyme's shares by Agilent.  Agilent further objects to this definition to the extent that its application requires legal conclusions or the disclosure of information that is protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity.  Agilent also objects to this definition to the extent that it seeks identification of any product "that practices or embodies any claim of the Patent-In-Suit."  Agilent contends that none of its products practice or embody such claims.  Agilent also objects to this definition because at the time of service of these Requests, Plaintiff had not served Agilent with its identification of accused products.

15.     Agilent objects to Waters' definition numbers 10 and 20 for "person," on the ground that Waters has provided multiple, conflicting definitions for this term. Agilent also objects to Waters' definition number 20 for "person" on the ground that the terms "firm," "group," "association," and "organization" are vague, ambiguous, and overly broad. Agilent further objects to Waters' definition number 10 purporting to define the acts and knowledge of a person "to include the acts and knowledge of that person's directors, officers, members, employees, representatives, agents, attorneys, and all other forms of legal entities" on the ground

4

that this definition is vague, overly broad in scope, unduly burdensome, and not proportional to the needs of the case.

16.     Agilent objects to Waters' definition number 11 on the ground that the phrases "[t]he use of the present tense includes the past tense as well as the future tense," "the use of the past tense includes the present tense as well as the future tense," and "the use of the future tense includes the past tense as well as the present tense" render Plaintiffs' Requests vague, ambiguous, overly broad in scope, and uncertain.

17.     Agilent objects to Waters' definition number 13 for "relating to," "relate to," and "concerning" on the grounds that the phrase "evidencing, comprising, constituting, reflecting, respecting, concerning, referring, stating, describing, recording, noting, embodying, containing, mentioning, studying, analyzing, discussing, evaluating, supporting, or tending to negate" is vague, ambiguous and overly broad.

18.     Agilent objects to Waters' definition number 17 for "prior art" to the extent that its application requires legal conclusions or the disclosure of information that is protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity.

19.     Agilent objects to Waters' Instruction number 1 because it purports to require the production of documents within the possession, custody, or control of entities other than Agilent. Agilent's responses to the Requests herein are made on behalf of itself and no other person or entity.   In accordance with its responses, Agilent will only produce documents in its own possession, custody, or control.

20.     Agilent does not, in any way, waive, or intend to waive, but rather intends to preserve and is preserving, without limitation: (a) the right to raise all questions of foundation,

relevancy, materiality, privilege, and admissibility as evidence of any information identified or documents produced in response to these Requests, or used in any motions or evidentiary hearing, in this or any subsequent proceeding; (b) the right to object on any ground to the use of these responses or documents produced in response to these Requests in any subsequent proceeding, including motions in, or the trial of, this or any other action; (c) the right to object to the introduction into evidence of these responses; and (d) the right to object on any ground at any time to other discovery involving or relating to the subject matter of these Requests.

Each of the above General Objections shall be deemed continuing and is incorporated into the Specific Objections and any responses, whether or not specifically stated with respect to each Request, and is not waived or in any way limited. No response to a Request shall be understood as, nor is intended to be, a waiver of any General Objection or any Specific Objection that may be separately stated with respect to any Request. A response or objection is not an admission that Agilent accepts or admits that any "fact" set forth in or assumed by any Request exists. Nor shall any objection or response to a Request be deemed to constitute any agreement or concession that the subject matter thereof is relevant to this action. All of the objections set forth below and any responses are made without waiving or intending to waive any objection. Agilent reserves the right to supplement, clarify, revise, or correct any or all of these objections and responses, if and when additional information is discovered. Agilent also expressly reserves the right to assert additional objections or privileges.

## RESPONSES TO REQUESTS FOR PRODUCTION

## REQUEST FOR PRODUCTION NO. 1

Documents sufficient to identify (by product name, product number, and internal project or product name or designation) each distinct version or model of each of the Accused Products,

6

and each component thereof, manufactured, sold, offered for sale, or used in the United States, imported into the United States, or exported from the United States.

**RESPONSE**

Agilent objects to this Request on the ground that it is not properly limited in time or scope because it is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Additionally, Agilent objects to this Request as seeking irrelevant information, specifically as it relates to all components of the Accused Product because the Accused Product is only InstantPC$^{TM}$.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents sufficient to identity each product sold containing the InstantPC$^{TM}$ reagent from Agilent's acquisition of ProZyme through the present, for alleged infringing activities in the United States market, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 2**

Documents sufficient to identify the structure, method of manufacture, or method of use of the Accused Products, or any component thereof.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Further,

Agilent objects to this Request as seeking information not relevant to any claims or defenses at issue in this case, specifically documents relating to the "method of manufacture."  Additionally, Agilent objects to this Request as seeking irrelevant information, specifically as it relates to all components of the Accused Product because the Accused Product is only InstantPC$^{TM}$.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents, from its acquisition of ProZyme through the present, sufficient to identify the structure or method of use of the Accused Product, to the extent such documents exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 3

Documents sufficient to identify and describe in detail the location and process of manufacture and testing of each of the Accused Products.

## RESPONSE

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Further, Agilent objects to this Request as seeking information not relevant to any claims or defenses at issue in this case, specifically documents relating to the "process of manufacture."

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 4

8

For each of the Accused Products, and each component thereof, manufactured, used, sold, or offered for sale in the United States, imported into the United States, or exported from the United States, documents sufficient to identify the facility or facilities in which such product or component was manufactured, the manufacturing steps or processes performed at each such facility, and the entity that directly owns each such facility.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Further, Agilent objects to this Request as seeking information not relevant to any claims or defenses at issue in this case, specifically documents relating to the "method of manufacture." Agilent also objects to this Request on the ground that the term "directly owns" is vague and ambiguous. Agilent further objects to this Request to the extent it is duplicative of Request 3. Additionally, Agilent objects to this Request as seeking irrelevant information, specifically as it relates to all components of the Accused Product because the Accused Product is only InstantPC$^{TM}$.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents, from its acquisition of ProZyme through the present, sufficient to show the facility or facilities in which InstantPC$^{TM}$ was manufactured, for alleged infringing activity within the United States market, to the extent such documents exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 5**

Documents sufficient to identify and describe in detail the location and process of manufacture and testing of each instrument sold with or for use with the Accused Products.

**RESPONSE**

Agilent objects to this Request as it improperly ties the sale of instruments with the Accused Product.  Agilent also objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme.  Agilent also objects to this request to the extent that the definition of "Accused Products" is not limited to the InstantPC reagent and, therefore, encompasses components routinely used in a laboratory.  Agilent also objects to this request to the extent that it seeks documents regarding instruments "for use with the Accused Products." Further, Agilent objects to this Request as seeking information not relevant to any claims or defenses at issue in this case, specifically documents relating to the "process of manufacture."  Agilent further objects to this Request to the extent it is duplicative of Requests 3 and 4.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

**REQUEST FOR PRODUCTION NO. 6**

The design history file, or DHF, for each of the Accused Products.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is

not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request on the ground that the phrase "design history file" is vague, ambiguous, and undefined.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

**REQUEST FOR PRODUCTION NO. 7**

Documents sufficient to identify all persons involved in the conception, design, or development of the Accused Products.

**RESPONSE**

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity.  Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case both due to the breadth of the request as a whole, and with respect to the request to identify "all persons involved with" each listed activity.  Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme.  Agilent further objects to this Request to the extent it is duplicative of Request 8.  Agilent further objects to this Request on the ground that the phrase "conception, design, or development" is vague, ambiguous, and undefined.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents sufficient to identify the persons primarily involved in the listed activities, from Agilent's acquisition of ProZyme through the present, for alleged infringing conduct within the United States market, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 8**

All documents relating to the conception, design, and development of the Accused Products.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request on the ground that the phrase "conception, design, and development" is vague, ambiguous, and undefined.  Further, Agilent objects to this Request as duplicative of Request No. 7.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

**REQUEST FOR PRODUCTION NO. 9**

All manufacturing instructions and protocols for the Accused Products.

**RESPONSE**

12

Agilent objects to this Request as not related to any claims or defenses at issue in this case, specifically, the manufacturing process and protocols are not at issue in this case. Further, Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request on the ground that the terms "manufacturing instructions" and "protocols" are vague, ambiguous, and undefined.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 10

All videos, animations, slides, and presentations relating to the function, operation, implementation, and use of the Accused Products.

## RESPONSE

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent also objects to this Request as duplicative of the Scheduling Order, which requires Agilent to produce core technical documents.

13

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged core technical documents, from its acquisition of ProZyme through the present, for alleged infringing conduct within the United States market, to the extent such documents exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 11

Documents sufficient to show the distribution channels for the Accused Products, and each component thereof, including but not limited to the identity of entities that import the Accused Products into or export the Accused Products from the United States.

## RESPONSE

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent further objects to this Request on the ground that the phrase "distribution channels" is vague, ambiguous, and undefined. Additionally, Agilent objects to this Request as seeking irrelevant information, specifically as it relates to all components of the Accused Product because the Accused Product is only InstantPC$^{TM}$.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 12

All marketing material relating to InstantPC.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because it is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request on the ground that the discovery sought is available in the public domain and thus accessible to all parties.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

**REQUEST FOR PRODUCTION NO. 13**

A copy of all documentation provided to customers or users in connection with the sale or use of each of the Accused Products, including but not limited to packaging, labeling, instructions for use, and training manuals.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent makes the same objections based on the request for "all documents … in connection with the sale."  Agilent also objects to this Request as duplicative of the Scheduling Order, which requires Agilent to produce core technical documents.

15

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged core technical documents, from its acquisition of ProZyme through the present, for alleged infringing conduct within the United States market, to the extent such documents exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 14

All marketing materials, sales training materials, advertisements, promotional materials, product descriptions, price lists, catalogs, brochures, trade show materials, models, and web publications referring or relating to the Accused Products.

## RESPONSE

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent objects to this Request to the extent it is duplicative of Request 12.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents constituting representative examples of the requested material, from Agilent's acquisition of ProZyme through the present, for alleged infringing conduct within the United States market, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 15

16

Documents sufficient to show the average selling price of each of the Accused Products, in and outside the United States, on a monthly, quarterly, and annual basis, including but not limited to any discounts, from May 23, 2017, to the present.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because it is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Further, Agilent objects to this Request as seeking information related to activities conducted overseas, specifically any manufacturing and sales that may be done exclusively outside the United States.  Agilent also objects to this Request as duplicative of the Scheduling Order, which requires Agilent to produce sales figures for InstantPC$^{TM}$.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents, from its acquisition of ProZyme through the present, for alleged infringing conduct within the United States market, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 16**

Documents sufficient to show the revenue from sales of each of the Accused Products, in and outside the United States, on a monthly, quarterly, and annual basis, from May 23, 2017, to the present.

**RESPONSE**

17

RLF1 21144998v.1

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because it is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme.   Agilent also objects to this Request as duplicative of the Scheduling Order, which requires Agilent to produce sales figures for InstantPC$^{TM}$.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged sales figures for products containing InstantPC$^{TM}$ from its acquisition of ProZyme through the present, for alleged infringing conduct within the United States market, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 17

Documents sufficient to show the volume of sales of each of the Accused Products, in and outside the United States, in units and dollars, on a monthly, quarterly, and annual basis, from August May 23, 2017, to the present.

## RESPONSE

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because it is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme.   Agilent also objects to this Request as

18

duplicative of the Scheduling Order, which requires Agilent to produce sales figures for InstantPC<sup>TM</sup>.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged sales figures for InstantPC<sup>TM</sup> from its acquisition of ProZyme through the present, for alleged infringing conduct within the United States market, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 18**

Documents sufficient to show the gross profits, net profits, and profit margins (including but not limited to gross margins and net margins) on sales of each of the Accused Products, in and outside the United States, on a monthly, quarterly, and annual basis, from May 23, 2017, to the present.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because it is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme.  Agilent also objects to this Request as duplicative of the Scheduling Order, which requires Agilent to produce sales figures for InstantPC<sup>TM</sup>.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents, from its acquisition of ProZyme through the present, for alleged infringing conduct within the United States, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

19

**REQUEST FOR PRODUCTION NO. 19**

All forecasts or projections of annual revenues, unit sales, gross sales, net profits, gross profits, fixed costs, variable costs, prices (including but not limited to discounts provided), production volume, and market share associated with each of the Accused Products, including but not limited to strategic, business, or operating plans.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents, from its acquisition of ProZyme through the present, for alleged infringing conduct within the United States market, to the extent such documents exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 20**

Documents sufficient to show any analysis, forecast and/or projection of the pricing of the Accused Product, including those discussing any list prices, discounts, and/or rebates to be offered for any such product.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited

to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents, from its acquisition of ProZyme through the present, for alleged infringing conduct within the United States market, to the extent such documents exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 21

Documents sufficient to show the identity of the persons or entities who have purchased or used the Accused Products.

## RESPONSE

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request to the extent it seeks information not in Agilent's possession, custody, or control. Agilent further objects to this Request to the extent it seeks a nonparty's proprietary or confidential information without the nonparty's consent.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 22

Documents sufficient to show any instruments sold with or for use with the Accused Products.

**RESPONSE**

Agilent objects to this Request as it improperly ties the sale of instruments with the accused product. Further, Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request to the extent it seeks information not in Agilent's possession, custody, or control. Agilent also objects to this Request on the ground that it seeks information not relevant to any claim or defense in this action.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

**REQUEST FOR PRODUCTION NO. 23**

Agreements relating to the Accused Products including any sales contracts for the Accused Products.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request to the extent it seeks information not in Agilent's possession,

custody, or control. Agilent further objects to this Request to the extent it seeks a nonparty's proprietary or confidential information without the nonparty's consent.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 24

Agreements relating to the sale or lease of instruments or other products (i) sold or leased in combination with or contemporaneously with the Accused Products or (ii) that reference the Accused Products.

## RESPONSE

Agilent objects to this Request as it improperly ties the sale of instruments with the accused product.  Further, Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request to the extent it seeks information not in Agilent's possession, custody, or control.  Agilent also objects to this Request on the ground that it seeks information not relevant to any claim or defense in this action. Agilent also objects to this Request as vague, ambiguous, and unintelligible particularly with respect to the phrases "relating to the sale or lease of instruments or other products," "in combination with or contemporaneously with the Accused Products," and "that reference the Accused Products."

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

**REQUEST FOR PRODUCTION NO. 25**

Documents sufficient to show the revenue from sales of instruments sold with or for use with the Accused Products, in and outside the United States, on a monthly, quarterly, and annual basis, from May 23, 2017, to the present.

**RESPONSE**

Agilent objects to this Request as it improperly ties the sale of instruments with the accused product. Further, Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent further objects to this Request to the extent it seeks information not in Agilent's possession, custody, or control. Agilent also objects to this Request on the ground that it seeks information not relevant to any claim or defense in this action. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because it is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

**REQUEST FOR PRODUCTION NO. 26**

Documents sufficient to show the volume of sales of instruments sold with or for use with the Accused Products, in and outside the United States, in units and dollars, on a monthly, quarterly, and annual basis, from August May 23, 2017, to the present.

**RESPONSE**

Agilent objects to this Request as it improperly ties the sale of instruments with the accused product. Further, Agilent objects to this Request as vague, overly broad, unduly

24

burdensome, and not proportional to the needs of the case. Agilent further objects to this Request to the extent it seeks information not in Agilent's possession, custody, or control. Agilent also objects to this Request on the ground that it seeks information not relevant to any claim or defense in this action. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because it is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 27

Documents sufficient to show the gross profits, net profits, and profit margins (including but not limited to gross margins and net margins) on sales of instruments sold with or for use with the Accused Products, in and outside the United States, on a monthly, quarterly, and annual basis, from May 23, 2017, to the present.

## RESPONSE

Agilent objects to this Request as it improperly ties the sale of instruments with the accused product.  Further, Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent further objects to this Request to the extent it seeks information not in Agilent's possession, custody, or control.  Agilent also objects to this Request on the ground that it seeks information not relevant to any claim or defense in this action. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because it is not limited to alleged infringing activities in the United

States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 28

All forecasts or projections of annual revenues, unit sales, gross sales, net profits, gross profits, fixed costs, variable costs, prices (including but not limited to discounts provided), production volume, and market share associated with instruments sold with or for use with the Accused Products, including but not limited to strategic, business, or operating plans.

## RESPONSE

Agilent objects to this Request as it improperly ties the sale of instruments with the accused product.   Further, Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent further objects to this Request to the extent it seeks information not in Agilent's possession, custody, or control.   Agilent also objects to this Request on the ground that it seeks information not relevant to any claim or defense in this action. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because it is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 29

26

Documents sufficient to show Agilent's pricing analyses, strategies, and decisions for the Accused Products.

**RESPONSE**

Agilent objects to this Request as vague, ambiguous, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definitions of the terms "Accused Product" and "Agilent" are not limited to alleged infringing activities in the United States market and purport to require the production of documents for entities other than Agilent Technologies Inc. relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent objects to this Request to the extent it is duplicative of Requests 15-20, 23, 27, and 28.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents from its acquisition of ProZyme through the present, for alleged infringing activity within the United States market, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 30**

Documents sufficient to show Agilent's pricing analyses, strategies, and decisions for instruments sold with or for use with the Accused Products.

**RESPONSE**

Agilent objects to this Request as it improperly ties the sale of instruments with the accused product. Further, Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to

require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request to the extent it seeks information not in Agilent's possession, custody, or control.  Agilent also objects to this Request on the ground that it seeks information not relevant to any claim or defense in this action. Agilent also objects to this Request on the ground that the definition of the term "Agilent" purports to require the production of documents for entities other than Agilent Technologies Inc. relating to conduct or events prior to Agilent's acquisition of ProZyme.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 31

All Documents relating to any discussion, advertising, display, demonstration, operation, or promotion of any of the Accused Products and any instrument sold with or for use with the Accused Products by Agilent or any third party at any conferences, exhibitions, conventions, or trade shows, including presentations, slides, photographs, brochures, handouts, poster boards, agendas, planning Documents, talking points, and scripts.

## RESPONSE

Agilent objects to this Request as it improperly ties the sale of instruments with the Accused Product.   Agilent also objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definitions of "Accused Product" and "Agilent" are not limited to alleged infringing activities in the United States market and purport to require the production of documents for entities other than Agilent Technologies Inc. relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further

28

objects to this Request to the extent it is duplicative of Requests 10, 12, 13, and 14. Agilent also objects to this Request to the extent it seeks documents that are available in the public domain and purports to subject Agilent to unreasonable burden and undue expense.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents constituting representative examples of the requested material relating to products containing the InstantPC$^{TM}$ reagent, from Agilent's acquisition of ProZyme through the present, for alleged infringing conduct within the United States market, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 32**

Documents sufficient to show Agilent's Research & Development (R&D) cost and time for the Accused Products.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definitions of "Accused Product" and "Agilent" are not limited to alleged infringing activities in the United States market and purport to require the production of documents for entities other than Agilent Technologies Inc. relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action, as all of the referenced conduct occurred prior to the filing of the application that resulted in the Patent-in-Suit.

Agilent will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 33**

29

Documents sufficient to show Agilent's Research & Development (R&D) cost and time for instruments sold with or for use with the Accused Products.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definitions of "Accused Product" and "Agilent" are not limited to alleged infringing activities in the United States market and purport to require the production of documents for entities other than Agilent Technologies Inc. relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action, as all of the referenced conduct occurred prior to the filing of the application that resulted in the Patent-in-Suit.

Agilent will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 34**

All royalty-bearing patent or technology license agreements related to the Accused Products and/or any instrument sold with or for use with the Accused Products that You have entered into.

**RESPONSE**

Agilent objects to this Request as it improperly ties the sale of instruments with the Accused Product.  Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definitions of "You" and "Accused Product" are not limited to alleged infringing activities in the United States market and purport to

require the production of documents for entities other than Agilent Technologies Inc. relating to conduct or events prior to Agilent's acquisition of ProZyme.  Agilent further objects to this Request to the extent it seeks a nonparty's proprietary or confidential information without the nonparty's consent.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents, from its acquisition of ProZyme through the present, for InstantPC$^{TM}$, for alleged infringing activity within the United States market, to the extent such documents exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 35

All Documents concerning any royalty-bearing patent or technology license agreement related to the Accused Products and/or any instrument sold with or for use with the Accused Products, including but not limited to Documents relating to any negotiations concerning such an agreement.

## RESPONSE

Agilent objects to this Request as it improperly ties the sale of instruments with the Accused Product.  Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definitions of "You" and "Accused Product" are not limited to alleged infringing activities in the United States market and purport to require the production of documents for entities other than Agilent Technologies Inc. relating to conduct or events prior to Agilent's acquisition of ProZyme.  Agilent further objects to this Request to the extent it seeks a nonparty's proprietary or confidential information without the nonparty's consent.

RLF1 21144998v.1

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents, from its acquisition of ProZyme through the present, for InstantPC$^{TM}$, for alleged infringing activity within the United States market, to the extent such documents exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 36

All patent, technology, or intellectual property license agreements that You deem reasonably comparable (in technological subject matter, license terms, or otherwise) to a license that would have resulted from a hypothetical negotiation between Waters and Agilent related to the '234 Patent as of the time of the first alleged infringement by Agilent, and all related Documents.

## RESPONSE

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definitions of "You" and "Agilent" are not limited to alleged infringing activities in the United States market and purport to require the production of documents for entities other than Agilent Technologies Inc. relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent also objects to this Request on the ground that it is vague, ambiguous, and based on an improper hypothetical that is not relevant to any claim or defense in this action.  Agilent further objects to this Request to the extent it calls for the disclosure of attorney work product and/or privileged communications.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 37

All asset purchase, assignment, license, or royalty agreements regarding the Accused Products.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request to the extent it seeks a nonparty's proprietary or confidential information without the nonparty's consent. Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent further objects to this Request to the extent it is duplicative of Requests 34, 35, and 36.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents, from its acquisition of ProZyme through the present, for alleged infringing activities within the United States market, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 38**

All documents relating to Your competitors, including but not limited to Waters, with respect to the Accused Products.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definitions of "Your" and "Accused Product"

33

are not limited to alleged infringing activities in the United States market and purport to require

the production of documents for entities other than Agilent Technologies Inc. relating to conduct

or events prior to Agilent's acquisition of ProZyme. Agilent objects to this Request to the extent

it seeks documents and communications protected from discovery by the attorney-client

privilege, the attorney work-product immunity, or any other applicable privilege or immunity.

Agilent further objects to this Request to the extent it seeks a nonparty's proprietary or

confidential information without the nonparty's consent. Agilent objects to this Request to the

extent that it seeks information not relevant to any claim or defense in this action. Agilent further

objects to this Request to the extent it is duplicative of Requests 34, 35, and 36. Agilent also

objects to this Request on the ground that the term "competitors" is vague, ambiguous, and

undefined. Agilent additionally objects to this Request to the extent that the discovery sought is

obtainable from a source other than Agilent that is more convenient, less burdensome, or less

expensive.

Agilent will not produce documents in response to this request but will consider a request

that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 39

All documents relating to any non-infringing alternatives to the Accused Products.

## RESPONSE

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not

proportional to the needs of the case. Agilent also objects to this Request on the ground that it is

not properly limited in time or scope because the definition of "Accused Product" is not limited

to alleged infringing activities in the United States market and purports to require the production

of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent

also objects to this Request on the ground that it requests information in the public domain or in Plaintiffs' possession, custody, or control and, as such, Agilent should not bear the burden of production on those documents.  Agilent further objects to this Request on the ground that the term "non-infringing alternatives" is vague, ambiguous, and undefined.  Agilent also objects to this Request on the ground that it requires legal conclusions on a disputed issue prior to the Court making claim-construction determinations.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 40

Documents sufficient to show Your manufacturing and marketing capability with respect to the Accused Products.

## RESPONSE

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definitions of "Your" and "Accused Product" are not limited to alleged infringing activities in the United States market and purport to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request on the ground that the phrase "manufacturing and marketing capability" is vague, ambiguous, and undefined. Agilent also objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action, particularly as to "manufacturing and marketing capability," which are not at issue in this case.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

**REQUEST FOR PRODUCTION NO. 41**

All Documents relating to royalty rates that are customary in the industry for the Accused Products.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent objects to this Request to the extent it seeks information not in Agilent's possession, custody, or control. Agilent further objects to this Request on the ground that the phrases "customary in the industry" and "the industry for the Accused Products" are vague, ambiguous, and undefined. Agilent also objects to this Request to the extent it seeks documents that are available in the public domain and purports to subject Agilent to unreasonable burden and undue expense.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

**REQUEST FOR PRODUCTION NO. 42**

All Documents relating to, supporting, or refuting Waters' contentions regarding whether injunctive relief is appropriate in this case.

**RESPONSE**

Agilent objects to this Request to the extent that this issue is already briefed, argued, and fully submitted to the Court for decision.

**REQUEST FOR PRODUCTION NO. 43**

36

Documents sufficient to show the organizational structure of Agilent, including but not limited to any divisions, departments, parents, predecessors, successors, subsidiaries (including ProZyme), affiliates, and other organizational or operating units, and the ownership of each such entity, since 2015.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because it purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request to the extent it seeks comprehensive disclosure of Agilent's corporate structure for "divisions, departments, parents, predecessors, successors, subsidiaries [], affiliates, and other organizational or operating units, and the ownership of each such entity" as this Request would encompass entities that bear no relation to this case.  Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent further objects to this Request to the extent it is duplicative of Request 44.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents sufficient to show the organizational structure of Agilent Technologies Inc., from the acquisition of ProZyme through the present, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 44**

Documents sufficient to show the corporate structure of Agilent since June 28, 2018, including organization charts.

**RESPONSE**

Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent further objects to this Request on the ground that the phrase "corporate structure" is vague, ambiguous, and undefined. Agilent objects to this Request to the extent it is duplicative of Request 43.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents relating to Agilent Technologies Inc., from the acquisition of ProZyme through the present, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 45

Documents sufficient to identify the members of the Board of Directors of Agilent since June 28, 2018.

## RESPONSE

Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent objects to this Request to the extent it is duplicative of Requests 43 and 44. Agilent further objects to this Request to the extent it seeks documents that are available in the public domain, and purports to subject Agilent to unreasonable burden and undue expense.

Agilent will not produce documents in response to this request.

## REQUEST FOR PRODUCTION NO. 46

Documents that refer or relate to Agilent's decision to acquire ProZyme, Inc., including but not limited to documents related to Agilent's acquisition of ProZyme, Inc., including any sales information, projections, indemnities and/or discussions between Agilent and ProZyme, Inc. concerning the '234 patent.

38

**RESPONSE**

Agilent objects to this Request on the ground that it is not properly limited in time or scope because it purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme.  Agilent also objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent further objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents, concerning the '234 Patent, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 47**

All documents and things that refer or relate to ProZyme, Inc. and any of the Accused Products.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case on the ground that it requests "all" documents and things referring or relating to ProZyme.  Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense

39

in this action, particularly information related to ProZyme and its activities not related to any Accused Product. Agilent further objects to this Request to the extent it is duplicative of numerous other Requests herein.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 48

Documents evidencing the corporate formation and corporate formalities of ProZyme, including all documents filed with any state agencies.

## RESPONSE

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because it purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme.  Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action.  Agilent also objects to this Request to the extent it seeks documents that are available in the public domain and purports to subject Agilent to unreasonable burden and undue expense. Agilent further objects to this Request on the ground that the phrase "corporate formation and corporate formalities" is vague, ambiguous, and undefined. Agilent further objects to this Request on the ground that it is duplicative of Request 47.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 49

Documents relating to ProZyme's compliance or non-compliance with its corporate formalities.

## RESPONSE

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because it purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme.  Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action.  Agilent also objects to this Request to the extent it seeks documents that are available in the public domain and purports to subject Agilent to unreasonable burden and undue expense. Agilent further objects to this Request on the ground that the phrase "corporate formation and corporate formalities" is vague, ambiguous, and undefined. Agilent further objects to this Request on the ground that it is duplicative of Request 47.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 50

Documents sufficient to show the corporate structure of ProZyme since June 28, 2018, including organization charts.

**RESPONSE**

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because it purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent also objects to this Request to the extent it seeks documents that are available in the public domain and purports to subject Agilent to unreasonable burden and undue expense. Agilent further objects to this Request on the ground that the phrase "corporate formation and corporate formalities" is vague, ambiguous, and undefined. Agilent further objects to this Request on the ground that it is duplicative of Request 47.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

**REQUEST FOR PRODUCTION NO. 51**

Documents sufficient to show the process and level of integration of ProZyme into Agilent since August 1, 2018.

**RESPONSE**

Agilent objects to this Request on the ground that the term "process and level of integration" is vague, ambiguous, and undefined.  Agilent further objects to this Request on the ground that it seeks information not relevant to any claim or defense in this action.  Agilent further objects to this Request on the ground that it is duplicative of Request 47.

Agilent will not produce documents in response to this request.

## REQUEST FOR PRODUCTION NO. 52

Documents sufficient to identify the members of the Board of Directors of ProZyme since June 28, 2018.

## RESPONSE

Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because it purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme.  Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case.  Agilent further objects to this Request to the extent it is duplicative of Requests 47, 48, 49, 50, and 51.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 53

All minutes of ProZyme's Board of Director meetings since June 28, 2018.

## RESPONSE

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent objects to this Request on the ground that it is not properly limited in time or scope because it purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent further objects to this Request on the ground that it is duplicative of Request 47.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 54

All minutes of Agilent's Board of Directors meetings where ProZyme or the Accused Products were discussed.

## RESPONSE

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent objects to this Request on the ground that it is not properly limited in time or scope because it purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent further objects to this Request on the ground that it is duplicative

44

of Request 47. Agilent further objects to this Request as overbroad and seeking irrelevant information to the extent that the Accused Product is only one of a panoply of ProZyme products, the others of which are irrelevant to this litigation.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

**REQUEST FOR PRODUCTION NO. 55**

Documents sufficient to show any common bank accounts used by Agilent and ProZyme.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action.  Agilent further objects to this Request on the ground that it is duplicative of Request 47.

Agilent will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 56**

All statements issued during the period from August 1, 2018 to date for every account held at a bank or financial institution by, in the name of, or on behalf of Agilent (including each deposit, investment, securities, custodian and/or escrow account).

**RESPONSE**

Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action.

Agilent will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 57**

All statements issued during the period from August 1, 2018 to date for every account held at a bank or financial institution by, in the name of, or on behalf of ProZyme (including each deposit, investment, securities, custodian and/or escrow account).

**RESPONSE**

Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent further objects to this Request to the extent it seeks a nonparty's proprietary or confidential information without the nonparty's consent. Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent further objects to this Request on the ground that it is duplicative of Request 47.

Agilent will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 58**

All financial statements (whether audited, unaudited, quarterly or annual) prepared by or on behalf of Agilent.

**RESPONSE**

Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action.

Agilent will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 59**

All financial statements (whether audited, unaudited, quarterly or annual) prepared by or on behalf of ProZyme

**RESPONSE**

Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent further objects to this Request to the extent it seeks a nonparty's proprietary or confidential information without the nonparty's consent. Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent further objects to this Request on the ground that it is duplicative of Request 47.

Agilent will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 60**

All tax returns filed by or on behalf of Agilent since August 1, 2018.

**RESPONSE**

Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action.

Agilent will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 61**

All tax returns filed by or on behalf of ProZyme since August 1, 2018.

**RESPONSE**

Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent further objects to this Request on the ground that it is duplicative of Request 47.

Agilent will not produce documents in response to this request.

**REQUEST FOR PRODUCTION NO. 62**

All agreements executed by Agilent on behalf of ProZyme.

47

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent further objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action, specifically to the extent it is not limited to only the Accused Product. Agilent further objects to this Request on the ground that it is duplicative of Request 47.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

**REQUEST FOR PRODUCTION NO. 63**

Documents sufficient to show the relationship between Agilent and ProZyme as it relates to the Accused Product, including, but not limited to, all agreements between Agilent and ProZyme concerning the Accused Product and any directions and communications provided between Agilent and ProZyme with respect to the Accused Products.

**RESPONSE**

Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" is not limited to alleged infringing activities in the United States market and purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent further objects to this Request to the extent it seeks a nonparty's proprietary or confidential information without the nonparty's consent.

48

Agilent further objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent further objects to this Request on the ground that it is duplicative of Request 47.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents, from its acquisition of ProZyme through the present, for alleged infringing activity within the United States market, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 64

All documents and things relating to the '234 Patent.

## RESPONSE

Agilent objects to this Request to the extent it calls for the disclosure of attorney work product and/or privileged communications.  Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 65

All documents and things relating to Agilent's knowledge of any of the '234 Patent and the application(s) from which the '234 Patent issued, including but not limited to the date on which, and extent to which, Agilent first became aware of each such patent and patent application.

## RESPONSE

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity,

or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case.  Agilent also objects to this Request on the ground that the definition of "Agilent" purports to require the production of documents for entities other than Agilent Technologies Inc. relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent also objects to this Request on the ground that it is duplicative of Request 64.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 66

All documents and things relating to any interpretation, construction, or meaning of any claim or claim term of any of the '234 Patent.

## RESPONSE

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent further objects to this Request on the ground that it is duplicative of Request 64. Agilent further objects to this Request as premature, as Waters has yet to produce its initial or final claim charts relating each known accused product to the asserted claims each such product allegedly infringes, and because it seeks production of documents relating to evidence that will be presented through expert testimony, which is not yet required under the Scheduling Order.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents relevant to the claims and defenses asserted in this action, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search, at the appropriate time.

## REQUEST FOR PRODUCTION NO. 67

All documents and things relating to the patentability, validity, infringement, or enforceability of the '234 Patent, including but not limited to any opinions of counsel.

## RESPONSE

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent further objects to this Request on the ground that it is duplicative of Request 64. Agilent further objects to this Request as premature, as Waters has yet to produce its initial or final claim charts relating each known accused product to the asserted claims each such product allegedly infringes, and because it seeks production of documents relating to evidence that will be presented through expert testimony, which is not yet required under the Scheduling Order.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents relevant to the claims and defenses asserted in this action, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search, at the appropriate time.

## REQUEST FOR PRODUCTION NO. 68

51

All documents and things upon which Agilent intends to rely in support of its contention that it has not infringed and does not infringe (willfully or otherwise) any of the asserted claims of the '234 Patent either directly, indirectly, literally, or under the doctrine of equivalents.

**RESPONSE**

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent further objects to this Request on the ground that it is duplicative of Request 64. Agilent further objects to this Request as premature, as Waters has yet to produce its initial or final claim charts relating each known accused product to the asserted claims each such product allegedly infringes, and because it seeks production of documents relating to evidence that will be presented through expert testimony, which is not yet required under the Scheduling Order.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents relevant to the claims and defenses asserted in this action, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search, at the appropriate time.

**REQUEST FOR PRODUCTION NO. 69**

All documents and things upon which Agilent intends to rely in support of its contention that the Accused Products do not infringe the '234 Patent.

**RESPONSE**

52

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request to the extent that it seeks information not relevant to any claim or defense in this action. Agilent further objects to this Request on the ground that it is duplicative of Request 64. Agilent further objects to this Request as premature, as Waters has yet to produce its initial or final claim charts relating each known accused product to the asserted claims each such product allegedly infringes, and because it seeks production of documents relating to evidence that will be presented through expert testimony, which is not yet required under the Scheduling Order.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents relevant to the claims and defenses asserted in this action, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search, at the appropriate time.

## REQUEST FOR PRODUCTION NO. 70

All Documents relating to or describing any of Your policies, practices, or guidelines regarding the patent rights of others, including policies regarding the analysis of patents to ensure You do not infringe such patents and policies with respect to monitoring of patents or patent rights.

## RESPONSE

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent also objects to this Request on the ground

that it seeks information not relevant to any claim or defense in this action. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "You" and "Your" purports to require the production of documents for entities other than Agilent Technologies Inc. relating to conduct or events prior to Agilent's acquisition of ProZyme.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

**REQUEST FOR PRODUCTION NO. 71**

All Documents relating to any design-around of the '234 Patent and the application(s) from which the '234 Patent issued that You considered or implemented, or are considering or implementing.

**RESPONSE**

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "You" purports to require the production of documents for entities other than Agilent Technologies Inc. relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request on the ground that it seeks design around information for other patents in the '234 Patent family because those patents are not at issue in this action. Agilent also objects to this Request as premature, as Waters has yet to produce its initial or final

54

claim charts relating each known accused product to the asserted claims each such product allegedly infringes.  Agilent further objects to this Request to the extent it is duplicative of Requests 64, 65, and 70.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents, from its acquisition of ProZyme through the present, relevant to the claims and defenses asserted in this action, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search, at the appropriate time.

## REQUEST FOR PRODUCTION NO. 72

All documents and things comparing any of the Accused Products, or any component thereof, with the '234 Patent.

## RESPONSE

Agilent objects to this Request as seeking irrelevant information, specifically as it relates to any component of the Accused Product because the Accused Product is only InstantPC$^{TM}$. Agilent also objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request to the extent it is duplicative of Requests 47, 64, 70, and 71.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents, from its acquisition of ProZyme through the present, for InstantPC$^{TM}$,

to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 73

All documents and things comparing any of the Accused Products, or any component thereof, with Waters' GlycoWorks RapFluor-MS N-Glycan Kit.

## RESPONSE

Agilent objects to this Request as seeking irrelevant information, specifically as it relates to any component of the Accused Product because the Accused Product is only InstantPC$^{TM}$. Agilent also objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Accused Product" purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request to the extent it is duplicative of Requests 47, 64, 70, and 71.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents, from its acquisition of ProZyme through the present, for InstantPC$^{TM}$, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 74

All documents and things upon which Agilent intends to rely in support of its contention that the asserted claims of the '234 Patent are invalid under one or more of 35 U.S.C. §§ 101, 102, 103, and 112.

**RESPONSE**

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that the term "asserted claims" is vague, ambiguous, and undefined. Agilent further objects to this Request as premature as Waters has yet to identify which claims it intends to assert against Agilent or produce its initial or final claim charts relating each known product to the asserted claims each such product allegedly infringes, and because it seeks production of documents relating to evidence that will be presented through expert testimony and/or invalidity contentions, which is not yet required under the Scheduling Order.  Agilent further objects to this Request to the extent it is duplicative of Request 64, 66, and 67.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents relevant to the claims and defenses in this action, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search, at the appropriate time.

**REQUEST FOR PRODUCTION NO. 75**

All Documents relating to any prior art search relating to '234 patent, including search requests, reports, analyses, and references located.

**RESPONSE**

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because it purports to require the production of documents relating to conduct or events prior to Agilent's acquisition of ProZyme. Agilent further objects to this Request to the extent it is duplicative of Requests 64, 67, and 74. Agilent further objects to this Request on the ground that the phrase "prior art search" is vague, ambiguous, and undefined.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 76

All Documents that You intend to rely on to establish the level of ordinary skill in the art relating to the '234 patent.

## RESPONSE

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request as premature in light of the Scheduling Order entered by the Court. Agilent further objects to this Request as premature as Waters has yet to identify which claims it intends to assert against Agilent or produce its initial or final claim charts relating each known product to

58

the asserted claims each such product allegedly infringes, and because it seeks production of documents relating to evidence that will be presented through expert testimony and/or invalidity contentions, which is not yet required under the Scheduling Order.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents relevant to the claims and defenses in this action, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search, at the appropriate time.

## REQUEST FOR PRODUCTION NO. 77

All Documents that You intend to rely on to rebut any claim by Waters that there is objective evidence (a/k/a "secondary considerations") of non-obviousness with respect to any claim of the '234 Patent.

## RESPONSE

Agilent objects to this Request on the ground that it is based on an improper hypothetical. Agilent also objects to this Request as premature, on the ground that Waters has not provided the evidence referenced in this Request. Agilent further objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent further objects to this Request on the ground that it is duplicative of Request 64. Agilent further objects to this Request as premature as Waters has yet to identify which claims it intends to assert against Agilent or produce its initial or final claim charts relating each known product to the asserted claims each such product allegedly infringes, and because it seeks production of documents relating to evidence that will be presented through expert testimony and/or invalidity contentions, which is not yet required under the Scheduling Order.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents relevant to the claims and defenses in this action, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search, at the appropriate time.

## REQUEST FOR PRODUCTION NO. 78

All documents and things upon which Agilent intends to rely in support of its affirmative defense that the claims of the '234 patent are invalid under the judicially-created doctrine of double patenting, including but not limited to obviousness-type double patenting.

## RESPONSE

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent further objects to this Request as premature as Waters has yet to identify which claims it intends to assert against Agilent or produce its initial or final claim charts relating each known product to the asserted claims each such product allegedly infringes, and because it seeks production of documents relating to evidence that will be presented through expert testimony and/or invalidity contentions, which is not yet required under the Scheduling Order.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents relevant to the claims and defenses in this action, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search, at the appropriate time.

## REQUEST FOR PRODUCTION NO. 79

60

All documents and things upon which Agilent intends to rely in support of its affirmative defense that the claims of the '234 patent are invalid on the grounds of statutory double patenting.

**RESPONSE**

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent further objects to this Request as premature as Waters has yet to identify which claims it intends to assert against Agilent or produce its initial or final claim charts relating each known product to the asserted claims each such product allegedly infringes, and because it seeks production of documents relating to evidence that will be presented through expert testimony and/or invalidity contentions, which is not yet required under the Scheduling Order.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents relevant to the claims and defenses in this action, to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search, at the appropriate time.

**REQUEST FOR PRODUCTION NO. 80**

All documents and things upon which Agilent intends to rely in support of its affirmative defense that Waters has engaged in patent misuse and/or improper conduct.

**RESPONSE**

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity,

61

or any other applicable privilege or immunity. Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 81

All documents and things upon which Agilent intends to rely in support of its affirmative defense that Waters' claim is barred by the equitable doctrine of prosecution laches.

## RESPONSE

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 82

All documents and things upon which Agilent intends to rely in support of its affirmative defense that Waters' claim is barred by the equitable doctrine of unclean hands.

## RESPONSE

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity,

or any other applicable privilege or immunity. Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 83

All documents and things upon which Agilent intends to rely in support of its affirmative defense that Waters' claim is barred by the doctrine of equitable estoppel.

## RESPONSE

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 84

All Documents that You intend to use, or may use, whether as evidence, for impeachment, or otherwise, at or in connection with any hearing, trial, or other proceeding in this action.

## RESPONSE

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity,

RLF1 21144998v.1

or any other applicable privilege or immunity. Agilent objects to this Request as overly broad, unduly burdensome, and not proportional to the needs of the case.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

## REQUEST FOR PRODUCTION NO. 85

All documents and things provided to, used by, received by, generated by, received from, or discussed with any other person contacted, interviewed, consulted, or retained by Agilent in relation to this lawsuit, including but not limited to any consulting or testifying experts.

## RESPONSE

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent also objects to this Request on the ground that it is not properly limited in time or scope because the definition of "Agilent" purports to require the production of documents for entities other than Agilent Technologies Inc. Agilent further objects to this Request to the extent it seeks a nonparty's proprietary or confidential information without the nonparty's consent. Agilent further objects to this Request to the extent it seeks to impose obligations beyond those in the Federal Rules of Civil Procedure.

Agilent will not produce documents in response to this request but will consider a request that is narrowed and/or clarified.

## REQUEST FOR PRODUCTION NO. 86

64

All document and things upon which Agilent relied in preparing its initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) or identified or referenced in such initial disclosures.

**RESPONSE**

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case.

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

**REQUEST FOR PRODUCTION NO. 87**

All Documents and Communications identified or referenced in Your answers to Waters' first set of Interrogatories, served contemporaneously with these Requests For Production.

**RESPONSE**

Agilent objects to this Request to the extent it seeks documents and communications protected from discovery by the attorney-client privilege, the attorney work-product immunity, or any other applicable privilege or immunity. Agilent objects to this Request as vague, overly broad, unduly burdensome, and not proportional to the needs of the case. Agilent objects to this Request to the extent that it incorporates by reference Waters' Interrogatories.  To the extent that they are relevant to this Request, Agilent incorporates by reference here its objections to Waters' Interrogatories.

RLF1 21144998v.1

Subject to the foregoing general and specific objections, Agilent will produce responsive, non-privileged documents to the extent they exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

|                              | /s/ Alexandra M. Ewing                              |
|------------------------------|-----------------------------------------------------|
| Of Counsel:                  | Chad M. Shandler (#3796)                            |
|                              | Travis S. Hunter (#5350)                            |
| Anne Elise Herold Li         | Alexandra M. Ewing (#6407)                          |
| James K. Stronski            | RICHARDS, LAYTON & FINGER L.P.                      |
| CROWELL & MORING LLP         | One Rodney Square                                   |
| 590 Madison Avenue, 20th Floor | 920 North King Street                             |
| New York, NY 10022           | Wilmington, Delaware 19801                          |
| (212) 223-4000               | (302) 651-7700                                      |
|                              | Shandler@rlf.com                                    |
| Chiemi Suzuki                | Hunter@rlf.com                                      |
| CROWELL & MORING LLP         | Ewing@rlf.com                                       |
| 515 South Flower St., 40th Floor |                                                 |
| Los Angeles, CA 90071        | *Attorneys for Defendant Agilent Technologies Inc.* |
| (213) 622-4750               |                                                     |

Dated: April 22, 2019

66

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of April, 2019, a true and correct copy of the

foregoing Agilent Technologies Inc.'s Responses to Waters' First Set of Requests for Production

of Documents (Nos. 1-87) was caused to be served by email on the following:

**VIA ELECTRONIC MAIL**
Matthew M. Wolf
David McMullen, Ph.D.
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Telephone: (202) 942-5000
Matthew.Wolf@arnoldporter.com
David.McMullen@arnoldporter.com

Jennifer A. Sklenar
Arnold & Porter Kaye Scholer LLP
777 South Figueroa St., 44th Floor
Los Angeles, CA 90015
Telephone: (213) 243-4000
Jennifer.Sklenar@arnoldporter.com

Jeffrey A. Miller
Arnold & Porter Kaye Scholer LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807
Telephone (650) 319-4500
Jeffrey.Miller@arnoldporter.com

**VIA ELECTRONIC MAIL**
Karen L. Pascale
Robert M. Vrana
Young Conaway Stargatt & Taylor LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
kpascale@ycst.com
rvrana@ycst.com

*/s/ Alexandra M. Ewing*
Alexandra M. Ewing (#6407)
Ewing@rlf.com

# EXHIBIT B

| | |
|---|---|
| **From:** | Kornweiss, Robert <RKornweiss@crowell.com> |
| **Sent:** | Tuesday, June 4, 2019 5:14 PM |
| **To:** | Reines, Victoria; Ewing, Alexandra M.; Li, Anne; Stronski, James; Suzuki, Chiemi; Shandler, Chad M.; Hunter, Travis S. |
| **Cc:** | Water-Agilent; Pascale, Karen; zzz.External.RVrana@ycst.com; Hanick, Linda |
| **Subject:** | RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN |

External E-mail

Victoria,

We agree that the parties are at issue on the production of pre-acquisition documents as well as RFPs 8, 22, 24-28, 30, 47-50, 52-55, and 62.  We also have updates on RFPs 6 and 70.  For RFP 6, Agilent will conduct a reasonable search for responsive documents.  For RFP 70, Agilent has agreed to search for responsive Agilent documents, but will not search for documents that relate only to ProZyme.  Regarding RFP 21, we are still investigating confidentiality obligations, but as a reminder, we have agreed to conduct a reasonable search for responsive documents and will notify Waters if any documents are being withheld on the basis of confidentiality.

Regards,

Rob

**Robert B. Kornweiss**
rkornweiss@crowell.com
Direct: 212.803.4045

**From:** Reines, Victoria [mailto:Victoria.Reines@arnoldporter.com]
**Sent:** Tuesday, June 4, 2019 12:36 PM
**To:** Kornweiss, Robert; Ewing, Alexandra M.; Li, Anne; Stronski, James; Suzuki, Chiemi; Shandler, Chad M.; Hunter, Travis S.
**Cc:** Water-Agilent; Pascale, Karen; RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External Email

Rob,

The parties are now at issue with respect to the following:
- Production of pre-acquisition documents
- RFP 8
- RFPs 22, 24-28, 30
- RFPs 47-50, 52-55, 62

We are still waiting to hear from Agilent on RFPs 6, 21 and 70.

We are going to ask our local counsel to coordinate a time with your local counsel to call Judge Noreika's Judicial Administrator to schedule an argument.

Best regards,
Victoria

**From:** Reines, Victoria
**Sent:** Monday, June 3, 2019 2:13 PM
**To:** 'Kornweiss, Robert' <RKornweiss@crowell.com>; Ewing, Alexandra M. <Ewing@rlf.com>; Li, Anne <ALi@crowell.com>; Stronski, James <JStronski@crowell.com>; Suzuki, Chiemi <CSuzuki@crowell.com>; Shandler, Chad M. <Shandler@RLF.com>; Hunter, Travis S. <Hunter@RLF.com>
**Cc:** Water-Agilent <Water-Agilent@arnoldporter.com>; Pascale, Karen <kpascale@ycst.com>; zzz.External.RVrana@ycst.com <RVrana@ycst.com>; Hanick, Linda <lhanick@ycst.com>
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

Rob,

- With respect to RFP 8, we have reviewed the cases you sent and they are inapposite.  We believe that we are at issue with respect to this request.
- We appreciate that Agilent is looking into RFPs 6 and 70 and hope to hear from you soon on these requests.
- We understand that the parties are at issue with respect to the pre-acquisition documents.
- With respect to RFP 59, given that Agilent has agreed to produce documents in response to RFPs 16 and 18, Waters does not intend to raise this request with the Judge.

Best regards,
Victoria

**From:** Kornweiss, Robert <RKornweiss@crowell.com>
**Sent:** Thursday, May 30, 2019 6:25 PM
**To:** Reines, Victoria <Victoria.Reines@arnoldporter.com>; Ewing, Alexandra M. <Ewing@rlf.com>; Li, Anne <ALi@crowell.com>; Stronski, James <JStronski@crowell.com>; Suzuki, Chiemi <CSuzuki@crowell.com>; Shandler, Chad M. <Shandler@RLF.com>; Hunter, Travis S. <Hunter@RLF.com>
**Cc:** Water-Agilent <Water-Agilent@arnoldporter.com>; Pascale, Karen <kpascale@ycst.com>; zzz.External.RVrana@ycst.com <RVrana@ycst.com>; Hanick, Linda <lhanick@ycst.com>
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External E-mail

Victoria,

I have included below a few additional notes regarding the requests we discussed yesterday.

- Please note that we provided our position along with supporting case law regarding RFP 8 yesterday.
- We will continue looking into RFPs 6 and 70 and will update you as soon as possible.
- As we have discussed, the scope of Agilent's search and production for RFPs 3, 9, 21, 64, and 65 (and other requests, as already discussed) will go back only to the time of Agilent's acquisition of ProZyme.
- As a follow-up on RFP 59, Agilent has provided its financial information, including sales figures for the accused product.  Agilent therefore does not intend to provide additional documents in response to RFP 59.

Additionally, based on our teleconference yesterday, we understand that you would let us know your position on whether Waters consents to our motion to stay pending IPR "next week."  We would appreciate your response by Wednesday as one week should be enough time for your client to decide if they would consent to such a motion.

Regards,

Rob

**Robert B. Kornweiss**

rkornweiss@crowell.com
Direct: 212.803.4045

**From:** Reines, Victoria [mailto:Victoria.Reines@arnoldporter.com]
**Sent:** Thursday, May 30, 2019 12:11 PM
**To:** Kornweiss, Robert; Ewing, Alexandra M.; Li, Anne; Stronski, James; Suzuki, Chiemi; Shandler, Chad M.; Hunter, Travis S.
**Cc:** Water-Agilent; Pascale, Karen; RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External Email

Rob,

As a follow-up to our conversation last night about RFP 70, Waters thinks it makes sense for your team to discuss whether Agilent is willing to search for post-acquisition documents responsive to this request that only relate to ProZyme to determine whether any exist, so that we do not have to bring a dispute to Judge Noreika about non-existent documents.  We understand that this may take some time, but we think it makes sense for this to be done as we finalize the parties' positions on the outstanding items.

Best regards,
Victoria

_____
Victoria Reines
Associate

Arnold & Porter
250 West 55th Street | New York, New York 10019-9710
T: +1 212.836.7228 | F: +1 212.836.6575
Victoria.Reines@arnoldporter.com | www.arnoldporter.com

**From:** Reines, Victoria
**Sent:** Wednesday, May 29, 2019 6:23 PM
**To:** Kornweiss, Robert; Ewing, Alexandra M.; Li, Anne; Stronski, James; Suzuki, Chiemi; Shandler, Chad M.; Hunter, Travis S.
**Cc:** Water-Agilent; Pascale, Karen; zzz.External.RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

Counsel,

Thank you for the meet-and-confers yesterday and today.  We discussed the following:

- **RFPs 3 and 9:** Agilent has agreed that it will search for and produce non-privileged, responsive documents related to the "process of manufacture" and "manufacturing instructions" for the Accused Products to the extent they exist in Agilent's possession, custody or control.
- **RFP 6:** Agilent will get back to Waters on this request.  This issue has been discussed several times now.  Please get back to us as soon as possible.
- **RFP 8:** Agilent will send Waters cases supporting its position on this request.  We have not yet received anything.
- **RFP 21:** Agilent will search for and produce non-privileged, responsive documents showing the identity of the individuals and entities who use the Accused Product to the extent they exist, are in Agilent's possession, custody or control, and are not subject to confidentiality agreements.  Agilent will investigate whether it needs to withhold any responsive documents subject to confidentiality agreements while it gets any necessary clearances from those customers that Agilent has such confidentiality obligations.  As we discussed, Waters will not wait to tee up the other discovery disputes with the Court while Agilent completes this investigation.

- **RFP 64**: Agilent will search for and produce non-privileged, responsive documents that relate to the actual '234 Patent (*i.e.*, Agilent will not search for documents relating to InstantPC in response to this request, as such documents would be responsive to others of Waters' RFPs) to the extent they exist and are in Agilent's possession, custody or control.  Agilent further agreed that responsive documents would not have to specifically call out the patent number, and that it would search for and produce documents where it is clear that the document relates to the '234 patent even if the patent is not specifically mentioned.  However, the parties are still at issue with regard to the ProZyme documents, as we have previously discussed.
- **RFP 65:** Agilent will perform a reasonable search for non-privileged, responsive documents that exist up until, and including, the call from Waters notifying Agilent of the '234 Patent and produce these documents to the extent that they exist and are in Agilent's possession, custody or control.
- **RFP 70:** I called you to seek clarification on Agilent's position regarding this RFP.  Please call me at your earliest convenience.
- **ProZyme documents**: Agilent is not withholding any post-acquisition ProZyme documents in response to Waters' requests**.**

Please let us know if this does not accurately reflect Agilent's positions.


Best regards,
Victoria

_____

Victoria Reines
Associate

Arnold & Porter
250 West 55th Street | New York, New York 10019-9710
T: +1 212.836.7228 | F: +1 212.836.6575
Victoria.Reines@arnoldporter.com | www.arnoldporter.com

**From:** Reines, Victoria
**Sent:** Wednesday, May 29, 2019 5:01 PM
**To:** Kornweiss, Robert; Ewing, Alexandra M.; Li, Anne; Stronski, James; Suzuki, Chiemi; Shandler, Chad M.; Hunter, Travis S.
**Cc:** Water-Agilent; Pascale, Karen; zzz.External.RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN


Rob,

As a follow-up from yesterday's meet-and-confer, attached please find a case that supports Waters' position with respect to RFP 8.

Best regards,
Victoria

_____

Victoria Reines
Associate

Arnold & Porter
250 West 55th Street | New York, New York 10019-9710
T: +1 212.836.7228 | F: +1 212.836.6575
Victoria.Reines@arnoldporter.com | www.arnoldporter.com

**From:** Kornweiss, Robert [mailto:RKornweiss@crowell.com]
**Sent:** Wednesday, May 29, 2019 1:08 PM
**To:** Reines, Victoria; Ewing, Alexandra M.; Li, Anne; Stronski, James; Suzuki, Chiemi; Shandler, Chad M.; Hunter, Travis S.
**Cc:** Water-Agilent; Pascale, Karen; zzz.External.RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External E-mail

Yes, 5:00 pm works.  Thank you for your flexibility.

Rob

**Robert B. Kornweiss**
rkornweiss@crowell.com
Direct: 212.803.4045

**From:** Reines, Victoria [mailto:Victoria.Reines@arnoldporter.com]
**Sent:** Wednesday, May 29, 2019 1:04 PM
**To:** Ewing, Alexandra M.; Kornweiss, Robert; Li, Anne; Stronski, James; Suzuki, Chiemi; Shandler, Chad M.; Hunter, Travis S.
**Cc:** Water-Agilent; Pascale, Karen; RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External Email

Waters is available at 5 pm ET.  Would that work for Agilent?

_____

Victoria Reines
Associate

Arnold & Porter
250 West 55th Street | New York, New York 10019-9710
T: +1 212.836.7228 | F: +1 212.836.6575
Victoria.Reines@arnoldporter.com | www.arnoldporter.com

**From:** Ewing, Alexandra M. [mailto:Ewing@rlf.com]
**Sent:** Wednesday, May 29, 2019 12:33 PM
**To:** Kornweiss, Robert; Reines, Victoria; ali?crowell.com; jstronski?crowell.com; csuzuki?crowell.com; Shandler, Chad M.; Hunter, Travis S.
**Cc:** Water-Agilent; Pascale, Karen; zzz.External.RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External E-mail

I can be available for a call at 4:30 pm.

Alexandra M. Ewing
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7898 (direct dial)
Ewing@rlf.com

The information contained in this electronic communication is intended only for the use of the individual or entity named above and may be privileged and/or confidential. If the reader of this message is not the intended recipient, you are hereby notified that any unauthorized dissemination, distribution or copying of this communication is strictly prohibited by law. If you have received this communication in error, please

immediately notify us by return e-mail or telephone (302-651-7700) and destroy the original message. Thank you.

---

**From:** Kornweiss, Robert <RKornweiss@crowell.com>
**Sent:** Wednesday, May 29, 2019 12:31 PM
**To:** Reines, Victoria <Victoria.Reines@arnoldporter.com>; ali?crowell.com <ali@crowell.com>; jstronski?crowell.com <jstronski@crowell.com>; csuzuki?crowell.com <csuzuki@crowell.com>; Shandler, Chad M. <Shandler@RLF.com>; Hunter, Travis S. <Hunter@RLF.com>; Ewing, Alexandra M. <Ewing@rlf.com>
**Cc:** Water-Agilent <Water-Agilent@arnoldporter.com>; Pascale, Karen <kpascale@ycst.com>; RVrana@ycst.com; Hanick, Linda <lhanick@ycst.com>
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

All,

Apologies for the inconvenience, but a scheduling conflict has come up and we are wondering if counsel are all available to meet and confer at 4:30 pm this afternoon rather than 2:00 pm.  Please let us know if that works for everyone.

Thank you,

Rob

**Robert B. Kornweiss**
rkornweiss@crowell.com
Direct: 212.803.4045

---

**From:** Reines, Victoria [mailto:Victoria.Reines@arnoldporter.com]
**Sent:** Saturday, May 25, 2019 6:27 PM
**To:** Kornweiss, Robert; Li, Anne; Stronski, James; Suzuki, Chiemi; shandler@rlf.com; hunter@rlf.com; Ewing@rlf.com
**Cc:** Water-Agilent; Pascale, Karen; RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External Email

Rob,

In addition to the ongoing discovery disputes between the parties, on Tuesday's meet-and-confer, Waters would also like to discuss the documents Agilent produced that are marked as "CONFIDENTIAL" even though they are publicly available.

Best regards,
Victoria

_____

Victoria Reines
Associate

Arnold & Porter
250 West 55th Street | New York, New York 10019-9710
T: +1 212.836.7228 | F: +1 212.836.6575
Victoria.Reines@arnoldporter.com | www.arnoldporter.com

**From:** Kornweiss, Robert [mailto:RKornweiss@crowell.com]
**Sent:** Friday, May 24, 2019 5:00 PM
**To:** Reines, Victoria; Li, Anne; Stronski, James; Suzuki, Chiemi; shandler@rlf.com; hunter@rlf.com; Ewing@rlf.com
**Cc:** Water-Agilent; Pascale, Karen; zzz.External.RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External E-mail

Victoria,

Please see the attached letter.

Regards,

Rob

**Robert B. Kornweiss**
rkornweiss@crowell.com
Direct: 212.803.4045

---

**From:** Reines, Victoria [mailto:Victoria.Reines@arnoldporter.com]
**Sent:** Thursday, May 16, 2019 2:55 PM
**To:** Kornweiss, Robert; Li, Anne; Stronski, James; Suzuki, Chiemi; shandler@rlf.com; hunter@rlf.com; Ewing@rlf.com
**Cc:** Water-Agilent; Pascale, Karen; RVrana@ycst.com; Hanick, Linda
**Subject:** Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External Email

Counsel,

Please see the attached correspondence.

Best Regards,
Victoria

_____

Victoria Reines
Associate

Arnold & Porter
250 West 55th Street | New York, New York 10019-9710
T: +1 212.836.7228 | F: +1 212.836.6575
Victoria.Reines@arnoldporter.com | www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

# EXHIBIT C

| | |
|---|---|
| **From:** | Li, Anne <ALi@crowell.com> |
| **Sent:** | Monday, February 11, 2019 7:04 AM |
| **To:** | Miller, Jeffrey |
| **Cc:** | Suzuki, Chiemi; Hunter, Travis; Stronski, James; McMullen, David; Wolf, Matthew M.; Sklenar, Jennifer; Gutrick, Shantell; Shandler, Chad M.; Morris, John; Jansen, Mark |
| **Subject:** | Re: Prozyme, Inc. v. Waters | Waters v. Agilent |

Jeff,

We will agree to withdraw our motion to dismiss or transfer in Delaware in exchange for a joint stipulation in CA staying the case until the outcome of the DE case.

Anne

P: (212) 895-4279


On Feb 10, 2019, at 5:28 PM, Miller, Jeffrey <Jeffrey.Miller@arnoldporter.com<mailto:Jeffrey.Miller@arnoldporter.com>> wrote:

External Email


Anne,

We do not understand how you can say this was not the plan we discussed, as we even called you back to confirm that Agilent/Prozyme would agree to withdraw its motion in Delaware if the parties stayed the ND.Cal Case, and you said "yes."

The stated reason for the offer you made (dismiss ND.Cal case and withdraw motion to dismiss/transfer in Delaware) was that your client decided that it made sense to litigate this dispute in one forum.  If the ND.Cal case is stayed, and the motion to dismiss/transfer in Delaware is withdrawn, your client gets exactly what it wanted.  Can you tell us what Agilent/Prozyme's position is on the motion to dismiss/transfer in the Delaware case?  Are you willing to file the stipulation you sent us for the Delaware case?   Or if that offer contingent on dismissal of the ND.Cal case?

Jeff

-----Original Message-----
From: Li, Anne [mailto:ALi@crowell.com]
Sent: Friday, February 08, 2019 4:22 PM
To: Miller, Jeffrey
Cc: Suzuki, Chiemi; Hunter, Travis; Stronski, James; McMullen, David; Wolf, Matthew M.; Sklenar, Jennifer; Gutrick, Shantell; Shandler, Chad M.; Morris, John; Jansen, Mark
Subject: Re: Prozyme, Inc. v. Waters | Waters v. Agilent

Jeff,

There is a misunderstanding here. We will not agree to stay the ND Cal case indefinitely or until the case in Delaware is complete. We had originally proposed a mutual dismissal without prejudice in California.

We will not waive our right to defend ProZyme in California. As I said, we're not waiving any defenses in DE.

Are you agreeing not to sue ProZyme for patent infringement in ND Cal on this patent?

Thanks,
Anne

P: (212) 895-4279


On Feb 8, 2019, at 6:05 PM, Miller, Jeffrey
<Jeffrey.Miller@arnoldporter.com<mailto:Jeffrey.Miller@arnoldporter.com><mailto:Jeffrey.Miller@arnoldporter.com>> wrote:

External Email


Anne,

Thanks for the calls earlier today.  Based on our conversations, we understand that Agilent has agreed to (1) withdraw its motion to dismiss or transfer in Delaware and (2) ProZyme has agreed to stipulate to a stay of the case it brought in California.  Our client is amenable to this agreement.  Thus, you have our permission to file the attached stipulation in Delaware which we have sent to our local counsel to review and sign but they appear to be unavailable until Monday.

Can you please prepare and a file a statement of non-opposition to our motion to stay in California?

Have a nice weekend,
Jeff


-----Original Message-----
From: Miller, Jeffrey
Sent: Friday, February 08, 2019 10:01 AM
To: 'Li, Anne'
Cc: Suzuki, Chiemi; Hunter, Travis; Stronski, James; McMullen, David; Wolf, Matthew M.; Sklenar, Jennifer; Gutrick, Shantell; Shandler, Chad M.; Morris, John; Jansen, Mark
Subject: RE: Prozyme, Inc. v. Waters | Waters v. Agilent

Anne, I will call you a couple of minutes after 2 pm EST.

-----Original Message-----
From: Li, Anne [mailto:ALi@crowell.com]
Sent: Friday, February 08, 2019 7:28 AM
To: Miller, Jeffrey
Cc: Suzuki, Chiemi; Hunter, Travis; Stronski, James; McMullen, David; Wolf, Matthew M.; Sklenar, Jennifer; Gutrick, Shantell; Shandler, Chad M.; Morris, John; Jansen, Mark
Subject: Re: Prozyme, Inc. v. Waters | Waters v. Agilent

Jeff,

Yes, I am. I would like to speak as early as possible. I am generally available other than 2:30-3:30 EST.

Thanks,
Anne

P: (212) 895-4279


On Feb 7, 2019, at 5:54 PM, Miller, Jeffrey <Jeffrey.Miller@arnoldporter.com<mailto:Jeffrey.Miller@arnoldporter.com><mailto:Jeffrey.Miller@arnoldporter.com> <mailto:Jeffrey.Miller@arnoldporter.com>> wrote:

External Email


Anne, are you around in the afternoon on Friday to discuss?

-----Original Message-----
From: Li, Anne [mailto:ALi@crowell.com]
Sent: Wednesday, February 06, 2019 5:51 PM
To: Miller, Jeffrey
Cc: Suzuki, Chiemi; Hunter, Travis; Stronski, James; McMullen, David; Wolf, Matthew M.; Sklenar, Jennifer; Gutrick, Shantell; Shandler, Chad M.; Morris, John; Jansen, Mark
Subject: Re: Prozyme, Inc. v. Waters | Waters v. Agilent

Hi Jeff,

Regarding the first point below, our proposal is that these issues be litigated in a single forum and that would be the District of Delaware. So, we have no present intention to re-file in California to the extent we reach an agreement to withdraw the NDCA case and litigate in Delaware.

On your second point, we are not willing to waive any of our claims or defenses.

Please let us know whether you agree to this proposal.

Thanks,
Anne

P: (212) 895-4279


On Feb 6, 2019, at 5:47 PM, Miller, Jeffrey <Jeffrey.Miller@arnoldporter.com<mailto:Jeffrey.Miller@arnoldporter.com><mailto:Jeffrey.Miller@arnoldporter.com> <mailto:Jeffrey.Miller@arnoldporter.com><mailto:Jeffrey.Miller@arnoldporter.com>> wrote:

External Email

Hi Anne,

We are considering your proposal and have a couple of questions:  (1) will ProZyme agree as a condition of dismissal that it will not file any new cases in the Northern District of California involving the patent-in-suit, and (2) will ProZyme object to venue in Delaware.

Please let us know your client's position on these issues.

Thanks,
Jeff


From: Miller, Jeffrey
Sent: Tuesday, February 05, 2019 1:41 PM
To: 'Li, Anne'; Scott, Katie
Cc: Suzuki, Chiemi; Hunter, Travis; Stronski, James; McMullen, David; Wolf, Matthew M.; Sklenar, Jennifer; Gutrick, Shantell; Shandler, Chad M.; Morris, John; Jansen, Mark
Subject: RE: Prozyme, Inc. v. Waters | Waters v. Agilent

Anne, Thank you for sending.

Our client contact is travelling overseas, but we expect to speak with him tomorrow and will let you know after we speak with him.

Jeff


From: Li, Anne [mailto:ALi@crowell.com]
Sent: Tuesday, February 05, 2019 9:11 AM
To: Miller, Jeffrey; Scott, Katie
Cc: Suzuki, Chiemi; Hunter, Travis; Stronski, James; McMullen, David; Wolf, Matthew M.; Sklenar, Jennifer; Gutrick, Shantell; Shandler, Chad M.; Morris, John; Jansen, Mark
Subject: RE: Prozyme, Inc. v. Waters | Waters v. Agilent

Jeff,

Any word from Waters?  Attached are the proposed joint stipulations for CA and DE.  Ideally, we would like to get them on file today.

Thanks,
Anne

From: Miller, Jeffrey [mailto:Jeffrey.Miller@arnoldporter.com]
Sent: Monday, February 4, 2019 11:54 AM
To: Li, Anne; Scott, Katie
Cc: Suzuki, Chiemi; Hunter, Travis; Stronski, James; McMullen, David; Wolf, Matthew M.; Sklenar, Jennifer; Gutrick, Shantell; Shandler, Chad M.; Morris, John; Jansen, Mark
Subject: Prozyme, Inc. v. Waters | Waters v. Agilent

External Email
Hi Anne,

While our client considers the offer you made on Thursday regarding dismissing the California case, and withdrawing your motion to dismiss/transfer and answering in the Delaware case, could you please send over the pleadings you propose filing in both cases?

Thanks,
Jeff


_____

Jeffrey Miller
Partner

Arnold & Porter
3000 El Camino Real
Five Palo Alto Square | Suite 500
Palo Alto, CA 94306-2112
T: +1 650.319.4538 | F: +1 650.319.4938
Jeffrey.Miller@arnoldporter.com<mailto:Jeffrey.Miller@arnoldporter.com><mailto:Jeffrey.Miller@arnoldporter.com><
mailto:Jeffrey.Miller@arnoldporter.com><mailto:Jeffrey.Miller@arnoldporter.com> |
www.arnoldporter.com<http://www.arnoldporter.com><https://urldefense.proofpoint.com/v2/url?u=http-
3A__www.arnoldporter.com&d=DwIFAg&c=Anw7wKLFSGyH7zEzIqo-zgMRy5HE-AH-
SibmOy3H7xE&r=eU4bc8ejKjVytxjQggltpQ&m=DDDe6rrXybS5_OitZezvtovcda3BBbsGzOQBAUr898A&s=cSZ6iYWLWbYZJ-
eN2kkfvb1xylHV3yKGPCGCfUPHkHM&e=><https://urldefense.proofpoint.com/v2/url?u=http-
3A__www.arnoldporter.com&d=DwIFAg&c=Anw7wKLFSGyH7zEzIqo-zgMRy5HE-AH-
SibmOy3H7xE&r=eU4bc8ejKjVytxjQggltpQ&m=7NnF5oNSDbxxp7YZJJ4yGLsLsuSrn9Qbmqx0IYRuz7Y&s=--
lTJDYOhMZjuRepOGRpaSmgoGGpqaZOrRF32wWlbuk&e=><https://urldefense.proofpoint.com/v2/url?u=http-
3A__www.arnoldporter.com&d=DwIFAg&c=Anw7wKLFSGyH7zEzIqo-zgMRy5HE-AH-
SibmOy3H7xE&r=eU4bc8ejKjVytxjQggltpQ&m=cQXYklpcLc3UgpZB3S0JqMbkaY4QmqpO_67fg6i6O88&s=i8cjr7zrNpOWiv
_ktAfqZMJaEKzn-ahhmOgKY9wIikc&e=>


_____

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.
_____
For more information about Arnold & Porter, click here:
https://urldefense.proofpoint.com/v2/url?u=http-3A__www.arnoldporter.com&d=DwIFAg&c=Anw7wKLFSGyH7zEzIqo-
zgMRy5HE-AH-
SibmOy3H7xE&r=eU4bc8ejKjVytxjQggltpQ&m=cQXYklpcLc3UgpZB3S0JqMbkaY4QmqpO_67fg6i6O88&s=i8cjr7zrNpOWiv
_ktAfqZMJaEKzn-ahhmOgKY9wIikc&e=


_____

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.
_____
For more information about Arnold & Porter, click here:

https://urldefense.proofpoint.com/v2/url?u=http-3A__www.arnoldporter.com&d=DwIFAg&c=Anw7wKLFSGyH7zEzIqo-zgMRy5HE-AH-SibmOy3H7xE&r=eU4bc8ejKjVytxjQggltpQ&m=cQXYklpcLc3UgpZB3S0JqMbkaY4QmqpO_67fg6i6O88&s=i8cjr7zrNpOWiv_ktAfqZMJaEKzn-ahhmOgKY9wIikc&e=

_____

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

_____

For more information about Arnold & Porter, click here:

https://urldefense.proofpoint.com/v2/url?u=http-3A__www.arnoldporter.com&d=DwIFAg&c=Anw7wKLFSGyH7zEzIqo-zgMRy5HE-AH-SibmOy3H7xE&r=eU4bc8ejKjVytxjQggltpQ&m=cQXYklpcLc3UgpZB3S0JqMbkaY4QmqpO_67fg6i6O88&s=i8cjr7zrNpOWiv_ktAfqZMJaEKzn-ahhmOgKY9wIikc&e=

_____

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

_____

For more information about Arnold & Porter, click here:

https://urldefense.proofpoint.com/v2/url?u=http-3A__www.arnoldporter.com&d=DwIFAg&c=Anw7wKLFSGyH7zEzIqo-zgMRy5HE-AH-SibmOy3H7xE&r=eU4bc8ejKjVytxjQggltpQ&m=7NnF5oNSDbxxp7YZJJ4yGLsLsuSrn9Qbmqx0IYRuz7Y&s=--lTJDYOhMZjuRepOGRpaSmgoGGpqaZOrRF32wWlbuk&e=

<Draft - Joint Stipulation to Withdraw Motion to Dismiss D Del (3).docx>

_____

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

_____

For more information about Arnold & Porter, click here:

https://urldefense.proofpoint.com/v2/url?u=http-3A__www.arnoldporter.com&d=DwIFAg&c=Anw7wKLFSGyH7zEzIqo-zgMRy5HE-AH-SibmOy3H7xE&r=eU4bc8ejKjVytxjQggltpQ&m=DDDe6rrXybS5_OitZezvtovcda3BBbsGzOQBAUr898A&s=cSZ6iYWLWbYZJ-eN2kkfvb1xylHV3yKGPCGCfUPHkHM&e=

# EXHIBIT D

**Reines, Victoria**

| | |
|---|---|
| **From:** | Kornweiss, Robert <RKornweiss@crowell.com> |
| **Sent:** | Thursday, May 30, 2019 6:25 PM |
| **To:** | Reines, Victoria; Ewing, Alexandra M.; Li, Anne; Stronski, James; Suzuki, Chiemi; Shandler, Chad M.; Hunter, Travis S. |
| **Cc:** | Water-Agilent; Pascale, Karen; zzz.External.RVrana@ycst.com; Hanick, Linda |
| **Subject:** | RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN |

External E-mail

Victoria,

I have included below a few additional notes regarding the requests we discussed yesterday.

- Please note that we provided our position along with supporting case law regarding RFP 8 yesterday.
- We will continue looking into RFPs 6 and 70 and will update you as soon as possible.
- As we have discussed, the scope of Agilent's search and production for RFPs 3, 9, 21, 64, and 65 (and other requests, as already discussed) will go back only to the time of Agilent's acquisition of ProZyme.
- As a follow-up on RFP 59, Agilent has provided its financial information, including sales figures for the accused product.  Agilent therefore does not intend to provide additional documents in response to RFP 59.

Additionally, based on our teleconference yesterday, we understand that you would let us know your position on whether Waters consents to our motion to stay pending IPR "next week." We would appreciate your response by Wednesday as one week should be enough time for your client to decide if they would consent to such a motion.

Regards,

Rob

**Robert B. Kornweiss**
rkornweiss@crowell.com
Direct: 212.803.4045

---

**From:** Reines, Victoria [mailto:Victoria.Reines@arnoldporter.com]
**Sent:** Thursday, May 30, 2019 12:11 PM
**To:** Kornweiss, Robert; Ewing, Alexandra M.; Li, Anne; Stronski, James; Suzuki, Chiemi; Shandler, Chad M.; Hunter, Travis S.
**Cc:** Water-Agilent; Pascale, Karen; RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External Email

Rob,

As a follow-up to our conversation last night about RFP 70, Waters thinks it makes sense for your team to discuss whether Agilent is willing to search for post-acquisition documents responsive to this request that only relate to ProZyme to determine whether any exist, so that we do not have to bring a dispute to Judge Noreika about non-existent documents. We understand that this may take some time, but we think it makes sense for this to be done as we finalize the parties' positions on the outstanding items.

Best regards,

Victoria

---

Victoria Reines
Associate

Arnold & Porter
250 West 55th Street | New York, New York 10019-9710
T: +1 212.836.7228 | F: +1 212.836.6575
Victoria.Reines@arnoldporter.com | www.arnoldporter.com

**From:** Reines, Victoria
**Sent:** Wednesday, May 29, 2019 6:23 PM
**To:** Kornweiss, Robert; Ewing, Alexandra M.; Li, Anne; Stronski, James; Suzuki, Chiemi; Shandler, Chad M.; Hunter, Travis S.
**Cc:** Water-Agilent; Pascale, Karen; zzz.External.RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

Counsel,

Thank you for the meet-and-confers yesterday and today.  We discussed the following:

- **RFPs 3 and 9:** Agilent has agreed that it will search for and produce non-privileged, responsive documents related to the "process of manufacture" and "manufacturing instructions" for the Accused Products to the extent they exist in Agilent's possession, custody or control.
- **RFP 6:** Agilent will get back to Waters on this request.  This issue has been discussed several times now.  Please get back to us as soon as possible.
- **RFP 8:** Agilent will send Waters cases supporting its position on this request.  We have not yet received anything.
- **RFP 21:** Agilent will search for and produce non-privileged, responsive documents showing the identity of the individuals and entities who use the Accused Product to the extent they exist, are in Agilent's possession, custody or control, and are not subject to confidentiality agreements.  Agilent will investigate whether it needs to withhold any responsive documents subject to confidentiality agreements while it gets any necessary clearances from those customers that Agilent has such confidentiality obligations.  As we discussed, Waters will not wait to tee up the other discovery disputes with the Court while Agilent completes this investigation.
- **RFP 64**: Agilent will search for and produce non-privileged, responsive documents that relate to the actual '234 Patent (*i.e.*, Agilent will not search for documents relating to InstantPC in response to this request, as such documents would be responsive to others of Waters' RFPs) to the extent they exist and are in Agilent's possession, custody or control.  Agilent further agreed that responsive documents would not have to specifically call out the patent number, and that it would search for and produce documents where it is clear that the document relates to the '234 patent even if the patent is not specifically mentioned.  However, the parties are still at issue with regard to the ProZyme documents, as we have previously discussed.
- **RFP 65:** Agilent will perform a reasonable search for non-privileged, responsive documents that exist up until, and including, the call from Waters notifying Agilent of the '234 Patent and produce these documents to the extent that they exist and are in Agilent's possession, custody or control.
- **RFP 70**: I called you to seek clarification on Agilent's position regarding this RFP.  Please call me at your earliest convenience.
- **ProZyme documents**: Agilent is not withholding any post-acquisition ProZyme documents in response to Waters' requests**.**

Please let us know if this does not accurately reflect Agilent's positions.

Best regards,
Victoria

_____
Victoria Reines
Associate

Arnold & Porter
250 West 55th Street | New York, New York 10019-9710
T: +1 212.836.7228 | F: +1 212.836.6575
Victoria.Reines@arnoldporter.com | www.arnoldporter.com

**From:** Reines, Victoria
**Sent:** Wednesday, May 29, 2019 5:01 PM
**To:** Kornweiss, Robert; Ewing, Alexandra M.; Li, Anne; Stronski, James; Suzuki, Chiemi; Shandler, Chad M.; Hunter, Travis S.
**Cc:** Water-Agilent; Pascale, Karen; zzz.External.RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

Rob,

As a follow-up from yesterday's meet-and-confer, attached please find a case that supports Waters' position with respect to RFP 8.

Best regards,
Victoria

_____
Victoria Reines
Associate

Arnold & Porter
250 West 55th Street | New York, New York 10019-9710
T: +1 212.836.7228 | F: +1 212.836.6575
Victoria.Reines@arnoldporter.com | www.arnoldporter.com

**From:** Kornweiss, Robert [mailto:RKornweiss@crowell.com]
**Sent:** Wednesday, May 29, 2019 1:08 PM
**To:** Reines, Victoria; Ewing, Alexandra M.; Li, Anne; Stronski, James; Suzuki, Chiemi; Shandler, Chad M.; Hunter, Travis S.
**Cc:** Water-Agilent; Pascale, Karen; zzz.External.RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External E-mail

Yes, 5:00 pm works.  Thank you for your flexibility.

Rob

**Robert B. Kornweiss**
rkornweiss@crowell.com
Direct: 212.803.4045

**From:** Reines, Victoria [mailto:Victoria.Reines@arnoldporter.com]
**Sent:** Wednesday, May 29, 2019 1:04 PM
**To:** Ewing, Alexandra M.; Kornweiss, Robert; Li, Anne; Stronski, James; Suzuki, Chiemi; Shandler, Chad M.; Hunter, Travis S.
**Cc:** Water-Agilent; Pascale, Karen; RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External Email

Waters is available at 5 pm ET.  Would that work for Agilent?

_____

Victoria Reines
Associate

Arnold & Porter
250 West 55th Street | New York, New York 10019-9710
T: +1 212.836.7228 | F: +1 212.836.6575
Victoria.Reines@arnoldporter.com | www.arnoldporter.com

**From:** Ewing, Alexandra M. [mailto:Ewing@rlf.com]
**Sent:** Wednesday, May 29, 2019 12:33 PM
**To:** Kornweiss, Robert; Reines, Victoria; ali?crowell.com; jstronski?crowell.com; csuzuki?crowell.com; Shandler, Chad M.; Hunter, Travis S.
**Cc:** Water-Agilent; Pascale, Karen; zzz.External.RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External E-mail

I can be available for a call at 4:30 pm.

Alexandra M. Ewing
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7898 (direct dial)
Ewing@rlf.com

The information contained in this electronic communication is intended only for the use of the individual or entity named above and may be privileged and/or confidential. If the reader of this message is not the intended recipient, you are hereby notified that any unauthorized dissemination, distribution or copying of this communication is strictly prohibited by law. If you have received this communication in error, please immediately notify us by return e-mail or telephone (302-651-7700) and destroy the original message. Thank you.

**From:** Kornweiss, Robert <RKornweiss@crowell.com>
**Sent:** Wednesday, May 29, 2019 12:31 PM
**To:** Reines, Victoria <Victoria.Reines@arnoldporter.com>; ali?crowell.com <ali@crowell.com>; jstronski?crowell.com <jstronski@crowell.com>; csuzuki?crowell.com <csuzuki@crowell.com>; Shandler, Chad M. <Shandler@RLF.com>; Hunter, Travis S. <Hunter@RLF.com>; Ewing, Alexandra M. <Ewing@rlf.com>
**Cc:** Water-Agilent <Water-Agilent@arnoldporter.com>; Pascale, Karen <kpascale@ycst.com>; RVrana@ycst.com; Hanick, Linda <lhanick@ycst.com>
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

All,

Apologies for the inconvenience, but a scheduling conflict has come up and we are wondering if counsel are all available to meet and confer at 4:30 pm this afternoon rather than 2:00 pm.  Please let us know if that works for everyone.

Thank you,

Rob

**Robert B. Kornweiss**
rkornweiss@crowell.com
Direct: 212.803.4045

**From:** Reines, Victoria [mailto:Victoria.Reines@arnoldporter.com]
**Sent:** Saturday, May 25, 2019 6:27 PM
**To:** Kornweiss, Robert; Li, Anne; Stronski, James; Suzuki, Chiemi; shandler@rlf.com; hunter@rlf.com; Ewing@rlf.com
**Cc:** Water-Agilent; Pascale, Karen; RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External Email

Rob,

In addition to the ongoing discovery disputes between the parties, on Tuesday's meet-and-confer, Waters would also like to discuss the documents Agilent produced that are marked as "CONFIDENTIAL" even though they are publicly available.

Best regards,
Victoria

_____

Victoria Reines
Associate

Arnold & Porter
250 West 55th Street | New York, New York 10019-9710
T: +1 212.836.7228 | F: +1 212.836.6585
Victoria.Reines@arnoldporter.com | www.arnoldporter.com

**From:** Kornweiss, Robert [mailto:RKornweiss@crowell.com]
**Sent:** Friday, May 24, 2019 5:00 PM
**To:** Reines, Victoria; Li, Anne; Stronski, James; Suzuki, Chiemi; shandler@rlf.com; hunter@rlf.com; Ewing@rlf.com
**Cc:** Water-Agilent; Pascale, Karen; zzz.External.RVrana@ycst.com; Hanick, Linda
**Subject:** RE: Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External E-mail

Victoria,

Please see the attached letter.

Regards,

Rob

**Robert B. Kornweiss**
rkornweiss@crowell.com
Direct: 212.803.4045

**From:** Reines, Victoria [mailto:Victoria.Reines@arnoldporter.com]
**Sent:** Thursday, May 16, 2019 2:55 PM
**To:** Kornweiss, Robert; Li, Anne; Stronski, James; Suzuki, Chiemi; shandler@rlf.com; hunter@rlf.com; Ewing@rlf.com
**Cc:** Water-Agilent; Pascale, Karen; RVrana@ycst.com; Hanick, Linda
**Subject:** Waters Corporation et al v. Agilent Technologies Inc.; Case 1:18-cv-01450-MN

External Email

Counsel,

Please see the attached correspondence.

Best Regards,
Victoria

_____

Victoria Reines
Associate

Arnold & Porter
250 West 55th Street | New York, New York 10019-9710
T: +1 212.836.7228 | F: +1 212.836.6575
Victoria.Reines@arnoldporter.com | www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.
_____
For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.
_____
For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.
_____
For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.
_____
For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

# EXHIBIT E



590 Madison Avenue, 20th Floor, New York, NY  10022-2544 ▪ p 212.803.4045

Robert B. Kornweiss
212.803.4045
RKornweiss@crowell.com

May 24, 2019

**VIA EMAIL**

Victoria Reines
Victoria.Reines@arnoldporter.com

Re:     *Waters Corp. et al. v. Agilent Technologies Inc.*, Case No. 18-1450-MN (D. Del.)

Victoria:

    We write in response to your May 16 letter regarding Agilent's responses to Waters'
requests for production of documents.  Please find below Agilent's positions with respect to the
issues raised in your letter.

### RFPs 3, 5, 9

    We have reviewed the revisions to RFPs 3 and 5 proposed in your letter, and appreciate
your acknowledgment that Agilent has already produced documents responsive to RFP 9.

    In response to Waters' revisions to RFPs 3 and 5, Agilent will conduct a reasonable
search for non-privileged documents sufficient to identify:  (1) uses, including testing, that
Agilent has made of InstantPC$^{TM}$; (2) the U.S. locations of that work; and (3) the location of
manufacture of InstantPC$^{TM}$.  However, the claims of the '234 patent do not relate to method of
manufacture.  Waters' requests for documents regarding the "process of manufacture" and
"manufacturing instructions" for InstantPC$^{TM}$ are therefore not relevant to any claim in this
action, and are not proportional to the needs of the case.  Absent an explanation of the relevance
and proportionality of this information, Agilent does not intend to conduct a search for
"manufacturing instructions" or documents regarding the "process of manufacture."

### RFP 8

    ProZyme launched InstantPC$^{TM}$ in October 2015, prior to Waters' January 2016 filing of
the application that issued as the '234 patent.  RFP 8 therefore relates only to conduct occurring
prior to the filing of the application that issued as the patent-in-suit.  Waters has not identified
any claim or defense to which documents generated prior to the filing of that application would
be relevant, nor how a request for such documents would be proportional to the needs of the

May 24, 2019
Page 2

==highlight==case.  Absent such an explanation, Agilent does not intend to conduct a search for such documents.==

### RFP 11

We have reviewed the revisions to RFP 11 proposed in your letter.  Agilent will produce non-privileged documents responsive to the revised request regarding the distribution of InstantPC$^{TM}$, from Agilent's acquisition of ProZyme through the present, to the extent they exist in Agilent's possession, custody, or control.  We note, however, that to the extent exports of InstantPC$^{TM}$ are relevant, such relevance is conditioned on, for example, claims 1-4 being deemed valid and those claims remaining at issue in this case.

### RFPs 12, 14

Agilent maintains that Waters' requests for marketing materials in RFPs 12 and 14 are overbroad, unduly burdensome, and not proportional to the needs of the case.  However, in an effort to minimize disputes, Agilent will produce non-privileged Agilent documents describing the InstantPC$^{TM}$ reagent, to the extent such documents exist in Agilent's possession, custody, or control, and can be located through a reasonable search.

### RFPs 21, 70

Agilent maintains that RFPs 21 and 70 are not relevant or proportional to the needs of the case.  Absent explanation of the relevance and proportionality of these requests, Agilent does not intend to conduct a search in response thereto.

### RFPs 23, 39

Agilent maintains that these requests are overbroad, unduly burdensome, and not proportional to the needs of the case.  However, in an effort to minimize disputes, Agilent will produce non-privileged documents responsive to these requests from Agilent's acquisition of ProZyme through the present, to the extent they exist in Agilent's possession, custody, or control and can be located through a reasonable search.

### RFPs 36, 38, 41

We have reviewed the revisions and clarifications to these requests provided in your letter.  Agilent will produce non-privileged documents responsive to the revised and clarified requests, from Agilent's acquisition of ProZyme through the present, to the extent they exist in Agilent's possession, custody, or control and can be located through a reasonable search.

May 24, 2019
Page 3

### RFPs 22, 24-28, 30

These requests relate to sales of "instruments sold with or for use with the Accused Products." Your April 26 letter acknowledges that a plaintiff must "sufficiently articulate" how the documents regarding unaccused products relate to a theory of convoyed sales (citing *Invensas Corp. v. Renesas Elecs. Corp.*, 2013 WL 12146531, at *3 (D. Del. May 8, 2013)). Waters has not provided such an articulation. Nor has Waters articulated how these instruments, together with InstantPC$^{TM}$, constitute a functional unit, such that neither product can function independently, or how InstantPC$^{TM}$ would drive demand for any instrument about which Waters requests documents. *See Immersion Corp. v. HTC Corp.*, 2015 WL 834209, at *4 (D. Del. Feb. 24, 2015). We reiterate our request that Waters reconsider its position on these RFPs.

### RFPs 47-50, 52-55, 62

The documents requested in RFPs 47-50, 52-55, and 62 (regarding, e.g., the corporate structure, corporate formalities, board members, board meeting minutes, agreements, and bank accounts of non-party ProZyme) are not relevant to any claim or defense in this action. Your April 26 letter suggests that these requests pertain to: (1) Agilent's possession, custody, or control of certain documents; or (2) piercing the corporate veil. However, neither Agilent's responses to Waters' RFPs nor its Answer to Waters' Complaint implicate either of these issues. Absent additional explanation of their relevance and proportionality, Agilent does not intend to conduct a search in response to these requests.

### RFPs 58, 59

Your letter inaccurately asserts that Agilent is "not willing to produce any financial information." This is not the position Agilent has taken or communicated, and in fact, Agilent has already produced financial information relating to InstantPC$^{TM}$. However, Agilent maintains that RFPs 58 and 59 are overbroad, unduly burdensome, and not proportional to the needs of the case. Additionally, Agilent's financial information is publicly available at https://www.investor.agilent.com/

### RFP 85

Thank you for your acknowledgment that expert materials need not be produced until the expert discovery period. Agilent will produce non-privileged documents responsive to this request, to the extent required by the Federal Rules of Civil Procedure, at the appropriate time under the Rules and the Scheduling Order in this case, to the extent they exist in Agilent's possession, custody, or control and can be located from a reasonable search.

May 24, 2019
Page 4

### Documents Regarding Non-Party ProZyme

We understand that the parties have not yet reached an agreement on the relevance of certain documents relating to non-party ProZyme.  We look forward to discussing this issue in our meet & confer on Tuesday, May 28th, so that we may continue pursuing a resolution.


Regards,

Robert B. Kornweiss

# EXHIBIT F

1

```
01:12:40        IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF DELAWARE


WATERS CORPORATION, et al. )
                           )
        Plaintiffs,        )
                           )  C.A. No. 18-1450(MN)
v.                         )
                           )
AGILENT TECHNOLOGIES, INC.,)
                           )
        Defendant.         )


                    Friday, December 21, 2018
                    2:00 p.m.
                    Courtroom 4A

                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge


APPEARANCES:


    YOUNG CONAWAY STARGATT & TAYLOR
    BY:  KAREN PASQUALE, ESQ.

    -and-

    ARNOLD & PORTER
    BY:  MATTHEW W. WOLF, ESQ.
    BY:  JENNIFER A. SKLENAR, ESQ.
    BY:  DAVID McMULLEN, ESQ.

                        Counsel for the Plaintiffs
```

2

```
 1
        APPEARANCES CONTINUED:
 2

 3

 4      RICHARDS, LAYTON & FINGER
        BY:  STEVEN J. FINEMAN, ESQ.
 5
        -and-
 6
        CROWELL & MORING LLP
 7      BY:  ANNE ELISE HEROLD LI, ESQ.
        BY:  JAMES K. STRONSKI, ESQ.
 8      BY:  KARLA I. ARIAS, ESQ.

 9           Counsel for the Defendant

10

11

12

13               - oOo -

14      P R O C E E D I N G S

15               — — —

16

17
01:55:49
18
01:56:41 19      THE COURT:  Good afternoon.  Please be seated.
01:56:43 20      (All said good afternoon.)
01:56:45 21      THE COURT:  Thanks everyone for being here on a
        Friday afternoon before a holiday.  Let's start with some
        introductions, please.
01:56:51 22
01:56:51 23
01:56:54 24      MS. PASCALE:  Good afternoon, Your Honor.  Karen
        Pascale from Young Conaway for Waters.  And if I might
        25
```

3

```
01:57:00  1   introduce co-counsel, this is Matthew Wolf.
01:57:03  2      MR. WOLF:  Good afternoon, Your Honor.
01:57:04  3      THE COURT:  Good afternoon.
01:57:06  4      MS. PASCALE:  Jennifer Sklenar.  David McMullen.
01:57:08  5   And also in the courtroom, in-house counsel from Waters are
01:57:13  6   Mike Lynn and Jamie Rhoades.
01:57:16  7      THE COURT:  Good afternoon, everybody.
01:57:17  8      Mr. Fineman.
01:57:21  9      MR. FINEMAN:  Good afternoon, Your Honor.  Steve
01:57:23 10   Fineman from Richards, Layton & Fink on behalf of Agilent.
01:57:26 11   With me at counsel table is Anne Li.
01:57:28 12      MS. LI:  Good afternoon.
01:57:29 13      THE COURT:  Good afternoon.
01:57:29 14      MR. FINEMAN:  Jim Stronski and Karla Arias all
01:57:33 15   from Crowell & Moring.  Ms. Arias is not yet admitted to the
01:57:37 16   bar, but she just completed her law school studies in the
01:57:41 17   last couple of weeks.
01:57:41 18      Also with us today are Constantine Pachivas and
01:57:46 19   John Lowe both from Agilent, Your Honor.
01:57:48 20      THE COURT:  Good afternoon.  Welcome.
01:57:50 21      So we are here on plaintiff's motion for
01:57:55 22   preliminary injunction.  I have reviewed all of the papers
01:57:58 23   and declarations that were submitted.  But this is your
01:58:01 24   opportunity to tell me anything else that you might like me
01:58:04 25   to know.
```

4

```
01:58:04  1      MR. WOLF:  Very good, Your Honor.  And Ms. Li
01:58:06  2   and I are cognizant of the fact that we are all that is
01:58:10  3   standing in between court staff and the holidays, so if
01:58:13  4   there is a set end time, we're happy to work to whatever
01:58:17  5   Your Honor's preference is.
01:58:18  6      THE COURT:  I think when we initially had
01:58:20  7   suggested that the parties try and do it in an hour each.
01:58:24  8   But whatever; finish in less, that's always good, too.
01:58:28  9      MR. WOLF:  We will do our best, Your Honor.
01:58:30 10   We'll try to do our openings in half an hour, thirty-five
01:58:33 11   minutes, and then reserve a little time for rebuttal if
01:58:36 12   that's all right.
01:58:36 13      THE COURT:  Perfect.
01:58:37 14      MR. WOLF:  Ms. Sklenar and I are going to split
01:58:40 15   the argument as will become apparent in a minute.
01:58:44 16      Your Honor, brief introductions to the players
01:58:46 17   here.  The plaintiff and our client is Waters.  They are a
01:58:49 18   sixty-year-old analytical science company.  They make big
01:58:53 19   machines like mass spectrometers and liquid chromatography
01:58:56 20   machines.  They make the reagents for those, the columns,
01:59:00 21   the disposals, the kits like specifically at issue in this
01:59:03 22   case.  They make the software that drives these things and
01:59:06 23   provides the services.  So they're really a full service
01:59:09 24   analytical science company, not just in the medical space
01:59:13 25   but, in fact, in five different areas.
```

5

01:59:15 1    Particularly at issue in this case as Your Honor
01:59:20 2 knows is the RapiFluor as we'll call it the shorthand, it's
01:59:23 3 a reagent kit. Originally the '234 patent was granted as a
01:59:29 4 license from Ajinomoto -- and we'll talk about them in a
01:59:33 5 minute -- in 2013. Shortly thereafter we began negotiations
01:59:38 6 to acquire the patent. And those finally came to pass, that
01:59:42 7 assignment finally came to pass in August of this year,
01:59:45 8 specifically August 7th, 2018. About a month later we filed
01:59:48 9 this lawsuit, just a week or two later we filed a
01:59:52 10 preliminary injunction motion.
01:59:55 11    Ajinomoto is not a party to this case, but
01:59:57 12 you'll hear the name. They're based in Japan. They're
02:00:04 13 actually one of the world's largest manufacturers of
02:00:04 14 monosodium glutamate. I don't know if that's a good thing
02:00:06 15 or bad thing in Your Honor's eyes. They do lots of things
02:00:09 16 in the food services industry, but that's interrelated to
02:00:13 17 this carbohydrate binding and labeling technology. So they
02:00:13 18 applied for the patent. They prosecuted the patent at
02:00:15 19 issue. As I said, there came a point in 2013 where we
02:00:18 20 licensed the patent. And then eventually we became the
02:00:21 21 owner of the patent.
02:00:22 22    THE COURT: And that was an exclusive license?
02:00:24 23    MR. WOLF: It was, Your Honor.
02:00:25 24    THE COURT: And did you have the right to sue
02:00:28 25 under that license?

6

02:00:28 1    MR. WOLF: We did not, Your Honor. The way it
02:00:31 2 was structured, we had to negotiate in good faith before any
02:00:36 3 lawsuit was brought. And we -- you know, we may get to this
02:00:41 4 at some point in the litigation, but that become a
02:00:47 5 cumbersome activity given that their interests and our
02:00:49 6 interests were not necessarily aligned because of customers
02:00:51 7 and the like, so it became clear that we would need -- if we
02:00:55 8 wanted to assert this patent, we would need to come to own
02:00:57 9 this patent. We began those negotiations a couple of years
02:01:01 10 ago as I said. And finally consummated that transaction
02:01:04 11 just a few months ago. So we could not have filed suit on
02:01:07 12 that license as an exclusive licensee whereas obviously in
02:01:12 13 some circumstances you can.
02:01:13 14    THE COURT: Is this agreement in the papers? I
02:01:17 15 don't recall seeing that.
02:01:18 16    MR. WOLF: I don't believe so. We're certainly
02:01:21 17 happy to submit it, Your Honor, if that's relevant. Given
02:01:25 18 that this is not the basis of our claim of ownership of the
02:01:28 19 patent we didn't think it relevant to assert.
02:01:30 20    THE COURT: I understand. But there are issues
02:01:32 21 where you say we couldn't have sued and this could be
02:01:36 22 relevant.
02:01:36 23    MR. WOLF: And we're more than happy to submit
02:01:39 24 it on a supplemental basis if that's useful, Your Honor.
02:01:41 25    MS. LI: And we would request a copy as we

7

02:01:43 1 haven't seen it either.
02:01:44 2    MR. WOLF: We'll timely produce to Your Honor
02:01:46 3 and the other side whatever is helpful to the decision
02:01:49 4 making.
02:01:49 5    THE COURT: If you just submit it, that would be
02:01:51 6 helpful.
02:01:52 7    MR. WOLF: Very good. We'll do that.
02:01:53 8    THE COURT: In any event, I didn't mean to --
02:01:55 9    MR. WOLF: I understood, Your Honor.
02:01:57 10    Pardon the fuzziness, this went back and forth
02:02:00 11 with Japan. The patent was assigned in August of 2018.
02:02:05 12 ProZyme, again, not a party, but a relevant player in this
02:02:11 13 case, they originally developed and sold the infringing
02:02:16 14 product InstantPC which completes directly against, it's a
02:02:19 15 one-for-one correspondence with our RapiFluor which we show
02:02:24 16 here. And they were a small privately held California
02:02:28 17 company. Unlike Agilent, they don't compete with us for the
02:02:33 18 big ticket items relevant to this technology. They don't
02:02:37 19 make mass spectrometers, they don't make liquid
02:02:40 20 chromatography machines, they're not a full service provider
02:02:41 21 like we are and like Agilent is. So if you were to ask the
02:02:45 22 question, the hypothetical question would we have sued
02:02:49 23 ProZyme had Agilent not come in the picture, the answer is
02:02:52 24 yes, but would have it have been preliminary injunction
02:02:55 25 worthy given the relevant market sizes? That's a different

8

02:03:00 1 issue. I don't have the answer to that question.
02:03:01 2    THE COURT: They had about 25 percent of the
02:03:03 3 market?
02:03:03 4    MR. WOLF: 20 to 25 percent, yes, Your Honor.
02:03:05 5 So it assuredly was significant enough that we would have
02:03:08 6 sued them if they were a standalone company as soon as we
02:03:12 7 got the patent, as soon as we got rights to it. Again,
02:03:15 8 given relative sizes, given convoyed sales issues -- let me
02:03:20 9 put it this way, the preliminary injunction would not have
02:03:22 10 been as urgent with ProZyme, although we may well have gone
02:03:27 11 ahead and filed the suit had they been standalone.
02:03:30 12    THE COURT: The preliminary injunction that you
02:03:30 13 are seeking here would be to -- and I need to hear from
02:03:37 14 Agilent, the structure of how Agilent and ProZyme are
02:03:42 15 related, but the preliminary injunction you're seeking here
02:03:47 16 would be to enjoin Agilent and ProZyme to the extent it's a
02:03:51 17 standalone company?
02:03:52 18    MR. WOLF: Your Honor, and we're not entirely
02:03:54 19 sure -- what our understanding is and you'll see this later,
02:03:57 20 but obviously we don't have access to their internal
02:04:00 21 business plan. What we understand is that Agilent is in the
02:04:02 22 process of absorbing ProZyme. We don't know what the
02:04:06 23 ultimate corporate structure will be. We'll see pictures.
02:04:09 24 We're starting to see more documents, evidence of
02:04:12 25 cross-branding, we're starting to see documents evidencing

02:04:15 1 that they're trying to sell the full portfolio, the full
02:04:18 2 suite. But to be clear, as we sit here today we're
02:04:22 3 confident that Agilent is offering for sale the product.
02:04:26 4 We're confident that they're at least inducing infringement.
02:04:30 5 What we don't know is whether they're directly selling the
02:04:33 6 product. We don't know that. We obviously don't have that
02:04:35 7 discovery yet. We don't know where in the corporate
02:04:38 8 acquisition process they are. They might have already
02:04:41 9 started. They might be starting next week, we just don't
02:04:43 10 know.
02:04:44 11       THE COURT: When you say inducing, you're
02:04:46 12 referring to what?
02:04:46 13       MR. WOLF: Just as an example, they're marketing
02:04:48 14 to the public, Agilent is marketing go buy this. Go use
02:04:53 15 this. So whether they are ultimately the ones selling or
02:04:56 16 whether they're a subsidiary, let's assume complete
02:04:59 17 corporate independence and it's ProZyme that's doing the
02:05:04 18 actual exchange of money, it still is Agilent that is
02:05:09 19 encouraging inducing under 271(b) and (c) the ProZyme sales.
02:05:19 20       THE COURT: All right.
02:05:20 21       MR. WOLF: And so then we get to Agilent.
02:05:23 22 Agilent is a direct competitor of Waters. We are basically
02:05:26 23 one-to-one, head-to-head at every level of the supply chain,
02:05:31 24 of the chain of use from preparing the materials for
02:05:36 25 analysis to the product at issue, to the mass spectrometer

10

02:05:43 1 or the liquid chromatography, to the software that analyzes
02:05:47 2 what the results are, et cetera.
02:05:49 3       With that, Your Honor, Ms. Sklenar is now going
02:05:54 4 to get up and talk about the technology briefly and the
02:05:56 5 likelihood of success on the merits, and then I will talk
02:05:58 6 about the other three injunction factors if that pleases the
02:06:02 7 Court.
02:06:02 8       THE COURT: Yes.
02:06:07 9       MS. SKLENAR: Good afternoon, Your Honor.
02:06:12 10       THE COURT: Good afternoon.
02:06:12 11       MS. SKLENAR: Let me just start briefly --
02:06:13 12 Jennifer Sklenar. Let me just start briefly with the
02:06:17 13 background of the technology. And I'm not going to dig that
02:06:20 14 deep into it because frankly I don't think it's necessary
02:06:22 15 for resolution of the issues that are presented to the
02:06:24 16 Court. But both the accused product and the patented
02:06:29 17 product of Waters deal with glyco, the field of glycobiology
02:06:33 18 which is the study of a certain type of carbohydrates called
02:06:38 19 glycans. Basically this is important because I'm sure that
02:06:41 20 Your Honor is familiar with DNA which is what contains the
02:06:45 21 genetic code and translates in the body into proteins, and
02:06:48 22 the proteins are responsible for many important bodily
02:06:52 23 functions and features.
02:06:55 24       And in particular glycosylation is a type of
02:06:59 25 modification to proteins that occur after the DNA has been

02:07:03 1 translated into proteins. And it can be very important to
02:07:06 2 understand those modifications and the way they interact
02:07:09 3 with the human body and the bodily functions in drug
02:07:13 4 development, in developing new drugs, in developing
02:07:15 5 biotherapeutics.
02:07:18 6       And the problem in the field had been that
02:07:21 7 preparing the sample to do this analysis of glycans had been
02:07:26 8 very time consuming and arduous. And in the prior
02:07:30 9 techniques prior to the work that my client did, the
02:07:33 10 patented process, it had taken up to a day even to get the
02:07:37 11 samples ready to be analyzed.
02:07:39 12       And so the technology that Waters developed and
02:07:43 13 then in 2015 commercialized, the GlycoWorks product base as
02:07:51 14 a whole, but in particular this RapiFluor labeling reagent
02:07:56 15 enabled this process to be done much more quickly so that
02:07:58 16 the samples could be prepared in less than thirty minutes,
02:08:01 17 and also it allowed for better detection, better analysis of
02:08:04 18 the proteins.
02:08:05 19       I'm not going to go through these steps, but
02:08:08 20 generally they're multiple steps of the way the process
02:08:11 21 works.
02:08:11 22       The labeling reagents which are a very important
02:08:14 23 part of the process come in to tag the glycan that's been
02:08:19 24 sort of separated from the mass to tag it so it can be
02:08:24 25 detected later to do this analysis.

12

02:08:26 1       And then we have the '234 patent. And, you
02:08:30 2 know, Mr. Wolf has shown this briefly, but this is a patent
02:08:34 3 family that my client, Waters, came across in developing
02:08:37 4 their products. And because they respect intellectual
02:08:41 5 property rights of others, they took a license and have been
02:08:43 6 paying for use of this patent for their own product.
02:08:47 7       So let me turn now to factor one for the
02:08:50 8 preliminary injunction factors, likelihood of success on the
02:08:54 9 merits. And I'm going to divide this into three buckets.
02:08:57 10 The first is obviously the burden we carry to show there is
02:09:00 11 a likelihood of proving infringement. And the other two are
02:09:03 12 challenges that the other side has raised. The Court I know
02:09:09 13 is well aware of the burdens on these issues. I'm not going
02:09:10 14 to get into them, but obviously they factor into some sort
02:09:13 15 of a consideration for the likelihood of success on the
02:09:16 16 merits.
02:09:16 17       So let me turn to infringement. And I will do
02:09:20 18 this analysis with respect to claim 1. We have also briefed
02:09:24 19 claim 6 in our PI papers. There are other claims we believe
02:09:28 20 to be infringed, but we have focused on these for purposes
02:09:31 21 of the PI motion. And we have laid out in our submission
02:09:35 22 including Mr., or Dr. Brousmiche's declaration, our expert,
02:09:41 23 why we submit that we are likely to show that there is
02:09:44 24 infringement.
02:09:44 25       And the dispute that we have heard from the

13

02:09:47 1  other side, they haven't disputed most of these limitations.
02:09:51 2  What they have disputed I think can really be collapsed into
02:09:55 3  two issues.  And one is whether there is this substituents
02:09:59 4  on the carbocyclic group or the aromatic heterocyclic group;
02:10:05 5  and two is whether that substituent contains one of the
02:10:09 6  groups that is recited in this last limitation.  There only
02:10:12 7  needs to be one, whether it includes or it has or contains
02:10:16 8  one of those groups.
02:10:17 9         We believe, and again, this is laid out in our
02:10:22 10 expert's declaration, that this is indisputably shown.  We
02:10:27 11 have pointed out where the substituent is.  It's shown
02:10:30 12 there.  We think this is definitely a showing that is likely
02:10:33 13 to succeed on this limitation.
02:10:36 14        And then for the next limitation, we have shown
02:10:38 15 that the substituents, again, the broader group, it
02:10:45 16 includes -- it contains a dialkylamino group.
02:10:51 17        And again, I'm not going to belabor the law of
02:10:54 18 claim construction.  The Court is very well aware of this.
02:10:56 19 But I think what this boils down to is a claim construction
02:10:59 20 dispute.  What does it mean to say that the substituent
02:11:03 21 contains, and then the rest of the language in the claim.
02:11:05 22 And, of course, we know ordinary and customary meaning.
02:11:09 23 There are ways in which a patent owner can be its own
02:11:14 24 lexicographer, give a definition, disavowal claim scope.
02:11:18 25 But that is as the Court I'm sure is very well aware a very

14

02:11:21 1  exacting standard for disavowal requiring a manifest, a
02:11:26 2  specific expression, manifest exclusion --
02:11:29 3         THE COURT:  Is there intrinsic evidence that
02:11:31 4  supports -- I understand your argument on the ordinary
02:11:34 5  meaning of the words and stuff.  Can you point me to what
02:11:37 6  you're relying on as the intrinsic evidence to support that?
02:11:42 7         MS. SKLENAR:  Certainly.  First and foremost I
02:11:45 8  would say it's the claim language, substituent contains.
02:11:48 9  The claim itself contains.
02:11:49 10        THE COURT:  There is nothing, though, in the
02:11:52 11 specification that talks about that.
02:11:56 12        MS. SKLENAR:  Let me turn to that.  So here we
02:12:01 13 have examples first where the specification includes the
02:12:05 14 term contain, and does so in such a way that it's clear that
02:12:09 15 it's not limiting.  In other words, how I understand
02:12:13 16 Agilent's position to the best I can understand it, it's
02:12:15 17 that they're saying contains means has only, has this and
02:12:21 18 only has this.  And the word contained is used multiple
02:12:25 19 times throughout the specification in a way where it's clear
02:12:30 20 that that's not the way that term is used in the patent.
02:12:32 21        So that's one example I would give.
02:12:35 22        Another example, and this we see is the language
02:12:39 23 from the specification at column 7 where the specification
02:12:44 24 talks about examples of substituent, and it makes it clear
02:12:48 25 that they're merely examples.  Now contrast that with

15

02:12:54 1  Agilent's position which is that they're trying to say that
02:12:57 2  where it says the dialkylamino group, that that must be
02:13:02 3  directly bonded with nothing intervening to the carbocyclic
02:13:09 4  group or the aromatic group, must be directly bound to the
02:13:13 5  ring.  And what I would say is there is intrinsic record
02:13:16 6  showing that that is wrong because where the patentee
02:13:19 7  intended a group to be bound to a ring, it said as much.
02:13:23 8  And there is other examples of that, for example, at column
02:13:27 9  9, lines 14 through 18.
02:13:30 10        And then further if we look at the original
02:13:33 11 claims, there is also examples of more --
02:13:36 12        THE COURT:  This was actually in the papers and
02:13:38 13 I remember reading it and I was trying to figure out the
02:13:41 14 points, so I just want to make sure I understand it.  Go
02:13:48 15 back to that slide.  I understand what you're saying with
02:13:50 16 respect to column 9 because you're saying it is bound to the
02:13:53 17 ring.  Right?
02:13:55 18        MS. SKLENAR:  Yes.
02:13:56 19        THE COURT:  Explain to me the open language.
02:13:58 20        MS. SKLENAR:  What it's saying is it's giving
02:14:00 21 examples of what the substituent groups can be.  It doesn't
02:14:04 22 say it's limited to these.  It doesn't say when we say
02:14:07 23 substituent contains, we mean it only has something.  It
02:14:12 24 says these are merely examples.  It certainly allows for the
02:14:15 25 possibility that the substituent includes other things which

16

02:14:18 1  is common in chemistry.  It's not restricted.
02:14:21 2         And one thing that I think is important to sort
02:14:24 3  of point out is Agilent's position as I understand it seems
02:14:27 4  to be when you use a term like contains or includes or
02:14:31 5  comprises, because it -- if you're going to say it could
02:14:36 6  include other things, they're not recited in the claims, but
02:14:42 7  it could be encompassed because they're not excluded, you
02:14:42 8  need to find written support for that in the specification.
02:14:46 9  And I would submit that's simply contrary to law.  That's a
02:14:50 10 written description argument.  They basically say if you're
02:14:53 11 saying a claim allows for other things to encompass the
02:14:56 12 accused product, you must show support for that accused
02:15:00 13 product structure in the claims.  And the Federal Circuit
02:15:02 14 has rejected that argument.  There does not need to be
02:15:06 15 written support for the accused product in the
02:15:06 16 specification.
02:15:09 17        And we briefed that and there is case law in
02:15:11 18 these slides in context with the written description
02:15:14 19 argument.
02:15:16 20        So just to go back and then I'll move on to the
02:15:19 21 other types of arguments that they raise.  But there is a
02:15:22 22 couple of things I think that they do improperly in their
02:15:25 23 analysis.  They submit their expert declaration who says he
02:15:25 24 finds the terms to be -- this is paragraph 44 of his
02:15:33 25 declaration, Dr. van Breeman.  He says he finds the terms to

17

be ambiguous.

And one important thing here is contains is not a term of art. Nobody has said contains has a special meaning in chemistry. There is no evidence of that. It's a plain and ordinary word. But he says he finds it to be ambiguous. And then he says, and this is at paragraph 68, "The only way to make sense of it is to limit it to the examples." And that's just simply not the way we do claim construction. There is again, multiple problems, but one of them, they don't provide any case law saying if you can say a term in a patent claim is ambiguous, then you can limit it to the examples, or certain examples.

And again, we submit there is much broader language in the specification. But this approach they take, they don't cite a single case in support of this type of analysis to do claim construction.

And I would also note --

THE COURT: Is your position, just so I understand it --

MS. SKLENAR: Sure.

THE COURT: -- that the claims of the '234 patent cover a substituent, and I know they call the part other than the specified part a linker, so I'm just going to use that for now without agreeing or disagreeing, it's a linker, but that that linker portion can be anything,

18

absolutely anything as long as it has the dialkylamino group at the end or one of the other groups at the end, that's covered by the claim. I think that would be limiting.

MS. SKLENAR: I think linkers are common things in chemistry that are commonly used. It would seem to me linkers, linkers are a defined set of things that are commonly used. I mean, if it was something -- you know, the answer may depend on what exactly is being put there. Does it change the nature so that it's no longer substituent, no longer -- it somehow changes the nature of the dialkylamino group. I think it would depend on the exact situation.

But certainly to say a substituent contains a part doesn't mean that it only has that part. It's funny, in getting ready for the argument, I actually Googled the term contain just to see what the online dictionary says. And the example is the boat contains four people. No one would think that means it's literally four people out there who would obviously get very wet if that was all, if that was the boat. That is the sort of oddity I'm trying to get at is their position of contain means only has, where clearly the common meaning is includes, which is a term commonly used in patent claims.

And not ironically it's a term that Dr. van Breeman, their own declarant, uses in his deposition in a way that's open that suggest that what he's saying contains

19

something else can include other things. So I will just examples of paragraphs 17, 42, 46.

So with that, I think I'm going to move on to the enforceability and validity issues, unless the Court has other questions about that.

THE COURT: No thank you.

MS. SKLENAR: But again, we would submit this claim construction issue we would submit should be resolved in our favor. And we believe we show that there is at least likely infringement. And for stability, let me do this quickly. Two things that they have raised. They raised prosecution laches --

THE COURT: Can I ask one more question?

MS. SKLENAR: Sure.

THE COURT: In Agilent's papers they point out that Waters obtained another patent, or applied for another patent that has essentially the same structure, a linker, though a different one than Agilent uses, and a dialkylamino group at the end, but that Waters didn't identify to the patent office this relevant prior art, the '234 patent. I think the point they were trying to make was that sort of suggest that Waters wasn't reading the '234 patent as being so broad because clearly the '234 patent if you read it as Waters would cover the structure that's described in that new patent.

20

MS. SKLENAR: A few things. It is a pending application. What they point to, this is actually part of their unclean hands allegation. They say that Waters has come to the court with unclean hands because it's taken inconsistent positions both in prosecuting the '234 and on their own.

First, Waters had no involvement in prosecuting the '234 patent. For their own, and this is the figure I think the Court was pointing to, all they point to is this figure. They don't point to any statements. There are some differences in the chemistry which if necessary we could get into. All they point to is this figure, not a single statement that Waters has even made.

THE COURT: Is it your position -- and I didn't go back and study that patent application very closely, but is it your position that that patent application does not have claims that would cover that figure?

MS. SKLENAR: I would have to study that analysis. I will say that we have now disclosed the '234 patent in the prosecution because it came to our attention that it hadn't been done, but I do think we're not intending to get the exact same claim, I believe that there are differences. Of course the patent office wouldn't have allowed us to get the very same claim.

THE COURT: I wasn't suggesting you were trying

21

02:21:02 1 to get the very same claim, I was more wondering whether
02:21:06 2 there was something to the position that you were reading
02:21:08 3 the '234 patent differently because it hadn't been
02:21:12 4 disclosed.
02:21:12 5     MS. SKLENAR: And we were not. And there is no
02:21:15 6 evidence, I do not believe there is any suggestion that the
02:21:18 7 person who prepared this figure somehow looked at the '234
02:21:21 8 and formed some sort of interpretation about the '234 in
02:21:24 9 preparation of this figure for Waters' own patent
02:21:28 10 application.
02:21:28 11     And when we secured the '234 as the Court knows,
02:21:32 12 what matters is the intrinsic record to the patent that
02:21:38 13 Ajinomoto acquired that we now own. It's an intrinsic
02:21:42 14 record to the '234. The notion that we should use this
02:21:45 15 figure with no text in a pending Waters application, with no
02:21:49 16 text whatsoever, a different patent family to interpret the
02:21:53 17 '234 I think sort of belies the laws of claim construction.
02:21:56 18     THE COURT: I don't know that we're necessarily
02:21:58 19 saying I should use it for interpretation, more that I
02:22:01 20 should use it to evaluate the credibility of the arguments
02:22:05 21 you're making vis-a-vis positions you have taken in other
02:22:10 22 cases.
02:22:11 23     MS. SKLENAR: And again, this is pending patent
02:22:14 24 prosecution and obviously these things are subject to the
02:22:17 25 back and forth with the patent office and we think there is

22

02:22:20 1 other differences, so again, there is nothing other than a
02:22:23 2 patent figure.
02:22:23 3     And let me just quickly go back to prosecution
02:22:27 4 laches. This is as the Court I'm sure well knows, this is a
02:22:31 5 very, very high standard. It requires egregious misconduct
02:22:35 6 in prosecution to delay. And Agilent's argument seems to be
02:22:39 7 that Ajinomoto waited too long with one of the parent
02:22:43 8 applications. And again, very high standard. There has
02:22:47 9 been no showing of the sort here.
02:22:49 10     There was a family of the patents that were
02:22:53 11 prosecuted. If you go through the prosecution history,
02:22:57 12 Ajinomoto was addressing each rejection in good faith.
02:23:00 13 There was a no long period as we see in some of the cases
02:23:00 14 where nothing had occurred where Ajinomoto sort of sat on it
02:23:01 15 and didn't move. So we just don't think we're anywhere
02:23:04 16 close to a patent -- a prosecution laches issue.
02:23:08 17     Again, as we pointed out, one of the cases we
02:23:11 18 cite actually overturned a finding of that.
02:23:13 19     With that, let me go to the validity issues that
02:23:16 20 they raise. And they raise double patenting and they raise
02:23:21 21 both flavors. First of all, the statutory double patenting
02:23:24 22 which requires the same invention to be claimed. And they
02:23:30 23 in their own brief I think just sort of contradict that this
02:23:34 24 even can be shown. The law requires identical. It's in the
02:23:41 25 MPEP case. It's cited in the CCPM case and it's cited in

23

02:23:42 1 the MPEP, that a good test is whether one claim would be
02:23:46 2 literally infringed without literally infringing the other.
02:23:50 3 And if it's not, it's not identical.
02:23:52 4     There is really no analysis, rigorous analysis
02:23:56 5 in their papers that say these inventions are the same.
02:23:59 6 This is why this is the same as this. They don't go
02:24:00 7 limitation by limitation. It's really just a lot of hand
02:24:04 8 waving saying some things are in common. In fact, they even
02:24:06 9 admit it's not identical. They say in their brief, although
02:24:10 10 not identical, they have overlapping scope. But that's not
02:24:14 11 enough for the statutory double patenting.
02:24:16 12     They also raise an obviousness type double
02:24:20 13 patenting. And again, there it you just see a lot of
02:24:24 14 hand waving. They don't talk about is it the one-way test?
02:24:28 15 Is it the two-way test? Which one applies? They don't
02:24:32 16 actually, if you dig in and go through their expert
02:24:34 17 declaration, try to apply either test which would show at
02:24:39 18 least for the one way that the claims would be anticipated
02:24:41 19 or obvious in view of one of the things that they say that
02:24:43 20 it's invalid in view of, they don't do that, any sort of
02:24:47 21 reissue analysis. Again, a lot of hand waving.
02:24:51 22     But in any event there is an exception which
02:24:53 23 sort of resolves this issue which is that, and courts have
02:24:56 24 said that this isn't a concern where the patents all expire
02:25:00 25 on the same date. And here we have that. So they're not at

24

02:25:04 1 risk of having different patents extend for a longer period
02:25:07 2 of time or anything of the sort. They haven't suggested we
02:25:10 3 believe we're at risk of being sued under any of the other
02:25:14 4 patents or done that analysis. So they have not shown that
02:25:17 5 as well.
02:25:17 6     And then this is the written description
02:25:18 7 argument, another invalidity argument they raise which I
02:25:23 8 briefly address. Again, I think they start with a fallacy.
02:25:27 9 They say that we argue the term contains encompasses a
02:25:30 10 linker. And that we to then show support for a linker.
02:25:36 11     THE COURT: Don't you?
02:25:37 12     MS. SKLENAR: Again, I think the analogy is if
02:25:40 13 you say I claim let's say a chair and it includes three legs
02:25:44 14 and a back, if you then try to accuse of infringement a
02:25:50 15 chair with three legs, a back and some armrest, you don't
02:25:53 16 have to find the armrest, written support for it in the
02:25:56 17 specification. Patent claims, you know, all the time say
02:25:59 18 something includes or contains or comprises, and it's silent
02:26:03 19 as to other limitations. And that doesn't mean if you try
02:26:06 20 to read it on a device or a composition that has these
02:26:11 21 additional features you have to have written support.
02:26:14 22     THE COURT: But my only point was you are saying
02:26:17 23 that the claims cover the compound that has a linker in it.
02:26:23 24     MS. SKLENAR: We're saying it covers the
02:26:23 25 compound because it has the features recited in the claims

25

02:26:25 1 and it also has a linker. And we would account for it in
02:26:31 2 the cases we talked about in our brief, the AbbVie, the
02:26:38 3 Lockwood cases, that the patent doesn't need to describe for
02:26:40 4 112 the accused products itself, and claims can certainly be
02:26:44 5 broader than the specific embodiments. And again, we have
02:26:45 6 briefed these issues so in the interest of time.
02:26:49 7      And then finally the last invalidity argument
02:26:51 8 that was raised was obviousness. And there, again, I would
02:26:55 9 submit there has not really been a rigorous analysis. There
02:26:58 10 is a lot of hand waving. I understand what Agilent to be
02:27:01 11 arguing is that there are three references that the skilled
02:27:05 12 person would sort of look at and somehow come up with the
02:27:09 13 claimed invention. And the way they go about it I think is
02:27:13 14 flawed. The Cohen reference, it basically had part of the
02:27:19 15 compound. And they say well, you basically would know to do
02:27:23 16 something different because you want to use the compound for
02:27:25 17 mass spectrometry, and you would look at these other
02:27:30 18 references and you would look at Roth and you would get
02:27:32 19 these other aspects of the claim that are missing in Cohen,
02:27:36 20 and you would like pick and choose and combine them together
02:27:39 21 because you know it would be good for this other detection
02:27:43 22 technique for mass spec. The problem is multiple things.
02:27:46 23 They don't really do a rigorous analysis of why you would
02:27:50 24 start with Cohen, why would you start with that. And if you
02:27:53 25 are going to pick out aspects of Roth, why you would pick

26

02:27:57 1 the particular aspects of the claim that they say you would
02:27:59 2 pick especially because there are a lot of what's called
02:28:03 3 schemes in Roth to do labeling and different types of
02:28:07 4 detection. There is something like seventeen different
02:28:10 5 schemes. And they point to two and they say, and point to
02:28:13 6 aspects of two and say oh, look, the skilled person would
02:28:17 7 pick these aspects. But why? They don't really explain why
02:28:20 8 those, why not others. What would be the rationale to
02:28:23 9 combine those two references in that manner? It's very
02:28:26 10 conclusionary, and it just does not raise a strong question
02:28:32 11 of obviousness.
02:28:37 12      So this is what I just went through. Again, no
02:28:37 13 rational basis for choosing Cohen. Cohen was considered by
02:28:39 14 the examiner during prosecution. They really don't do a
02:28:42 15 meaningfully analysis of the secondary references, what they
02:28:46 16 show, all the different schemes that are shown, why the
02:28:50 17 different parts would be selected and combined in the manner
02:28:52 18 they say.
02:28:54 19      And unless the Court has further questions, I
02:28:56 20 would turn it back over to Mr. Wolf.
02:28:58 21      THE COURT: No. That was helpful.
02:29:00 22      Mr. Wolf.
02:29:00 23      MS. SKLENAR: Thank you.
02:29:02 24      MR. WOLF: Thank you, Your Honor. I will talk
02:29:05 25 briefly about irreparable harm and the other factors.

27

02:29:08 1 Starting with Your Honor's first question was the issue of
02:29:12 2 delay. Waters didn't delay here. In fact, we acted with
02:29:16 3 more than all due speed given when the patent came to be
02:29:21 4 acquired and when Agilent came to acquire ProZyme.
02:29:25 5      We have this timeline, I don't think I need to
02:29:27 6 go through it, but what you see is it was a matter of a
02:29:30 7 couple weeks when Agilent announced their intention. They
02:29:33 8 actually followed through with their intention to buy
02:29:36 9 ProZyme. We bought the patent. Within a month and a week
02:29:39 10 we filed the complaint and just a few weeks later, literally
02:29:43 11 days after we learned who was going to be responsible for
02:29:45 12 this case we filed the preliminary injunction motion. So
02:29:48 13 unless somehow they are going to argue that pre-ownership of
02:29:52 14 the patent we should have been doing something different,
02:29:56 15 this is as antithetical to a delay case as one can find.
02:30:00 16      THE COURT: I guess that was what I was getting
02:30:03 17 at with my question. There are instances where an exclusive
02:30:07 18 licensee has standing to sue on its own and then usually if
02:30:10 19 exclusive licensee has standing to sue, it brought along
02:30:14 20 with the patent owner. And that issue wasn't addressed by
02:30:18 21 Waters in the papers. So I was curious as to what your
02:30:23 22 position is because that could actually seem like, you know,
02:30:25 23 if you could have brought a suit earlier, that goes into my
02:30:28 24 factoring.
02:30:30 25      MR. WOLF: Understood. And we will supplement

28

02:30:32 1 the record. I would just note that we focused our
02:30:36 2 irreparable harm argument on the fact that Agilent owning
02:30:40 3 ProZyme in any event, so whether or not we could have
02:30:43 4 brought suit and we couldn't, where things become urgent
02:30:46 5 when the chainsaw got close to the trunk of the tree was
02:30:50 6 when our desperate competitor Agilent as opposed to the
02:30:54 7 little guy ProZyme entered the picture. We'll talk a little
02:30:58 8 bit about why this is.
02:31:00 9      I mean, for example, we have here during the --
02:31:03 10 they sent out some FAQ's during the transition process. Who
02:31:08 11 do I contact to order ProZyme products or to request product
02:31:12 12 information? Agilent cannot process any orders for ProZyme
02:31:16 13 products until the acquisition is closed and integration is
02:31:19 14 completed. This is the kind of imminence that we got in at
02:31:22 15 the right time, but there is a bit of pushing and pulling
02:31:25 16 going on in this case, where on the one hand we're being
02:31:28 17 accused of waiting too long and then in other motions we're
02:31:31 18 being accused of jumping the gun. I'm not quite sure how
02:31:34 19 they reconcile these two positions, but we clearly tried to
02:31:37 20 file at precisely the time when the imminent injury became
02:31:41 21 imminent and apparent.
02:31:42 22      THE COURT: I like Dr. Dolittle.
02:31:43 23      MR. WOLF: Thank you, Your Honor. Can you tell
02:31:45 24 I have kids?
02:31:46 25      This I don't think is in dispute, but I want to

29

| | |
|---|---|
| 02:31:49 | 1 make this clear, Agilent is a direct competitor of Waters. |
| 02:31:53 | 2 And the Federal Circuit has said not surprisingly and, in |
| 02:31:57 | 3 fact, this district in particular has focused on when |
| 02:32:00 | 4 analyzing preliminary injunction factors and for that matter |
| 02:32:05 | 5 permanent injunction factors, direct competition is a |
| 02:32:08 | 6 significant indicator of the likelihood of irreparable harm. |
| 02:32:12 | 7 Market share and price erosion, I just want to |
| 02:32:16 | 8 give you some examples. This is the press release that |
| 02:32:17 | 9 Agilent issued before they actually acquired but when they |
| 02:32:20 | 10 announced the intent to acquire. And if I had asked someone |
| 02:32:28 | 11 to write me up examples of imminent irreparable harm, this |
| 02:32:28 | 12 would come pretty close. We see in the first bullet, |
| 02:32:39 | 13 they're saying it's highly synergistic with Agilent's |
| 02:32:40 | 14 current customer base and sales channel. Basically ProZyme, |
| 02:32:43 | 15 this little guy, is now about to be super charged in its |
| 02:32:47 | 16 sales effort by taking advantage of Agilent's existing base |
| 02:32:51 | 17 and sales channel. It enables complete liquid |
| 02:32:56 | 18 chromatography and liquid chromatography/mass spectometry |
| 02:32:56 | 19 workflow solutions in important glycan biopharma segment. |
| 02:33:00 | 20 In other words, they're incorporating, they're convoying, |
| 02:33:03 | 21 they're bringing it all together. It strengthens Agilent's |
| 02:33:05 | 22 customer value proposition. That's a shorthand way of |
| 02:33:08 | 23 saying we're going to start bundling this stuff. We're |
| 02:33:12 | 24 going to start saying buy the kit or buy the mass |
| 02:33:16 | 25 spectrometer you get keeper kits or vice versa, the razor |

30

| | |
|---|---|
| 02:33:21 | 1 and blade thing. |
| 02:33:22 | 2 THE COURT: Now the Agilent's current customer |
| 02:33:25 | 3 base, are those folks who are currently Waters's customers? |
| 02:33:28 | 4 MR. WOLF: So you can be both, you can have an |
| 02:33:33 | 5 Agilent machine and use Waters' reagents and vice versa. |
| 02:33:36 | 6 But this is a fast growing -- you know, the biopharma market |
| 02:33:41 | 7 is growing. Every day pharma companies and universities are |
| 02:33:46 | 8 buying these machines. They're a half million dollars |
| 02:33:48 | 9 apiece, maybe more. They're buying multiple machines. So |
| 02:33:52 | 10 we're looking at fifty percent year on year growth for these |
| 02:33:56 | 11 reagent kits, for example. There is existing customer |
| 02:34:00 | 12 competition, but of more significance frankly to the PI |
| 02:34:04 | 13 motion is the customer order tomorrow be it an existing |
| 02:34:07 | 14 customer, the University of Delaware that says we need three |
| 02:34:11 | 15 more machines, or be it the startup company spun out of the |
| 02:34:16 | 16 University of Delaware that says we need our first mass |
| 02:34:20 | 17 spectrometer. |
| 02:34:20 | 18 And then the question is who has their foot in |
| 02:34:22 | 19 the door, who is going to get their foot in the door, who is |
| 02:34:25 | 20 going to be able to leverage. If they're saying use our |
| 02:34:30 | 21 reagent, you get your foot in the door because you have a |
| 02:34:33 | 22 reagent that's an infringing reagent kit, then they have a |
| 02:34:35 | 23 leg up not just for the sale of the kits we're talking |
| 02:34:39 | 24 about, but then their salesperson is in the door for the |
| 02:34:42 | 25 mass spectrometer sale, for the software sale. |

31

| | |
|---|---|
| 02:34:44 | 1 And I have a couple more slides that go to this |
| 02:34:49 | 2 point. Here we see on the left was at the time we filed our |
| 02:34:51 | 3 complaint, this was the ad for the infringing product. At |
| 02:34:57 | 4 the time we started responding to their other motions on |
| 02:35:00 | 5 transfer and the like, you see that the web page had |
| 02:35:05 | 6 actually changed and now they're identifying it as a part of |
| 02:35:07 | 7 Agilent. That's how quickly this is happening. |
| 02:35:10 | 8 Here we see another slide. Did that work? Can |
| 02:35:13 | 9 I approach the screen for a second, Your Honor? |
| 02:35:15 | 10 THE COURT: Sure. |
| 02:35:16 | 11 MR. WOLF: What we see here, this is a slide |
| 02:35:18 | 12 when we're talking about this integration convoyed sales |
| 02:35:21 | 13 issue, and they're talking about the workflow, starting with |
| 02:35:24 | 14 the assay, we get down here, this is the Agilent liquid |
| 02:35:29 | 15 chromatography machine, so they're saying this is the half |
| 02:35:32 | 16 million dollar machine, this is both a liquid chromatography |
| 02:35:34 | 17 and mass spectometry machine -- I can't even say it. I'm |
| 02:35:37 | 18 going to mispronounce it five times today. |
| 02:35:41 | 19 But notice what they say to use it with now, the |
| 02:35:42 | 20 InstantPC kit. So they're now advertising use existing |
| 02:35:47 | 21 Agilent stuff with the ProZyme kit we just acquired. That's |
| 02:35:50 | 22 the part that when we get to the damages phase of this case |
| 02:35:54 | 23 is going to be very difficult for our expert to disentangle. |
| 02:35:57 | 24 We're going to say because you sold these kits, |
| 02:36:00 | 25 these infringing kits, you got these mass spectrometer |

32

| | |
|---|---|
| 02:36:03 | 1 sales. And they're going to come in and say you can't prove |
| 02:36:06 | 2 that. How do you prove as a matter of causality that that |
| 02:36:08 | 3 particular sale, there were other factors? Well, we're here |
| 02:36:11 | 4 today to prevent that problem. That's what irreparable harm |
| 02:36:17 | 5 is. |
| 02:36:17 | 6 THE COURT: Irreparable harm isn't always just |
| 02:36:20 | 7 it's difficult to prove your damages; right? |
| 02:36:23 | 8 MR. WOLF: True. |
| 02:36:24 | 9 THE COURT: And I'm sure that if you had to, to |
| 02:36:28 | 10 give the good old college try and say that you had managed |
| 02:36:31 | 11 to meet your burden. |
| 02:36:32 | 12 MR. WOLF: No doubt. And if I were allowed to |
| 02:36:36 | 13 throw their words today against their damages expert two |
| 02:36:39 | 14 years from now, you know how this would play. We know |
| 02:36:41 | 15 what's going to happen on the stand two years from now or a |
| 02:36:45 | 16 year from now or whenever, when that damages expert for them |
| 02:36:48 | 17 says you can't prove that to me. It's your burden to show |
| 02:36:52 | 18 the causation or causality where these convoyed sales are |
| 02:36:56 | 19 tied to the infringing product and we're going to say that's |
| 02:37:01 | 20 why we filed for the preliminary injunction in the first |
| 02:37:01 | 21 place. |
| 02:37:01 | 22 Now the other thing that's just common sense is |
| 02:37:04 | 23 price erosion. And price erosion, once they come into this |
| 02:37:04 | 24 market full bore as Agilent which again, could be happening |
| 02:37:11 | 25 tomorrow, could be happening a week from now, could have |

33

```
02:37:13  1   happened yesterday and we just don't know about it yet,
02:37:16  2   we're going to see price competition.  And we're just not
02:37:20  3   going to be able to recoup that, as Your Honor knows, once
02:37:23  4   prices go down, it's really hard to get them to go back up
02:37:26  5   once we get the permanent injunction at the end of trial.
02:37:29  6          THE COURT:  What is your basis for asserting
02:37:32  7   that there will be price erosion, especially when we have as
02:37:38  8   you said, a very, very fast growing market, it doesn't seem
02:37:42  9   like there is necessarily a need for price erosion, so I'm
02:37:46 10   just wondering if that's not speculative.
02:37:49 11          MR. WOLF:  Your Honor, you raised a good point.
02:37:51 12   And you're actually pointing out a whipsaw we face.  If we
02:37:55 13   filed this motion two months later, we would have been able
02:37:57 14   to come to you -- if this were February, we would be able to
02:38:01 15   come to you and say look, they have now put in a bid at the
02:38:05 16   University of Delaware at 20 percent lower than our cost to
02:38:08 17   try to get this new customer and to try to prove to Agilent
02:38:08 18   people that they have something as good as Waters when it
02:38:14 19   comes to the kit.  Now the problem if we had done that, they
02:38:16 20   would be making the argument that we delayed two extra
02:38:19 21   months in bringing the PI motion in the first place.
02:38:22 22          So the truth is, we have the Fournier
02:38:25 23   declaration that talks about the market forces at work and
02:38:28 24   we rely on that.  But if I saw to me, Mr. Wolf or Matt or
02:38:32 25   whatever you want to call me, that prove to me that your
```

34

```
02:38:35  1   prices have already eroded, my response would be we filed
02:38:38  2   this too quickly to be able to prove that to you, because we
02:38:41  3   just saw that Q and A that they are not yet selling, so
02:38:45  4   we're -- in a month we'll be able to prove that to you, in
02:38:48  5   two months.  Today, we don't yet have their contract offers.
02:38:52  6   So speculation, I think that's too strong a word, but I
02:38:56  7   acknowledge it's a prediction.
02:38:59  8          THE COURT:  That's also the case with the
02:39:02  9   assertions of loss of market share; right?
02:39:05 10          MR. WOLF:  Right.  But that one I feel even more
02:39:08 11   confident.  Agilent advertised when they -- look, this is
02:39:11 12   the whole point of this press release.  Right?  Enables
02:39:16 13   complete solutions.  Highly synergistic with the sales
02:39:19 14   channel.  What they're saying is we're going to make a lot
02:39:23 15   more sales than ProZyme would have standing alone.  That's
02:39:27 16   what synergy means.  They're not saying we're buying
02:39:31 17   ProZyme's royalty stream and we're just going to take what
02:39:34 18   they otherwise would have made and put it in our pockets,
02:39:37 19   they're saying we're going to synergize, we're going to do
02:39:41 20   better than they would have done if either of us were
02:39:42 21   standing alone.  That's the loss of market share we're
02:39:44 22   talking about.  That's what they mean by synergistic.
02:39:48 23          THE COURT:  Where does your argument that this
02:39:53 24   is potentially a good time to ask this question, the first
02:39:57 25   bullet point you have up there is long-time customers, I
```

35

```
02:40:00  1   thought the argument Waters was making was look, customers
02:40:04  2   are long-term, they rarely switch.  And your point was, if
02:40:07  3   we lose them, we're not going to get them back.
02:40:09  4          But when I look at it, I'm saying someone,
02:40:15  5   another competitor, ProZyme, already has 25 percent of the
02:40:19  6   market, so isn't that -- if I believe that the customers are
02:40:21  7   long-term and rarely switch, haven't you have already lost
02:40:25  8   that 25 percent of the market?
02:40:28  9          MR. WOLF:  The answer is yes and no.  The reason
02:40:31 10   I stay it's yes and no is that there is a big segment of
02:40:35 11   this market that is FDA regulated.  And once you get
02:40:38 12   approved by the FDA for whatever drug development you're
02:40:42 13   doing, you're locked in.  In fact, I think there is even a
02:40:45 14   slide on this because they brought it up and that's what I
02:40:48 15   was trying to click through, maybe I have it, maybe I don't.
02:40:50 16   There we go.  About the validation process.  And so for
02:40:53 17   those customers where there is a validation process, an FDA
02:40:57 18   process, once they have gotten approval from the FDA, it's
02:41:01 19   going to be very hard to get them to switch because that
02:41:04 20   means they would have to go back through the validation
02:41:06 21   process all over again.  And marginal benefit isn't going to
02:41:11 22   convince Pfizer to go back to the FDA and delay things by
02:41:14 23   six months just to get five minutes faster throughput.
02:41:18 24          THE COURT:  Are there people who have gone
02:41:20 25   through the validation process that encourages ProZyme?  I'm
```

36

```
02:41:26  1   trying to figure out if I'm going to be impacting people I
02:41:32  2   don't understand.
02:41:32  3          MR. WOLF:  This is not in the record, but these
02:41:33  4   products are both so new, there is no product yet, although
02:41:38  5   there is about to be, that is relying just on our kit.  In
02:41:42  6   other words, there are FDA processes where they have the old
02:41:47  7   and the new basically to benchmark against each other.  As
02:41:50  8   far as we know, there is no one that's using ProZyme at all,
02:41:53  9   but we don't have perfect access.  That's part of the reason
02:41:56 10   why a PI even more appropriate, because if you enter it
02:42:01 11   now and say don't start, Pfizer, whatever company, I'm just
02:42:05 12   randomly picking one, but Pfizer, don't start using the
02:42:10 13   Agilent system, kit and everything else, they will be better
02:42:15 14   off than if two years from now you say you have to stop
02:42:19 15   using the Agilent kit.  I assure you that if we win at trial
02:42:23 16   and we get the permanent injunction, they're going to be
02:42:26 17   seeking a carve out from that permanent injunction for
02:42:29 18   customers that have FDA regulated processes.  And we're
02:42:33 19   going to remind them that two years ago we said don't let
02:42:36 20   them go down that path because once they're locked in,
02:42:40 21   they're locked in.  The long answer to Your Honor's very
02:42:43 22   short and straightforward question, and I apologize, but the
02:42:46 23   short answer is we're at the precipice of customers locking
02:42:50 24   in, but as far as we know, no FDA regulated customers have
02:42:54 25   yet locked in.  Does that sort of answer your question?
```

37

```
02:42:56   1        THE COURT:  It does.
02:42:57   2        MR. WOLF:  I skipped through and I don't think
02:43:00   3   there is much reason to go into this in detail.  The balance
02:43:03   4   of hardship is straightforward.  The only point to note is
02:43:07   5   we told them before the transaction that we were in the
02:43:10   6   process of acquiring the '234 patent.  It didn't --
02:43:14   7   obviously it wasn't until about a month later that we
02:43:18   8   actually got the contract signed, but we gave them a heads
02:43:20   9   up about this patent.  They went in with eyes wide open to
02:43:26  10   consummate the ProZyme transaction.  So the law is pretty
02:43:29  11   clear that you bear the risk of an injunction if you're told
02:43:31  12   about a patent, you're told about the risk, and you go ahead
02:43:35  13   and launch your product, or in this case acquire ProZyme
02:43:38  14   anyway.
02:43:39  15        So with that, Your Honor, I think I don't want
02:43:42  16   to take up more of the Court's time, I want to save a little
02:43:45  17   bit for rebuttal.  Unless you have any questions, we'll turn
02:43:49  18   it over to Agilent.
02:43:50  19        THE COURT:  That would be fine.  Thank you.
02:43:52  20        MR. WOLF:  Thank you, Your Honor, for your time.
02:44:02  21        MS. LI:  Good afternoon, Your Honor.  Thank you
02:44:05  22   for letting me come and speak to you today.  I think we have
02:44:07  23   heard a lot from --
02:44:11  24        MR. WOLF:  They're not my reading glasses.
02:44:14  25        THE COURT:  Very stylish, Mr. Wolf.
```

38

```
02:44:17   1        MS. LI:  I want to, if I may, come back and sort
02:44:20   2   of talk to you today about really what this whole timeline
02:44:23   3   is.  We have heard Waters' counsel go through and discuss
02:44:28   4   how they started this suit with an all new case, but they
02:44:33   5   did not actually do so.  I think the timeline tells a very
02:44:43   6   different story, actually.
02:44:45   7        So in May 2015, ProZyme started selling its
02:44:48   8   instant feed product that you heard so much about.
02:44:52   9        Waters today in their pleadings in California
02:44:55  10   admitted that ProZyme, they announced it, they started
02:45:00  11   marketing it.  When Waters knew that.  In January
02:45:06  12   2016, the '234 patent was filed.  So there is a little bit
02:45:09  13   of a question where they discuss how they acquired exclusive
02:45:12  14   license rights to the patent, it wasn't filed until 2016,
02:45:17  15   they said they acquired rights in 2013, I think they meant
02:45:21  16   for the family.
02:45:21  17        So the patent application was filed in 2016, and
02:45:23  18   it didn't ultimately issue until May 23, 2017.  During that
02:45:28  19   whole time, Your Honor, ProZyme sold this product.  They
02:45:32  20   invested time, energy and resources in marketing and
02:45:35  21   building up this business to sell this InstantPC product.
02:45:39  22   But then the patent issued.  Waters never called ProZyme.
02:45:46  23   Waters proceeded to go ahead and let ProZyme build up its
02:45:49  24   business and engage in its activities that they accuse are
02:45:56  25   infringing the products.
```

39

```
02:45:56   1        It wasn't until Agilent announced that it was
02:46:00   2   going to acquire ProZyme that they decided to -- they were
02:46:04   3   suddenly interested in what this '234 patent might cover and
02:46:08   4   what it could do for them.
02:46:10   5        Waters' counsel called Agilent the very next day
02:46:13   6   to let them know that they, Waters, were the exclusive
02:46:17   7   licensee of the '234 patent.  They did not mention
02:46:25   8   InstantPC.  They did not mention any product that it may
02:46:25   9   cover.  They simply said we own the rights to use this
02:46:30  10   patent.  That's it.
02:46:32  11        THE COURT:  Did ProZyme have any other products
02:46:35  12   other than InstantPC?
02:46:36  13        MS. LI:  Yes, Your Honor, ProZyme has a panoply
02:46:40  14   of products many of which are used in glycan analysis as
02:46:44  15   well.  So only a small portion of ProZyme's products are
02:46:47  16   actually InstantPC, they use many different kinds of
02:46:50  17   products.  Agilent bought a company that does many things,
02:46:53  18   including this one thing.
02:46:54  19        THE COURT:  Okay.
02:46:57  20        MS. LI:  So clearly according to Waters, they
02:47:02  21   were very interested as soon as they heard that Agilent was
02:47:02  22   buying ProZyme in initiating this litigation.  They managed
02:47:10  23   to get rights to this patent in August, on August 7th, 2018.
02:47:15  24   But they didn't file suit, Your Honor, for another month.
02:47:18  25        What actually happened here is there were sixty
```

40

```
02:47:23   1   days between the time that they acquired rights to the
02:47:25   2   patent and when they filed for preliminary injunction
02:47:28   3   against Agilent.
02:47:29   4        Now, why is this really interesting to me?
02:47:34   5   You're thinking sixty days is sixty days, but it's not just
02:47:40   6   sixty days.  402 days elapsed before the time they got the
02:47:46   7   patent and the time that they even made a phone call about
02:47:48   8   it.
02:47:50   9        THE COURT:  But do you agree that there could be
02:47:52  10   a difference in kind in competition between Waters and
02:47:57  11   ProZyme and Waters and Agilent such that while they might be
02:48:01  12   willing to tolerate, you know, and have other priorities
02:48:01  13   that they focus on rather than ProZyme, when Agilent came
02:48:11  14   in, it was a difference that it caught their attention?
02:48:15  15        MS. LI:  Your Honor, I would say that it appears
02:48:18  16   that that would be a difference except that if you look a
02:48:22  17   little bit closer to the facts, that would not be the case.
02:48:26  18   The way that this has been framed so far in this litigation
02:48:29  19   is that people buy Agilent equipment because now thank
02:48:34  20   goodness they can use the InstantPC product line.  No one is
02:48:38  21   going to be buying a hundred thousand dollar mass spec
02:48:42  22   machine for one little kit.  These machines run hundreds of
02:48:47  23   tests, as Your Honor probably knows.  People who were using
02:48:51  24   InstantPC before could be buying a Waters product, may have
02:48:56  25   Agilent machines, may have had Waters machines, we don't
```

41

02:48:59 1   know, but they could have been used on Agilent machines all
02:49:04 2   this time.
02:49:04 3         This InstantPC product was one test kit, it was
02:49:08 4   an agnostic test, it can be run on both sets of equipment.
02:49:13 5   Just because it's in the market doesn't mean that it's
02:49:15 6   suddenly tied to these huge mass spectrometers.
02:49:19 7         THE COURT:  What about the marketing materials
02:49:21 8   that it would put out saying, you know, and now you can use
02:49:26 9   InstantPC with Agilent properties or use synergy, I don't
02:49:34 10  have the exact quotes?
02:49:35 11        MS. LI:  Sure, Your Honor.  So you can use
02:49:37 12  InstantPC as part of the panoply of the glycan testing
02:49:43 13  reagents that are used that ProZyme makes and develops.
02:49:45 14  InstantPC is one of these things.  We have advertising
02:49:49 15  materials about lots of these things.
02:49:53 16        Also, it was very well-known in the industry
02:49:56 17  that you could use the InstantPC product on the Agilent
02:50:00 18  equipment to date.  We're not saying anything new here.
02:50:03 19        THE COURT:  Just one second.
02:50:29 20        Sorry.
02:50:30 21        MS. LI:  So this assertion that Waters makes
02:50:35 22  that they really came to this Court with all due haste as
02:50:38 23  soon as they acquired the patent is not actually borne out
02:50:42 24  by the facts.  If Waters is correct and as soon as they got
02:50:45 25  an assignment to the patent is when the clock should start

42

02:50:48 1   ticking, what happened to the other 450 days?  Does sitting
02:50:53 2   on the rights against ProZyme for 400 days suddenly get
02:50:59 3   wiped away because there is a new assignee to the patent?
02:51:02 4         If you rule that they waited too long, if they
02:51:06 5   sell it tomorrow, there is a new assignee, does the clock
02:51:11 6   start over?  When does this risk start?  It's unfair to
02:51:13 7   ProZyme, unfair to Agilent to say all of a sudden the clock
02:51:17 8   started over on August 7th, the day that they finally
02:51:20 9   perfected title of the patent-in-suit.  What about all that
02:51:25 10  came before?  There is that argument that doesn't make
02:51:29 11  sense.  It's 503 days since the patent issued before they
02:51:32 12  filed for preliminary injunction.
02:51:32 13        THE COURT:  Is your issue that they didn't move
02:51:36 14  for preliminary injunction against ProZyme or just that they
02:51:39 15  didn't contact or pursue or make any indication that they,
02:51:45 16  ProZyme, was infringing the patent?
02:51:49 17        MS. LI:  Really it's that they never made any
02:51:51 18  assertions towards ProZyme that they were infringing the
02:51:54 19  patent.
02:51:54 20        THE COURT:  There could be a reason that they
02:51:57 21  might not get a preliminary injunction against ProZyme
02:51:59 22  whereas they might against Agilent just because of the
02:52:03 23  nature of the competition, for example.
02:52:06 24        MS. LI:  Correct, Your Honor, but as they have
02:52:06 25  said, they lost 20 to 25 percent of their market to ProZyme

43

02:52:11 1   on this kit.  Right?  They presented evidence that they
02:52:15 2   started marketing their kit in early 2015.  We came, ProZyme
02:52:20 3   came on the market at the end of 2015 and took 20 to 25
02:52:24 4   percent of the market.  That's not an insignificant portion.
02:52:27 5   And yet they did absolutely nothing.
02:52:29 6         And their argument that they did absolutely
02:52:32 7   nothing because and Ajinomoto was not going to sue with
02:52:36 8   them, that's not really Agilent's problem.
02:52:39 9         Waters could have sued and brought them in as an
02:52:43 10  involuntary plaintiff.  There are other mechanisms to
02:52:47 11  address this sort of problem other than let's just wait 400
02:52:50 12  days to file a lawsuit.
02:52:52 13        And they did talk a little bit about -- just one
02:53:02 14  last point on that, and I promise I won't beat that dead
02:53:05 15  horse any longer.
02:53:06 16        THE COURT:  I get 400 days.  I know that one
02:53:08 17  now.
02:53:10 18        MS. LI:  I'm glad I have done -- if nothing
02:53:13 19  else, Your Honor, I have done something today.
02:53:15 20        So the issue becomes, you know, that laches runs
02:53:19 21  with the patent.  You can't just suddenly make all that wait
02:53:23 22  time vanish by suddenly waive assigning the patent.  There
02:53:27 23  is case law on that which I can present to Your Honor, I can
02:53:30 24  read into the record, whichever you prefer.
02:53:33 25        But I wanted to go back briefly and talk to you

44

02:53:39 1   about what this really is.  You know, Waters' counsel got up
02:53:45 2   today and said no, no, no, we're really after Agilent.  It's
02:53:49 3   Agilent that's causing us this fear.  Agilent is a wholly
02:53:53 4   own subsidiary, but it is a separate owned entity.  It's a
02:53:57 5   California corporation with a California place of business,
02:54:00 6   and zero employees in the District of Delaware.  Okay?
02:54:04 7         Now, why is this important?  Because ProZyme is
02:54:07 8   not before Your Honor.  ProZyme cannot be before Your Honor
02:54:10 9   for patent infringement under 35 USC 1400(b) as we have all
02:54:16 10  learned recently, they can't be sued here.  There is no
02:54:19 11  venue.
02:54:21 12        But nonetheless, that's really what Waters is
02:54:23 13  seeking here.  In their proposed order that they filed with
02:54:29 14  this preliminary injunction motion, they asked you to enjoin
02:54:33 15  Agilent and its subsidiaries.  Agilent moved to dismiss the
02:54:38 16  complaint in this case as I'm sure Your Honor is aware or to
02:54:42 17  transfer it to the Northern District of California.  In the
02:54:44 18  opposition, Waters said Agilent should be on the hook for
02:54:47 19  everything that ProZyme is on the hook for.
02:54:50 20        THE COURT:  Well, in your papers, Agilent said,
02:54:54 21  I think it was at the very beginning, non-party ProZyme, not
02:55:01 22  Agilent, makes themselves the accused InstantPC.  And I
02:55:05 23  guess I just need to understand what your position is about
02:55:09 24  the relationship between the two.  And I do understand what
02:55:14 25  you're saying.  You're saying look, if they want to enjoin

45

02:55:18  1   ProZyme, they should had filed this in a place where they
02:55:22  2   could sue ProZyme.  But I guess my question to you is, are
02:55:25  3   these really different such that if I said Agilent is
02:55:29  4   enjoined, but ProZyme is not, is that a real distinction?
02:55:35  5          MS. LI:  If you enjoin Agilent and not ProZyme,
02:55:39  6   that is a distinction.  ProZyme is a separate company, and
02:55:42  7   as long as the injunction did not cover Agilent and its
02:55:45  8   subsidiaries.
02:55:47  9          But that's not what they told the California
02:55:50 10   court.  So in California, they answered after our papers
02:55:54 11   were submitted in this, they answered our complaint last
02:55:57 12   Friday.  And in there they characterize this hearing, this
02:56:00 13   very one we're at today as seeking a preliminary and
02:56:05 14   permanent injunction that would enjoin Agilent and ProZyme,
02:56:09 15   so they're asking this Court to assert jurisdiction over
02:56:13 16   both companies.  So that kind of relief that they're asking
02:56:14 17   against just Agilent was not briefed, it was not discussed
02:56:16 18   and it's not the relief that they sought.
02:56:19 19          THE COURT:  And would Agilent agree not to sell
02:56:23 20   or offer to sell InstantPC itself if ProZyme were allowed to
02:56:28 21   continue?
02:56:31 22          MS. LI:  Well, obviously if Your Honor issues an
02:56:34 23   order, we would follow it.  Right?  But Agilent -- the issue
02:56:40 24   for Agilent in that case, Your Honor, is that Agilent bought
02:56:44 25   this company and they're really trying to get the whole

46

02:56:48  1   ProZyme into the Agilent system.
02:56:52  2          THE COURT:  I think that's Waters' problem.
02:56:54  3          MS. LI:  I understand that that's their problem,
02:56:56  4   but under a sort of bifurcated analysis like the one that
02:57:01  5   you propose, we have to leave what, three guys at ProZyme
02:57:05  6   who can sell InstantPC and that's their sole job there.  You
02:57:10  7   know, we have made -- we entered a contract for the press
02:57:13  8   release, we acquired ProZyme, we were going to lose the
02:57:17  9   benefit of our acquisition if we're not allowed to merge and
02:57:21 10   join and do our thing.
02:57:22 11          But I really want to go to this tie in, Your
02:57:28 12   Honor --
02:57:29 13          THE COURT:  See, where I'm getting confused is
02:57:31 14   when you say what we really want to do is merge and join and
02:57:35 15   do our thing, what does it matter if I am saying
02:57:42 16   Agilent and its subsidiaries are enjoined?  Right?  Because
02:57:47 17   you're basically telling me, yeah, it's Agilent that wants
02:57:51 18   to sell these things, we want to incorporate ProZyme, get
02:57:54 19   rid of that distinction, so why does it matter what you just
02:57:57 20   were there saying oh, my gosh, they want to enjoin ProZyme
02:58:01 21   and ProZyme is not here if you're telling me it's really you
02:58:05 22   that wants to sell?
02:58:06 23          MS. LI:  It's really Agilent that wants to merge
02:58:09 24   the companies.  There is no timeline for that.  There is no
02:58:12 25   definitive timeline for that to happen.  What they're

47

02:58:15  1   basically asking is would Agilent agree not to sell
02:58:18  2   InstantPC.  Could their wholly own subsidiary sell
02:58:23  3   InstantPC?  Would that be within the scope of their order?
02:58:27  4   There is no basis on which they could ask for that.  They
02:58:30  5   have offered no evidence about why that's better.
02:58:32  6          Let's imagine what that looks like in the
02:58:35  7   market.  ProZyme goes on to sell its products.  Agilent goes
02:58:39  8   on to sell its own mass spectometry products, and it goes to
02:58:44  9   sell other ProZyme products with it, and they say don't ask
02:58:49 10   us about InstantPC.  We can't talk to you about it.  Agilent
02:58:55 11   already says that on their website.  They say we can't sell
02:58:57 12   you InstantPC, call ProZyme.  ProZyme says Agilent can't
02:59:06 13   sell InstantPC, call us.
02:59:09 14          What they're asking you to do is put up this
02:59:09 15   permanent barrier between these two companies so they can't
02:59:13 16   even deal with each other in this way.  They're already
02:59:16 17   saying the fact that they're talking about each other, the
02:59:19 18   fact that ProZyme has Agilent on its website is enough to
02:59:22 19   show that they are in cahoots.  It's really not true.
02:59:26 20   ProZyme is working diligently to sell its product.  Agilent
02:59:29 21   is working diligently to sell their products.  There is no
02:59:32 22   cross selling that's going on right there.  Agilent is not
02:59:36 23   offering to sell InstantPC.  Agilent is not making it.
02:59:40 24   ProZyme is still separate and ProZyme is still doing that.
02:59:44 25          THE COURT:  When you said the website said

48

02:59:47  1   Agilent can't sell InstantPC, that's current, that wasn't
02:59:51  2   before the sale?
02:59:52  3          MS. LI:  That is up until this day, Your Honor.
02:59:55  4          And I really want to skipped ahead and you're
03:00:00  5   going to have to bear with me because I don't know how to
03:00:04  6   skip ahead on the technology here without panning through
03:00:07  7   the slides.
03:00:07  8          THE COURT:  Can I ask you a question just
03:00:09  9   because I'm thinking of it now?  I apologize if it gets you
03:00:13 10   out of order.  But what about the point, I was interested in
03:00:18 11   Agilent's response on the public interest, and the impact
03:00:24 12   that there would be on folks who already use it.  But then
03:00:30 13   Mr. Wolf suggested, well, that really isn't such a big deal
03:00:34 14   now because nobody has FDA approval of it, so they could
03:00:39 15   just simply switch.  Could you respond to that?
03:00:41 16          MS. LI:  Sure, Your Honor.  Whether or not
03:00:44 17   somebody has FDA approval on the entire pharmaceutical
03:00:48 18   product that would involve glycan testing, I honestly can't
03:00:53 19   speak to you about that, but I can certainly check and send
03:00:58 20   a letter if that would be to Your Honor's liking.  However,
03:01:00 21   I think the real thing --
03:01:00 22          THE COURT:  My question is sort of that,
03:01:04 23   if we just assume that for now, short of that, why would
03:01:07 24   there still be an impact on folks who are currently using
03:01:10 25   the InstantPC?

49

03:01:12 1        MS. LI:  Sure.  So there are a couple of points
03:01:14 2   to that, Your Honor.  So the first is that we don't know
03:01:16 3   where in the process the customers are.  Perhaps they
03:01:20 4   haven't gotten complete FDA approval for the
03:01:23 5   biopharmaceutical product at issue, however, they have
03:01:26 6   gotten approval for the methodology of testing.  They would
03:01:29 7   have to go back and reevaluate that testing on a new piece
03:01:33 8   of equipment.
03:01:34 9        I think the much more interesting evidence comes
03:01:36 10  in in the third bullet point here.  Waters has admitted in
03:01:40 11  their declaration of Mr. Grover that it would be unable to
03:01:44 12  meet customer demand for a month or two at this time.  And
03:01:47 13  that he would have to increase production by 60 percent
03:01:51 14  which he thinks they could do in a month or two, but it's
03:01:55 15  not that just that month or two.  It's that month or two to
03:02:01 16  get the product to the customer and the customer to validate
03:02:02 17  that test internally, and then for the customer to validate
03:02:06 18  that test with the FDA.  We're not just talking about a snap
03:02:09 19  of the fingers.  Rapid InstantPC or not, it's not that fast.
03:02:15 20       And then the people who use these products on
03:02:21 21  Agilent equipment are not going to suddenly go and buy
03:02:27 22  Waters' mass specs on which to use the Waters' test.
03:02:29 23  They're going to try to use the Waters' test on the Agilent
03:02:32 24  equipment.  You're not going to try and buy a whole mass
03:02:37 25  spec to try to evaluate a test, it would be very prejudicial

50

03:02:42 1   to any customer that's currently using InstantPC.
03:02:46 2        And again, these have been customers that have
03:02:47 3   been using InstantPC for years.  These are not suddenly new
03:02:53 4   customers.  He talked a lot about the University of Delaware
03:02:56 5   buying a new mass spec machine, but it's not just them, it's
03:02:59 6   the people that have been using it all this time.
03:03:01 7        THE COURT:  What about the rapidly growing
03:03:03 8   market, is that folks who already -- is that new customers,
03:03:07 9   or is that -- for example, you kept saying Pfizer, folks at
03:03:12 10  Pfizer who are just buying more and more machinery and more
03:03:16 11  kits.
03:03:16 12       MS. LI:  I think it's a combination, Your Honor.
03:03:19 13  I think there is current customers and there is future
03:03:21 14  customers as there are in any market.  But I really want to
03:03:24 15  address this point that was repeated over and over and over
03:03:29 16  about these pieces of equipment, and how they are so
03:03:36 17  inextricably linked to this kit.  Again, Waters has been
03:03:39 18  competing with ProZyme for this kit for years already.
03:03:43 19  Waters already lost 25 -- 20 to 25 percent of the market
03:03:47 20  when competing with ProZyme.  Those guys may have Waters
03:03:51 21  equipment, they may not have Waters equipment.  Right?
03:03:55 22  Nobody is going to buy a piece of hundred-thousand-dollar
03:03:59 23  equipment for a $2,000 test.  They run -- they can run
03:04:04 24  ProZyme's InstantAB test which is not accused of
03:04:09 25  infringement.  It doesn't infringe this patent, neither does

51

03:04:14 1   InstantPC which we'll get to later.  There is no nexus.
03:04:17 2   There is no legal nexus.  There are no facts on the record.
03:04:21 3   They have not pointed to one sale of a piece of equipment
03:04:23 4   that they have lost because InstantPC has been on the market
03:04:25 5   for three years.  They would know better than anybody else
03:04:28 6   if they lost any mass spec sales because InstantPC could be
03:04:32 7   running on equipment.  So they have presented no evidence
03:04:33 8   and there is no facts on the record on that.
03:04:39 9        In terms of price erosion, they talk a lot about
03:04:42 10  price erosion.  Oh, my God, Agilent is going to offer this
03:04:45 11  as a package.  But InstantPC again has been on the market
03:04:48 12  for three years.  What evidence have they offered of actual
03:04:52 13  price erosion that Waters has suffered?  None.  There is no
03:04:55 14  evidence.  They have four declarants and zero evidence of
03:05:00 15  any price erosion that has happened.  All of their damages
03:05:04 16  are purely speculative.  And yes, they argue this is going
03:05:07 17  to happen way off into the future and then they're going to
03:05:11 18  be stuck with it.  But as we all know, finding a dollar
03:05:16 19  value on price erosion is the very thing that damages
03:05:19 20  experts are there for.
03:05:20 21       THE COURT:  What about the point that Waters
03:05:22 22  made about the downstream sales?
03:05:26 23       MS. LI:  They're trying to tie the downstream
03:05:29 24  sales of a piece of equipment with tons of non-infringing
03:05:34 25  uses to one teeny weeny patented test.  There is just no

52

03:05:40 1   nexus legally or factually between these two things.
03:05:47 2        Any alleged harm that they could possibly prove
03:05:50 3   would have to be compensable by money damages.  There is no
03:06:00 4   irreparable harm that Waters can show.
03:06:04 5        And with your permission, Your Honor, I would
03:06:06 6   like to turn to the merits arguments.
03:06:12 7        So we spent a lot of time talking about
03:06:18 8   irreparable harm, public interest, and we talked a lot,
03:06:24 9   Waters talked a lot about what the '234 patent doesn't
03:06:29 10  cover, covers and doesn't cover.  All we're talking a lot
03:06:33 11  about is the word contained.  This is really -- let me just
03:06:38 12  skip ahead to the contains argument, because I think this is
03:06:41 13  really the heart of the matter.  We're having an argument
03:06:44 14  about what the word contains means.
03:06:47 15       THE COURT:  Your position really is the claim
03:06:48 16  would be the same whether it says contains or says is; is
03:06:54 17  that right?
03:06:54 18       MS. LI:  That is correct, Your Honor, because to
03:06:57 19  read it the way that Waters reads it, contains would have to
03:07:01 20  be comprising.  All of the case law that they cite and all
03:07:07 21  of the examples that they give relate to comprising
03:07:12 22  language.  This does not say the constituent comprises, it
03:07:17 23  says the constituent contains.  So you're looking for the
03:07:20 24  plain meaning of the word contains.
03:07:23 25       As Your Honor so deftly pointed out, it does say

53

03:07:27  1   the word contains, but contains what?  What is that linker?
03:07:29  2   How many atoms are in there?  What could possibly be in
03:07:34  3   there?  Could you put a whole protein in between those two
03:07:38  4   things and this will be the same thing.  This is not a
03:07:41  5   Gillet razor blade case, this is a case about a chemical
03:07:44  6   structure that does something.
03:07:46  7          THE COURT:  The point that I made, is that a
03:07:48  8   written description point or is that enablement?
03:07:54  9          MS. LI:  That is enablement, claims
03:07:59  10  indefiniteness.  It doesn't point out in the claim what it
03:08:01  11  is.  It is also an enablement argument in that, you know,
03:08:05  12  they make a lot of hay about the fact that Dr. van Breeman
03:08:09  13  used the word contains in his background of the technology,
03:08:12  14  but that's because we all know that DNA contains molecules,
03:08:16  15  right, we all know what's in there.  But what we don't know
03:08:20  16  is what the word contains means in this claim.  It could
03:08:26  17  literally contain 50 molecules, it could contain 200
03:08:29  18  molecules, it could contain two molecules or no molecules.
03:08:33  19         He thought, he opined that contains was
03:08:36  20  confusing because you wouldn't know how to build something
03:08:39  21  that was not directly connected.  That's why it was
03:08:42  22  ambiguous, not that the word itself contains is ambiguous,
03:08:46  23  it's just you wouldn't know what to do with it.
03:08:49  24         So I kind of want to go back to that point.
03:08:52  25         THE COURT:  But is that indefiniteness, their

54

03:08:56  1   position is we don't care what's in between, yes, it could
03:08:59  2   be a protein in between, and they would say well, it has to
03:09:05  3   be something reasonable to a person of skill in the art.
03:09:08  4   Does that make it indefinite if it says yes, it means
03:09:13  5   whatever substituent you want to put on there as long as
03:09:17  6   part of that is a dialkylamino group or a phosphoric acid
03:09:23  7   group.
03:09:24  8          MS. LI:  My house contains four walls and a
03:09:27  9   roof.  Is the roof covered?  So the question is, it's a very
03:09:30  10  different scope here.  You have no idea what is covered by
03:09:33  11  this claim if the word contains means you can stick
03:09:36  12  absolutely anything in there.  I would like to make that
03:09:39  13  point because --
03:09:39  14         THE COURT:  What I'm trying to figure out is it
03:09:41  15  you don't know what's covered, or is it that its claims are
03:09:47  16  too broad and is valid for other reasons.  It seems like you
03:09:51  17  know it's what is covered, their position would be
03:09:54  18  everything is covered.  I'm not saying that's really your
03:09:57  19  position, but assuming it is, everything is covered, it's
03:10:00  20  not that you don't know what's covered, it's well, yeah,
03:10:03  21  it's all covered and you might say good for you, but nobody
03:10:07  22  would have known that in reading what your written
03:10:12  23  description says.
03:10:12  24         MS. LI:  What I'm saying, Your Honor, is you can
03:10:15  25  have one or the other, but you can't have both things.  So

55

03:10:18  1   if this claim is construed to mean that the InstantPC
03:10:24  2   product infringes this patent, right, that means contains
03:10:28  3   can have absolutely anything between the aromatic ring and
03:10:34  4   the moiety that's attached.  It can have a linker, it can
03:10:41  5   have whatever, it's a functional group.  So that can be
03:10:45  6   anything.
03:10:45  7          So we agree, we have a formula one, a carbonate
03:10:53  8   backbone, we have the ring that's bound to the nitrogen, all
03:10:57  9   we're arguing about is whether the linker that's the
03:11:00  10  functional group is covered by this claim.  So these days
03:11:05  11  they say that it is, it is covered.  But when they file for
03:11:09  12  the patent application in 2011, their very own expert,
03:11:13  13  that's Dr. Brousmiche who is on the patent right there,
03:11:17  14  their very own expert claimed that very structure, that is
03:11:22  15  not copied, that is copied out of the Brousmiche's
03:11:25  16  application, which is why it's so fuzzy, that structure when
03:11:29  17  they filed that was different.  It was different enough from
03:11:35  18  the patent family that they have now.  And the '234 patent,
03:11:39  19  right, was not disclosed.  They filed an IDS on June 28th,
03:11:44  20  the day before they call Agilent to alert the patent office
03:11:48  21  about material prior art.  The '234 patent is prior art.
03:11:53  22  Dr. Brousmiche's application, they didn't think it was
03:11:57  23  material enough to disclose at that time, but it was
03:11:59  24  material enough to sue Agilent on or alert Agilent that it
03:12:03  25  should be aware of this product.

56

03:12:04  1          Waters received a notice of allowance on
03:12:06  2   September 10th.  Clearly they were already contemplating
03:12:10  3   litigation against Agilent.  They did not stop that bus and
03:12:14  4   say, wait, wait, wait, the '234 clearly covers this and we
03:12:18  5   should disclose it because it's material.  They filed for
03:12:21  6   preliminary injunction against us.  We responded and then
03:12:24  7   they withdrew it from issue, filed an RCE and disclosed the
03:12:30  8   '234 patent.  But what they did not disclose in that IDS
03:12:34  9   which was just filed on November 27th was Dr. Brousmiche's
03:12:38  10  declaration that went along with that about what was his
03:12:41  11  understanding of what the '234 patent covered, so they're
03:12:44  12  still taking depositions.
03:12:46  13         THE COURT:  Tell me in very simple terms the
03:12:48  14  inconsistent positions they're taking are rather than sort
03:12:52  15  of what you're inferring from the fact that they didn't
03:12:55  16  disclose it.
03:12:55  17         MS. LI:  Sure.  So here at the litigation
03:12:58  18  they're saying the '234 patent covers.
03:13:01  19         THE COURT:  That compound.
03:13:02  20         MS. LI:  That compound.
03:13:03  21         THE COURT:  Which included the picture you
03:13:06  22  showed me.
03:13:07  23         MS. LI:  It included that compound with the
03:13:09  24  picture.  But to the patent office, this patent is not
03:13:15  25  material enough to tell them about it, nor is

57

03:13:19  1    Dr. Brousmiche's opinion about what this patent covers
03:13:23  2    material enough to disclose.  It should not relate to
03:13:26  3    patentability of a compound that looks almost identical to
03:13:30  4    ours, but not the same.  There is that difference in the
03:13:34  5    middle, but it is similar, and would be covered by the
03:13:36  6    claims of the '234 patent that they assert against ProZyme.
03:13:41  7         THE COURT:  And so are you suggesting -- I sort
03:13:44  8    of asked Mr. Wolf what I thought you were saying, but I
03:13:47  9    could have been wrong.  Are you suggesting that they weren't
03:13:50  10   acting as if the '234 patent actually included linkers when
03:13:56  11   they were thinking about what was relevant to the new
03:14:03  12   patent?
03:14:03  13        MS. LI:  That's exactly correct, Your Honor.
03:14:07  14   That's exactly our position.  And they did recently file the
03:14:07  15   '234 in an IDS, however, it still doesn't include the
03:14:14  16   declaration.  So just sort of wait and see what the patent
03:14:20  17   office is going to say about what they think the '234 patent
03:14:24  18   covers without advancing the litigation position that they
03:14:27  19   have there.  So I wanted to make that point kind of clear.
03:14:32  20        In addition, they talk a lot about Dr. van
03:14:42  21   Breeman and his opinion on non-infringement.  He doesn't
03:14:47  22   think InstantPC meets the limitation of the claims as
03:14:50  23   properly construed.  And they talk about their expert,
03:14:51  24   Dr. Brousmiche, who again is the patent applicant on the
03:14:56  25   other patent.

58

03:14:57  1         So they didn't respond to Dr. van Breeman's
03:15:03  2    expert declaration.  There has been no additional
03:15:07  3    declaration evidence in their reply.
03:15:11  4         Also, if they get their wish and the '234 patent
03:15:14  5    should be construed as they think it should be construed,
03:15:17  6    it's completely invalid for lack of written description.
03:15:21  7    The '234 patent has no description of anything that can go
03:15:25  8    between the aromatic ring and the functional group.  It can
03:15:29  9    be as we said absolutely anything.
03:15:32  10        THE COURT:  What do you say about the language
03:15:34  11   that Ms. Sklenar put out saying sometimes they used
03:15:39  12   open-ended language and sometimes they used closed language,
03:15:42  13   so if they had wanted to limit it to closed language, they
03:15:46  14   could have done so?
03:15:52  15        MS. LI:  It was column 3 of the patent.  And
03:15:56  16   they did -- and it starts at line 12.  I don't know if you
03:16:01  17   have that.  I don't have the slides.  I have the patent.
03:16:05  18        MR. WOLF:  We can cull it up, Your Honor, if
03:16:07  19   that would be helpful.
03:16:09  20        THE COURT:  I'm sure I can find it.  But you can
03:16:13  21   keep talking.
03:16:14  22        MS. LI:  Certainly.  So the language that they
03:16:17  23   talk to, they talk about are just examples of what the
03:16:26  24   substituents can include and there is a whole long laundry
03:16:26  25   list in there.

59

03:16:27  1         THE COURT:  I think the language I have here is
03:16:30  2    column 7, line 24 to 30, where it might be similar to what
03:16:38  3    you were looking at, suitable examples of substituents to
03:16:43  4    include.
03:16:43  5         MS. LI:  That is the language, it could be
03:16:45  6    open-ended in this way.  But if you were reading this patent
03:16:51  7    and saying that because there is no contains in here and
03:16:53  8    that this is a closed language and that there is contains
03:16:57  9    over there, and open-ended lexicography type definition,
03:17:05  10   they did not in this patent application -- I'm sorry, in
03:17:06  11   this patent discuss what substituent contains actually is.
03:17:11  12   Substituent contains did not appear in this patent until the
03:17:15  13   claims of the '234 patent were filed.  So if suddenly
03:17:23  14   substituent can contain all these things with that new
03:17:26  15   language in there, it's our position that they're not
03:17:28  16   entitled to their priority date, it suddenly has this much
03:17:31  17   broader scope, in which case the Brousmiche application in
03:17:36  18   2011 would invalidate the '234 patent which is not entitled
03:17:41  19   to that priority date, but we can save that fight for
03:17:43  20   another day.
03:17:44  21        So none of the examples of the '234 patent have
03:17:47  22   any linkers in them.  There is zero examples.  And I know, I
03:17:50  23   know, there is a lot of case law about well, the examples
03:17:53  24   are just examples.  Well, but the examples are illustrative
03:17:57  25   of what the scope of the claim covers.  And that certainly

60

03:17:59  1    would inform a person of ordinary skill in the art such as
03:18:03  2    Dr. Van Breeman who is reading this patent and says oh, I'm
03:18:07  3    going to build this molecule and I'm go to do it with the
03:18:10  4    carbonate, the aromatic ring, the bond and the substituent.
03:18:15  5    He's not going to look at it and say I can stick anything I
03:18:19  6    want between those two things and I can make absolutely
03:18:21  7    anything.  That's not what they're talking about here.  He
03:18:26  8    didn't give any examples of it and that's why it's
03:18:30  9    illustrative of the point that there is no written
03:18:30  10   description.
03:18:32  11        So it would also be invalid for indefiniteness,
03:18:36  12   because again, there would be no notice to any person such
03:18:40  13   as ProZyme who is practicing this invention making a
03:18:46  14   molecule that they allege now is claimed by this broad
03:18:49  15   interpretation of the '234 claim scope what the meets and
03:18:54  16   bounds of the claim are.  What kind of linker can you put in
03:18:58  17   there?  Can you put no linker?  Can you put any linker?  Can
03:19:00  18   you put an oxygen?  Can you put a nitrogen?  What can you
03:19:04  19   put in there?  There is absolutely no notice to any person
03:19:07  20   who is trying to practice this without infringing their
03:19:10  21   patent given this broad claim scope that what they can do
03:19:13  22   and what they cannot do.  Saying it has to have like the
03:19:19  23   Gillette case, at least three razor blades doesn't mean that
03:19:22  24   you get a chemical compound that could literally have
03:19:26  25   anything between these things, because if that's the case,

61

03:19:28 1 then that's really not particularly claiming what it is that
03:19:33 2 you think is your actual invention.
03:19:36 3 THE COURT: Do you have any case law to support
03:19:37 4 the indefiniteness argument or that is analogous to the
03:19:42 5 indefiniteness argument?
03:19:44 6 MS. LI: I don't have any case law standing
03:19:46 7 right here in front of me, but I can -- we can submit
03:19:51 8 something by letter. But there is a large body of case law
03:19:54 9 on indefiniteness.
03:19:55 10 THE COURT: I'm familiar with the law on
03:19:58 11 indefiniteness, I'm just trying to understand how it applies
03:20:03 12 when you have a situation where you're saying it just --
03:20:09 13 it's too broad so it could cover everything and thus
03:20:14 14 indefiniteness, or I wouldn't know what works, and I don't
03:20:18 15 think of that as indefiniteness, so I'm just trying to get a
03:20:22 16 handle on what case law you're relying on.
03:20:25 17 MS. LI: Sure, Your Honor, I'll pass it up as
03:20:28 18 soon as I get my hands on it. I think what we all -- you
03:20:33 19 sort of said you're familiar with, you know, this idea that
03:20:38 20 could be anything, but it really could be absolutely
03:20:41 21 anything that would say it's covered by this. You know, if
03:20:46 22 we put 42 molecules between that functional group and the
03:20:52 23 aromatic ring that would also be covered under the claim
03:20:56 24 interpretation.
03:21:00 25 So, then they sort of went over obviousness type

62

03:21:05 1 double patenting, a one-way test and two-way test. And we
03:21:09 2 are not sitting here saying that we think both of those
03:21:15 3 patents cover the InstantPC. Obviously we think neither of
03:21:19 4 these patents cover the InstantPC.
03:21:22 5 THE COURT: It I thought your position at least
03:21:26 6 at some point in your brief was look, we knew these other
03:21:27 7 two didn't cover it so then they went to the patent office
03:21:30 8 and they got these new claims.
03:21:31 9 MS. LI: Correct, that's true. Our issue is
03:21:35 10 it's not an internal disclaimer issue, it's not when the
03:21:36 11 patents expire, they obviously share the same priority, what
03:21:40 12 they no longer share is the same assignee. I apologize you
03:21:43 13 can't read the white on the blue, given this projection,
03:21:47 14 but --
03:21:47 15 THE COURT: I can see it. Ajinomoto '123 and
03:21:52 16 '069.
03:21:52 17 MS. LI: What it really does is create the risk
03:21:54 18 not to Agilent or ProZyme, if suddenly a person or company
03:22:00 19 practicing a similar invention, practicing something that
03:22:03 20 would be covered by the '234 patent is liable to Waters
03:22:07 21 under that patent would also be liable to Ajinomoto, there
03:22:11 22 is no way to fix that double jeopardy problem. For the same
03:22:16 23 invention, they're liable to two different companies.
03:22:19 24 That's the obviousness type double patenting thing of which
03:22:22 25 we were just talking, and not this internal disclaimer

63

03:22:26 1 remedy problem.
03:22:27 2 THE COURT: What is your basis for saying that a
03:22:30 3 patent, and I assume for obviousness type double patenting,
03:22:35 4 I don't want to assume anything. Obviousness type double
03:22:40 5 patenting, are you looking at is as contain means, that that
03:22:45 6 is the substituent or that contain is broader and includes
03:22:49 7 linkers?
03:22:50 8 MS. LI: It overlaps regardless.
03:22:56 9 THE COURT: What is your basis for saying it
03:22:58 10 would be obvious that you could put in a linker in between
03:23:01 11 the functional group and the aromatic ring?
03:23:05 12 MS. LI: You mean what would be my basis for
03:23:08 13 saying that our obviousness position about why the patent is
03:23:10 14 invalid?
03:23:11 15 THE COURT: Yes. So if you're saying that the
03:23:14 16 claims of the '234 are obvious, are invalid for obviousness
03:23:19 17 double patenting over the '123 and the '069 patent, right?
03:23:25 18 MS. LI: I see. Sorry, I misunderstood your
03:23:27 19 question.
03:23:27 20 THE COURT: And I would understand the
03:23:31 21 obviousness double patenting argument or maybe even double
03:23:36 22 patenting arguments if you said look, contains a substituent
03:23:40 23 means that's the substituent, it's attached, and they're all
03:23:44 24 exactly the same thing, but when I asked you the question,
03:23:47 25 you said no, no, no, our arguments also apply even if

64

03:23:50 1 contain means something broader as Waters suggest. So then
03:23:54 2 I'm trying to understand what's your basis for saying that
03:23:57 3 it would be obvious to throw in a linker?
03:24:00 4 MS. LI: I apologize. I misunderstood your
03:24:03 5 question earlier. No, it would only apply if there was a
03:24:06 6 direct link, not if there was a linker because there is no
03:24:10 7 support for any of that in either of the patents.
03:24:13 8 The basis for saying there is overlap in the
03:24:15 9 subject matter is clear from the scope of the claims and
03:24:19 10 also we have the unrebutted expert opinion of Dr. Van
03:24:24 11 Breeman.
03:24:24 12 I think I have covered everything that I want to
03:24:27 13 say if Your Honor has no additional questions.
03:24:29 14 THE COURT: So didn't Agilent take a calculated
03:24:38 15 risk when it purchased ProZyme after Waters had come to
03:24:42 16 Agilent and said hey, we have this patent and it's going to
03:24:45 17 be a problem?
03:24:47 18 MS. LI: Well, Your Honor, firstly, we had
03:24:50 19 already entered a contact by that time, so we would breach
03:24:53 20 that contract by not acquiring ProZyme. And secondly,
03:24:57 21 that's not exactly what happened in the conversation. What
03:25:00 22 they said was we're the exclusive licensee of this '234
03:25:03 23 patent, and you should be aware of that.
03:25:05 24 THE COURT: And what did Agilent say, okay, or
03:25:09 25 we should be aware of that for something in particular?

65

03:25:12 1    MS. LI:  I mean, they never sort of said -- you
03:25:16 2    know, it was never disclosed to Agilent that oh, we think
03:25:20 3    this covers the '234 patent and we're trying to get an
03:25:22 4    assignment for this to sue you.  Agilent looked at ProZyme
03:25:28 5    and saw that there were all of these different things that
03:25:32 6    it had been doing all this time with no notice from Waters.
03:25:40 7    So if you're looking at the patent, you're not thinking to
03:25:42 8    yourself based certainly on Waters' conduct all this time,
03:25:47 9    Ajinomoto's conduct as well which would be imputed to Waters
03:25:50 10   when they bought the patent, warts and all that it would
03:25:53 11   have covered any of the products.
03:25:55 12          THE COURT:  Okay.  Thank you.  I don't have any
03:25:57 13   further questions.
03:25:58 14          MS. LI:  Thank you, Your Honor.
03:25:59 15          MR. WOLF:  Just a bit, Your Honor.
03:26:03 16          THE COURT:  Sure.
03:26:07 17          MR. WOLF:  A few loose ends and then I'll try to
03:26:11 18   address a couple of questions you might have asked and I'm
03:26:13 19   sure you may have additional ones.
03:26:15 20          First of all on the website, I want to be clear,
03:26:19 21   this is document 91, what was actually said on the website.
03:26:22 22   Who do I contact to order ProZyme products or request
03:26:26 23   product information?  The answer, Agilent cannot process any
03:26:29 24   orders for ProZyme products until the acquisition is closed
03:26:33 25   and integration is completed.  That's precisely the point

66

03:26:37 1    here.
03:26:38 2          THE COURT:  I sort of remember that, then I
03:26:41 3    think I asked Ms. Li and she said that's still the case.  Is
03:26:44 4    that correct?
03:26:45 5          MS. LI:  That's correct, Your Honor, it still
03:26:47 6    says it on the website.
03:26:49 7          MR. WOLF:  That's precisely the point.  At some
03:26:52 8    point in the next day, week, month, the acquisition and
03:26:58 9    integration will be completed and at that point Agilent
03:27:01 10   becomes the sole target meaningfully speaking, that's why we
03:27:05 11   sued them.  That's the whole point of why we're here.  If
03:27:08 12   it's a month from now, it's a month from now, but that's why
03:27:11 13   the dispute is live and important.
03:27:13 14          I want to turn to the delay issue.  First I want
03:27:17 15   to note on policy, the reason delay is relevant is because
03:27:21 16   the Federal Circuit and other courts have said it tends to
03:27:24 17   as an evidentiary matter undermined your claim of
03:27:28 18   irreparable harm.  It's not in and of itself a factor, but
03:27:32 19   it's a common sense reason.  Our irreparable harm here as I
03:27:35 20   think we made clear is primarily based on the 800 pound
03:27:39 21   gorilla that is Agilent.  That became an issue when Agilent
03:27:42 22   announced in that acquire.
03:27:46 23          But there are a couple of things that we don't
03:27:49 24   think are legally relevant but the record should be cleared
03:27:52 25   up.  There was a suggestion that we never approach ProZyme

67

03:27:55 1    and that's simply not true.  There were conversations in
03:27:58 2    2014 and 2015 where we brought the portfolio to ProZyme's
03:28:04 3    attention.  They ignored that.  We proceeded to start the
03:28:08 4    process of buying and ultimately did buy the patent such
03:28:11 5    that we could sue, but as we were getting close to
03:28:14 6    consummating the transaction, the situation went from DEFCON
03:28:18 7    3, I don't remember whether 1 or 5 is the worst, but
03:28:21 8    whatever, it got worse and that's when Agilent came on the
03:28:25 9    scene.
03:28:26 10          So the suggestion that there was no discussion,
03:28:28 11   I don't think it's relevant whether we talked to ProZyme or
03:28:30 12   not, Agilent is the party here, but we did talk to ProZyme.
03:28:34 13          And there were -- counsel suggested phrases like
03:28:37 14   it's not Agilent's problem and it's unfair, et cetera.
03:28:41 15   Remember, we're here because we're alleging patent
03:28:44 16   infringement.  And assuming we meet that burden, it's not
03:28:48 17   unfair to exercise the patent right to exclude against the
03:28:51 18   person infringing the patent.
03:28:53 19          THE COURT:  But you could have sued ProZyme
03:29:01 20   potentially years ago, and now it does seem like -- and even
03:29:07 21   in your papers you ask at one point in the balance of
03:29:10 22   hardships to maintain the status quo.  Well, the status quo
03:29:15 23   is ProZyme has 20 to 25 percent of the market.  What you
03:29:18 24   seem to be asking me to do is to change the status quo so
03:29:22 25   they have zero.  And yet ProZyme isn't here in front of me

68

03:29:25 1    to do that.
03:29:27 2          MR. WOLF:  Respectfully, Your Honor, that's not
03:29:30 3    what we're asking today.  If the status quo was avoiding
03:29:34 4    what's on your screen, this is DI-12-1, that's the future
03:29:38 5    the client is afraid of, is the highly synergistic, I have
03:29:42 6    some other quotes pulled out from that document.  This is
03:29:45 7    from the same document.
03:29:46 8          THE COURT:  I can't draft an order that says and
03:29:49 9    not what's in a marketing document.  What is it that you
03:29:52 10   want me to do that is maintaining the status quo, because it
03:29:57 11   seems to me saying Agilent and its subsidiaries, of which
03:30:02 12   ProZyme is one, are enjoying significant changes to the
03:30:06 13   status quo.
03:30:07 14          MR. WOLF:  Fair point, Your Honor.  And if we
03:30:10 15   say Agilent shall not directly or by inducement infringe the
03:30:16 16   patent.
03:30:17 17          THE COURT:  But does that mean it can't sell a
03:30:20 18   mass spec if it knows that someone could use InstantPC or
03:30:24 19   it?
03:30:24 20          MR. WOLF:  No, absolutely not.  What it means,
03:30:27 21   though, is that Agilent's website wouldn't say buy
03:30:32 22   InstantPC.  It means that when Agilent salespeople went out
03:30:33 23   into the field, they wouldn't be selling InstantPC.  It
03:30:38 24   means when Agilent was selling a mass spectrometer, it
03:30:41 25   wouldn't be bundling it with InstantPC.

69

03:30:44 1    So if ProZyme for purposes of today, and again,
03:30:47 2 you know, what happens at trial and all those issues are
03:30:50 3 different, but for purposes of the PI motion, if the status
03:30:55 4 quo anti is maintained even though ProZyme's profits now
03:31:00 5 flow into a different corporate coffer, then we have
03:31:04 6 achieved what we sought with the preliminary injunction
03:31:06 7 motion.
03:31:07 8    And I just want to read this to you.  This is
03:31:11 9 from, again, the same document that's on your screen.  This
03:31:13 10 is a quote from the general manager of Agilent's chemistry
03:31:17 11 and supply division.  This acquisition provides greater
03:31:22 12 scale to our biopharma consumables business and enhances our
03:31:26 13 value proposition by enabling complete glycan liquid
03:31:31 14 chromatography and mass spectometry workflow solutions.
03:31:35 15 That's the irreparable harm we're seeking to avoid and
03:31:38 16 that's the irreparable harm that wasn't threatened when
03:31:41 17 ProZyme was a stand-alone company.  We didn't like their
03:31:44 18 infringement, we would have sued them, we might have sought
03:31:46 19 a PI, but it would have been a very different flavored PI
03:31:50 20 than the one we have here today.
03:31:52 21    THE COURT:  Do you agree with what Agilent was
03:31:53 22 saying -- I'll give you a chance, Ms. Li.  Do you agree with
03:31:59 23 what Agilent's position was which is folks can use the
03:32:03 24 InstantPC on Waters equipment, they can use it on Agilent
03:32:06 25 equipment, that now there are people who might have

70

03:32:10 1 purchased Waters equipment but they're using InstantPC
03:32:13 2 rather than Waters.
03:32:14 3    MR. WOLF:  It is mechanically possible, but it's
03:32:17 4 the -- the way business works is the Agilent salesperson
03:32:21 5 goes to Pfizer, UD, or whatever example we're using and says
03:32:26 6 now they plan to say buy our complete line.  And if that --
03:32:29 7 this is just common sense sales.  And this is what is in the
03:32:34 8 declaration, et cetera.  If Agilent is trying to sell and
03:32:38 9 succeeds in selling product A, it now has its foot in the
03:32:42 10 door to sell product B, and now more importantly it can
03:32:46 11 bundle A and B.
03:32:47 12    THE COURT:  But Agilent has that ability, from
03:32:49 13 what I understand, ProZyme has lots and lots of products,
03:32:52 14 only one of which we're talking about here today.  So
03:32:55 15 Agilent could get its foot in the door and say hey, buy a
03:32:59 16 ProZyme product B, they can't say InstantPC maybe, but they
03:33:03 17 can say product B, and I'm not sure I understand how we tie
03:33:12 18 that specifically to InstantPC.
03:33:14 19    MR. WOLF:  Let me give the clearest example.
03:33:16 20 They go to a customer and say you buy our mass spectrometer,
03:33:20 21 we'll give you a fifty percent discount on InstantPC.  The
03:33:24 22 bundling.  The bundling is the clearest example of what
03:33:27 23 they're talking with synergies up there.  That's the kind of
03:33:29 24 thing that doesn't happen if Agilent is not allowed to
03:33:32 25 infringe our patent either directly or by inducement or by

71

03:33:37 1 offering to sell, I guess that's a species of direct
03:33:39 2 inducement.
03:33:40 3    But Your Honor, I understand that there are
03:33:42 4 lines that are not perfectly clear and that there -- that we
03:33:46 5 cannot prevent all parades or horribles today, but Agilent,
03:33:51 6 it did change the world by coming in and it's trying to
03:33:55 7 change it more, and we're trying to avoid that change.
03:33:57 8    I just --
03:33:59 9    THE COURT:  I'm just trying to make sure I
03:34:01 10 understand that you're talking about avoiding change rather
03:34:04 11 than necessarily impacting a company that is not here in
03:34:08 12 front of me?  And what you have requested, I think you'll
03:34:13 13 agree, Agilent and its subsidiaries would prevent ProZyme
03:34:20 14 from selling the product?
03:34:22 15    MR. WOLF:  Yes, Your Honor.  Although, again,
03:34:23 16 when we read a quote, Agilent cannot process until
03:34:27 17 integration is completed, we're making that request in the
03:34:31 18 context of not knowing whether ProZyme is a free-standing
03:34:34 19 company or is just a brand name that is run directly by
03:34:38 20 Agilent.  We don't know.
03:34:38 21    So the order is Agilent, you stop doing the
03:34:44 22 infringing acts.  If that's what comes out of today, a lot
03:34:47 23 of harm from the infringement, not all of it, but a lot of
03:34:52 24 harm from the infringement will be obviated, and my client
03:34:56 25 will say, Matt, you did a pretty good job today.

72

03:34:59 1    THE COURT:  You did a good job regardless.
03:35:02 2    MR. WOLF:  Thank you, Your Honor.
03:35:05 3    Can I talk briefly about the merits issues?
03:35:07 4    THE COURT:  Please.
03:35:09 5    MR. WOLF:  So can we turn to your slide 14.
03:35:13 6 Would you mind culling that up?
03:35:17 7    Your Honor, I have to admit that this argument,
03:35:20 8 I'm still not following for the simple reason that it is, of
03:35:23 9 course, black letter patent law that one can claim a genous
03:35:27 10 and then subsequently someone, the same person or someone
03:35:30 11 else can come along and at least try to claim a species of
03:35:34 12 that genous.  For example, I could claim all transmissions
03:35:37 13 in cars and Ms. Sklenar could come up with a particular --
03:35:41 14    THE COURT:  I get it.  I understand.  I think
03:35:43 15 their point just was look, if you're claiming a species off
03:35:47 16 of a genous, wouldn't you think you would disclose the
03:35:52 17 genous patent if that's what you thought it was?  And you
03:35:55 18 didn't.  And their point is so does that suggest maybe that
03:35:59 19 you weren't thinking of it as a genous patent.
03:36:03 20    MR. WOLF:  If that's a level, it's kind of an
03:36:05 21 evidentiary issue, we got the prosecutors or at least the
03:36:08 22 supervisor of the prosecutors back here who will say it was
03:36:10 23 simply a goof, we actually disclosed the parent of the
03:36:13 24 genous patent, not the genous patent, so we could get into
03:36:16 25 this in much more detail.  So we disclosed a family member

73

03:36:20 1 and they thought that covered everything and now that they
03:36:23 2 raised the issue --
03:36:24 3 THE COURT: Agilent does think that covered
03:36:27 4 everything. Right?
03:36:28 5 MR. WOLF: But we have now disclosed the patent.
03:36:30 6 We have now disclosed it so that's --
03:36:32 7 THE COURT: And did you disclose it with the
03:36:34 8 declaration that explains that it's broader than you might
03:36:37 9 think?
03:36:39 10 MR. WOLF: I don't think at this point we have
03:36:41 11 submitted any declarations yet. We haven't gotten to the
03:36:44 12 point of fighting at the patent office, we're at the IDS
03:36:49 13 phase, not the experts explaining what does and doesn't
03:36:52 14 cover phase.
03:36:53 15 THE COURT: Your experts have actually already
03:36:55 16 taken a position.
03:36:56 17 MR. WOLF: Right.
03:36:57 18 THE COURT: And it might not be evidence
03:37:01 19 arguably given the positions in the case, it might not be
03:37:04 20 evidence to the prosecutor that just simply putting the word
03:37:09 21 contains in there makes it broader.
03:37:11 22 MR. WOLF: And Your Honor, if something
03:37:13 23 happened, let me be clear, if something happened that
03:37:16 24 suggested that we were taking inconsistent positions, not
03:37:20 25 only would we risk the viability of that patent, but

74

03:37:24 1 poisoning the entire tree. Inequitable conduct can run both
03:37:30 2 forward and back, and so we are on notice as it were that
03:37:33 3 this is a concern and we have taken the first step to
03:37:37 4 obviate that concern.
03:37:38 5 I want to talk a little bit about this
03:37:40 6 indefiniteness/written description issue. I say this only
03:37:44 7 as the analogy, because my daughter was playing with this
03:37:48 8 when I left yesterday. She was playing with a jump rope.
03:37:50 9 And if I say a jump rope, a claim I invented jump rope and I
03:37:55 10 claim a jump rope that contains handles and knobs and a
03:37:59 11 rope, if someone comes along -- and her jump rope actually
03:38:02 12 has the beads at the bottom to make a noise when you jump.
03:38:07 13 If someone comes along and adds those beads, they don't get
03:38:08 14 out from under infringement because they added D to A, B and
03:38:13 15 C, nor is that a written description or indefiniteness
03:38:16 16 problem. You're not required to describe or enable all the
03:38:20 17 things that are added to A, B and C.
03:38:23 18 Now, there are circumstances and maybe later in
03:38:25 19 this case they'll say this is one of those rare
03:38:28 20 circumstances where it so fundamentally changes the molecule
03:38:32 21 --
03:38:32 22 THE COURT: That was sort of my question when I
03:38:34 23 was asking Ms. Sklenar, really if you get to the point, it's
03:38:38 24 a chemical compound, we all know that even adding an atom
03:38:44 25 or, you know, a functional group can significantly change

75

03:38:46 1 the way it works. So I get the jump rope analogy. But
03:38:49 2 there could be, you know, you add as Ms. Li said a protein
03:38:54 3 in between there and it could have a significant impact on
03:38:59 4 the way it works.
03:38:59 5 MR. WOLF: Yes, Your Honor.
03:39:00 6 THE COURT: Where did you tell anybody about any
03:39:03 7 of that?
03:39:03 8 MR. WOLF: As Your Honor is aware there is a
03:39:05 9 significant body of case law about normal chemistry versus
03:39:09 10 -- you know, if someone comes up with a cure for cancer with
03:39:13 11 a particular molecule and so happens to have the other
03:39:15 12 pieces of this on there, they might well say we haven't
03:39:18 13 described the cure for cancer, but when we're talking about
03:39:22 14 linkers which are run of the mill chemistry, the case law
03:39:25 15 strongly suggest that that doesn't run afoul of
03:39:27 16 indefiniteness law, that wasn't in the paper, nor does it
03:39:31 17 run afoul of written description or enablement. That's
03:39:34 18 routine chemistry. That's the WAN's factors when you're
03:39:38 19 talking about enablement. There is no suggestion that that
03:39:41 20 linker changes the nature of this invention.
03:39:44 21 THE COURT: But how is it that if I read
03:39:49 22 contains to be as broad as it just means that it's in there
03:39:54 23 somewhere, how is it that I know we're limited by standard
03:39:58 24 principles of chemistry versus getting outside of that?
03:40:02 25 MR. WOLF: Your Honor, I think --

76

03:40:03 1 THE COURT: Because it doesn't tell me in the
03:40:05 2 patent, you know, and of course any modifications that would
03:40:09 3 be standard, that's where I'm having a problem with why
03:40:13 4 isn't that language as you want me to interpret it just so
03:40:18 5 broad?
03:40:18 6 MR. WOLF: Your Honor, they criticize us, but
03:40:21 7 let's suppose that rather than contains it said comprises, I
03:40:25 8 think then we wouldn't be having the non-infringement
03:40:28 9 argument. I think they would concede infringement at that
03:40:31 10 point even though we say the words are synonymous.
03:40:35 11 Presumably they would make the written description argument
03:40:37 12 Your Honor is getting at and then we would get into the case
03:40:41 13 law that says you're not required to describe every
03:40:45 14 function. If I claim the jump rope, it is conceivable that
03:40:49 15 someday a jump rope would be tied to back of a 747, that
03:40:54 16 doesn't mean that I am required to describe a jump rope
03:40:57 17 attached to the back of a 747.
03:40:59 18 So that is a level of written description law
03:41:01 19 that their brief gets nowhere near. We would be happy to
03:41:04 20 brief it, but this gets down to conventional chemistry
03:41:08 21 issues. And as Your Honor is aware, there is actually a
03:41:10 22 specific body of law on chemistry and comprising and what it
03:41:13 23 means and what its parameters are. And that's a level of
03:41:16 24 detail we just haven't briefed.
03:41:16 25 The last issue is the obviousness double

77

03:41:18  1  patenting.  We quote this in our brief, the overlapping
03:41:22  2  subject matter is not double patenting, it needs to be
03:41:26  3  coextensive.  There is overlapping patents all the time.
03:41:30  4  Apple has got sued a thousand times and Samsung on the same
03:41:33  5  feature with similar but not coextensive claims.  That's
03:41:35  6  nothing new.
03:41:37  7      So unless Your Honor has anything else, we would
03:41:38  8  suggest that the infringement case is about as clear as it
03:41:41  9  gets frankly, that there are no good invalidity claims and
03:41:45  10  if ProZyme wants to do its business independently of
03:41:48  11  Agilent, we'll deal with them as they come, but that doesn't
03:41:51  12  seem to be Agilent's intention.  That's not what they're
03:41:54  13  telling the world they're planning to do.  And that's what
03:41:58  14  we're seeking to enjoin.
03:42:00  15      THE COURT:  Okay.
03:42:00  16      MR. WOLF:  Thank you, Your Honor.
03:42:02  17      MS. LI:  If I may?
03:42:03  18      THE COURT:  Yes.
03:42:05  19      MS. LI:  Thank you.
03:42:05  20      I just wanted to address a few quick points if I
03:42:10  21  may.  And I promise to be very brief because I know I'm
03:42:17  22  delaying everyone's vacation.
03:42:17  23      THE COURT:  I mean, people miss their flights on
03:42:18  24  a holiday day weekend.
03:42:20  25      MR. WOLF:  No big deal.

78

03:42:22  1      MS. LI:  I was told I have to be home by 8:00
03:42:25  2  a.m. or my family is leaving for China without me.  So I
03:42:28  3  will attempt to be brief.
03:42:29  4      So first I would like to address this issue of
03:42:32  5  bundling that keeps getting raised at this nexus of
03:42:38  6  irreparable harm and Waters.  So the scenario that Waters
03:42:42  7  just described is an Agilent salesman walks in to a customer
03:42:49  8  and says I have --
03:42:51  9      THE COURT:  There must be a joke, Agilent
03:42:53  10  salesman walks into a bar.
03:42:55  11      MR. WOLF:  Right, a priest, rabbi and Waters
03:42:59  12  salesman.
03:42:59  13      MS. LI:  And then he says to the customer, hey,
03:43:01  14  I have got InstantPC, okay, it's a $2,000 kit.  I'll give it
03:43:06  15  to you for a thousand bucks if you buy this hundred thousand
03:43:10  16  dollar piece of equipment that can run it.  Right?  This is
03:43:13  17  really -- I mean, I shouldn't laugh, it's really not funny,
03:43:17  18  but it is --
03:43:19  19      THE COURT:  It's not necessarily a terrible
03:43:21  20  sales tactic; right?  Because then you get someone to buy
03:43:25  21  the InstantPC and they like the InstantPC, the next time
03:43:30  22  they buy at full price.  So it's not -- what he said is not
03:43:32  23  a completely -- you know, if this person is already
03:43:35  24  interested in the Agilent equipment, and you sell the
03:43:40  25  InstantPC, they might go along with it, it just doesn't seem

79

03:43:47  1  that outrageous to me.
03:43:49  2      MS. LI:  It's not outrageous if they're already
03:43:52  3  going to buy the Agilent mass spec, they might also get the
03:43:56  4  InstantPC, I agree with you.  What seems unlikely to me,
03:43:59  5  though, is they could save a thousand dollars on a $2,000
03:44:03  6  test to buy a hundred thousand dollar machine, which is
03:44:05  7  really the harm that we're talking about that --
03:44:08  8      THE COURT:  That is convoyed sales.
03:44:10  9      MS. LI:  Yes.  So Agilent is a huge
03:44:14  10  manufacturing company just like Waters that makes all this
03:44:17  11  equipment and suddenly it has access to a new bevy of
03:44:21  12  customers because it sells this little kit.  So, you know,
03:44:23  13  the price erosion on that kit, yeah, they could buy a
03:44:28  14  thousand more InstantPC kits once they have bought a hundred
03:44:33  15  thousand dollar machine.  Sure.  Price erosion, Your Honor,
03:44:35  16  is so clearly compensable with money damages and so easily
03:44:40  17  calculable, this idea that somebody like Pfizer who are a
03:44:46  18  very, very, very savvy buyer is going to buy a hundred
03:44:51  19  thousand dollar piece of equipment because you dangle a
03:44:54  20  thousand dollar discount on the initial push of the
03:44:57  21  InstantPC product is speculative at best.
03:44:59  22      The next thing I want to say, they talk a lot,
03:45:03  23  and I don't know which slide it is, but they keep putting up
03:45:06  24  the website about how Agilent now has an integrated glycan
03:45:13  25  solution and isn't that wonderful and they keep showing that

80

03:45:16  1  over and over and over.  I don't know what slide it is, and
03:45:19  2  I can't get it to bring it up.  As I have told Your Honor,
03:45:25  3  ProZyme makes lots of glycan solutions.  It's not just the
03:45:30  4  InstantPC, they make lots of different things.  So saying
03:45:30  5  that Agilent offers an integrated glycan solution does not
03:45:30  6  mean that we are pegging our world to the InstantPC.
03:45:38  7      THE COURT:  But there was something in one of
03:45:38  8  those things that he showed me where it specifically
03:45:42  9  mentioned InstantPC.  I didn't see it mentioning lots of
03:45:46  10  other products, but that's maybe because InstantPC was
03:45:49  11  highlighted.
03:45:50  12      MS. LI:  That's one of many web pages.
03:45:52  13      And then I think I wanted to be clear about you
03:45:57  14  saw this written description and the jump rope sort of
03:45:59  15  argument.  There is no written description as we have
03:46:03  16  discussed ad nauseam at this point about what would be
03:46:07  17  between the functional group and the aromatic ring, but if
03:46:12  18  Waters is right and things can be between there, what's to
03:46:17  19  tell me that this product is covered and not that one?
03:46:20  20  That's where that indefiniteness really comes in.
03:46:23  21      You know, well, if we had -- if you stuck
03:46:27  22  something between these two things that cured cancer Waters
03:46:30  23  said, well, that's a new thing.  It's not covered.  Well,
03:46:34  24  why not?  If we're covered, why aren't they covered?
03:46:38  25  Linkers are well-known in the art.  They are well-known in

81

03:46:41 1 the art. This is Dr. Brousmiche's declaration from whence I
03:46:46 2 have taken this picture and they claim all kinds of
03:46:48 3 functional groups and you have literally seen this over and
03:46:51 4 over and over in the '234 patent. But there is something
03:46:54 5 really special about this linker where they specifically
03:46:57 6 point out and claim that exact compound. That is the
03:47:01 7 RapiFluor product that Waters sells. So something about
03:47:04 8 that nitrogen is important to them.
03:47:06 9         They didn't specifically claim the InstantPC
03:47:10 10 product with an oxygen there. Something in that linker is
03:47:14 11 doing something that's important enough for them to
03:47:16 12 specifically cull it out and give it its own independent
03:47:20 13 claim. So I think that will cut against this idea that you
03:47:23 14 can throw anything between.
03:47:24 15         THE COURT: In these patents do they make clear
03:47:26 16 that you can use all different kinds of linkers?
03:47:29 17         MS. LI: They do, Your Honor. You can see there
03:47:33 18 is all different kinds of -- on claim 1 especially --
03:47:35 19         THE COURT: I see attached.
03:47:38 20         MS. LI: Yes. It covers lots of different kinds
03:47:41 21 of linkers. But it doesn't say any kind of linker or
03:47:46 22 anything can be here, they specifically cull out what would
03:47:50 23 be attached to that.
03:47:51 24         THE COURT: Okay.
03:47:52 25         MS. LI: Thank you, Your Honor.

82

03:47:54 1         THE COURT: Thank you. Anything else?
03:47:55 2         MR. WOLF: Just two factual matters. One, Your
03:47:59 3 Honor, I don't know if it matters, that's not RapiFluor.
03:48:02 4         MS. LI: Sorry.
03:48:03 5         MR. WOLF: That's all right. I don't want us to
03:48:06 6 be deemed to be conceding that for all purposes. The other
03:48:09 7 thing is just to note that the kits that we're talking about
03:48:11 8 are typically in the five to $6,000 range.
03:48:14 9         THE COURT: I was sort of interested in Ms. Li's
03:48:17 10 argument there if you want to address it. Was your point
03:48:19 11 really that you think that Agilent would get sales of mass
03:48:23 12 spec by selling InstantPC -- of a large piece of equipment
03:48:26 13 by selling a kit?
03:48:29 14         MR. WOLF: Not a kit, but we're talking about
03:48:33 15 long-term contracts, and so it's -- it's absolutely a razor
03:48:37 16 and blade situation. When you talk about twenty kits which
03:48:41 17 could for a large throughput company be just a month or two
03:48:45 18 toward the supplies, the reagents, the kits could in just a
03:48:49 19 year wildly exceed the cost of the machine.
03:48:52 20         So depending on the customer and depending on
03:48:54 21 what they're doing and how much of it they're doing, you
03:48:58 22 could either drive sales of the kits by reducing the price
03:49:01 23 of a spectrometer, you could drive sales of a spectrometer
03:49:04 24 by reducing the price of the kit, or most likely you package
03:49:10 25 it together, you're kind of agnostic and say we'll give you

83

03:49:14 1 what's your year supply, we'll sell you a kit, we'll sell
03:49:17 2 you a spectrometer and twenty of these $5,000 kits for X
03:49:22 3 price. So it's not -- I don't want to diminish counsel's
03:49:25 4 argument, but it's not where -- it's not as extreme as
03:49:30 5 what's suggested. These kits can get very expensive and can
03:49:35 6 quickly dwarf -- depending on the customer and depending on
03:49:39 7 what their throughput is and what they're doing, the kit
03:49:42 8 values can quickly exceed in some cases the machines, but in
03:49:46 9 other cases it's the exactly the opposite.
03:49:48 10         All I'm saying is that bundling, that synergy
03:49:51 11 can flow in both directions. Mockery is not the right word,
03:49:56 12 especially a couple of days before Christmas, but the
03:49:59 13 skeptical tone that counsel just showed is precisely what
03:50:02 14 they will show to our damages expert when they said look at
03:50:06 15 all these adjunctive sales, and it's not just the big
03:50:11 16 machines, it's columns, it's software, there are all kinds
03:50:11 17 of convoyed issues of various price points that come into
03:50:12 18 play that we just haven't talked about in detail.
03:50:13 19         Thank you. Your Honor.
03:50:14 20         THE COURT: Thank you.
03:50:16 21         MS. LI: I would like to, quickly, Your Honor.
03:50:20 22 I appreciate counsel's respectful rebuttal, but I think that
03:50:25 23 it's pretty clear that this is all speculation. He's just
03:50:27 24 sort of guessing based on no evidence in the record that
03:50:30 25 this is how this will work, this is how this is going to

84

03:50:34 1 happen. They have all the sales already that have been
03:50:36 2 happening for the last three years with InstantPC, they have
03:50:40 3 presented no evidence on the record that this is going to
03:50:44 4 affect mass spectrometer sales.
03:50:45 5         Also, I would just like to say that based on all
03:50:48 6 the facts in this record, there is really no support for a
03:50:53 7 factual finding that would warrant preliminary injunction.
03:50:57 8         Thank you, Your Honor.
03:50:58 9         THE COURT: And it's your motion, so I give you
03:51:00 10 the last word. You don't have to use it.
03:51:04 11         MR. WOLF: I will not even approach the podium.
03:51:06 12 The whole point of this, Your Honor, is we wouldn't be
03:51:10 13 losing these sales to ProZyme because they didn't have any
03:51:13 14 of these adjunctive products to get the machine or anything
03:51:16 15 else. That's the reason we're here today is that Agilent
03:51:21 16 has products that ProZyme doesn't.
03:51:21 17         Thank you very much, Your Honor.
03:51:22 18         THE COURT: Thank you very much. We will be
03:51:24 19 adjourned. And we will work on this diligently and get an
03:51:30 20 opinion out as soon as we can.
03:51:30 21         MR. WOLF: On behalf of Ms. Li, thank you. And
03:51:32 22 happy holidays to everyone in the court.
03:51:34 23         THE COURT: Thank you. Happy holidays.
03:51:34 24         (Court adjourned at 3:51 p.m.)
25

## $

**$2,000** [3] - 50:23, 78:14, 79:5
**$5,000** [1] - 83:2
**$6,000** [1] - 82:8

## '

**'069** [2] - 62:16, 63:17
**'123** [2] - 62:15, 63:17
**'234** [41] - 5:3, 12:1, 17:21, 19:20, 19:22, 19:23, 20:5, 20:8, 20:19, 21:3, 21:7, 21:8, 21:11, 21:14, 21:17, 37:6, 38:12, 39:3, 39:7, 52:9, 55:18, 55:21, 56:4, 56:8, 56:11, 56:18, 57:6, 57:10, 57:15, 57:17, 58:4, 58:7, 59:13, 59:18, 59:21, 60:15, 62:20, 63:16, 64:22, 65:3, 81:4

## 1

**1** [3] - 12:18, 67:7, 81:18
**10th** [1] - 56:2
**112** [1] - 25:4
**12** [1] - 58:16
**14** [2] - 15:9, 72:5
**1400(b** [1] - 44:9
**17** [1] - 19:2
**18** [1] - 15:9
**18-1450(MN** [1] - 1:5

## 2

**20** [6] - 8:4, 33:16, 42:25, 43:3, 50:19, 67:23
**200** [1] - 53:17
**2011** [2] - 55:12, 59:18
**2013** [3] - 5:5, 5:19, 38:15
**2014** [1] - 67:2
**2015** [6] - 11:13, 38:7, 38:11, 43:2, 43:3, 67:2
**2016** [3] - 38:12, 38:14, 38:17
**2017** [1] - 38:18
**2018** [4] - 1:9, 5:8, 7:11, 39:23
**21** [1] - 1:9
**23** [1] - 38:18
**24** [1] - 59:2
**25** [9] - 8:2, 8:4, 35:5, 35:8, 42:25, 43:3, 50:19, 67:23
**271(b** [1] - 9:19
**27th** [1] - 56:9
**28th** [1] - 55:19
**2:00** [1] - 1:9

## 3

**3** [2] - 58:15, 67:7

**30** [1] - 59:2
**35** [1] - 44:9
**3:51** [1] - 84:24

## 4

**400** [3] - 42:2, 43:11, 43:16
**402** [1] - 40:6
**42** [2] - 19:2, 61:22
**44** [1] - 16:24
**450** [1] - 42:1
**46** [1] - 19:2
**4A** [1] - 1:10

## 5

**5** [1] - 67:7
**50** [1] - 53:17
**503** [1] - 42:11

## 6

**6** [1] - 12:19
**60** [1] - 49:13
**68** [1] - 17:6

## 7

**7** [2] - 14:23, 59:2
**747** [2] - 76:15, 76:17
**7th** [3] - 5:8, 39:23, 42:8

## 8

**800** [1] - 66:20
**844** [1] - 1:11
**8:00** [1] - 78:1

## 9

**9** [2] - 15:9, 15:16
**91** [1] - 65:21

## A

**a.m** [1] - 78:2
**AbbVie** [1] - 25:2
**ability** [1] - 70:12
**able** [6] - 30:20, 33:3, 33:13, 33:14, 34:2, 34:4
**absolutely** [11] - 18:1, 43:5, 43:6, 54:12, 55:3, 58:9, 60:6, 60:19, 61:20, 68:20, 82:15
**absorbing** [1] - 8:22
**access** [3] - 8:20, 36:9, 79:11

**according** [1] - 39:20
**account** [1] - 25:1
**accuse** [2] - 24:14, 38:24
**accused** [9] - 10:16, 16:12, 16:15, 25:4, 28:17, 28:18, 44:22, 50:24
**achieved** [1] - 69:6
**acid** [1] - 54:6
**acknowledge** [1] - 34:7
**acquire** [6] - 5:6, 27:4, 29:10, 37:13, 39:2, 66:22
**acquired** [9] - 21:13, 27:4, 29:9, 31:21, 38:13, 38:15, 40:1, 41:23, 46:8
**acquiring** [2] - 37:6, 64:20
**acquisition** [6] - 9:8, 28:13, 46:9, 65:24, 66:8, 69:11
**acted** [1] - 27:2
**acting** [1] - 57:10
**activities** [1] - 38:24
**activity** [1] - 6:5
**acts** [1] - 71:22
**actual** [3] - 9:18, 51:12, 61:2
**ad** [2] - 31:3, 80:16
**add** [1] - 75:2
**added** [2] - 74:14, 74:17
**adding** [1] - 74:24
**addition** [1] - 57:20
**additional** [4] - 24:21, 58:2, 64:13, 65:19
**address** [7] - 24:8, 43:11, 50:15, 65:18, 77:20, 78:4, 82:10
**addressed** [1] - 27:20
**addressing** [1] - 22:12
**adds** [1] - 74:13
**adjourned** [2] - 84:19, 84:24
**adjunctive** [2] - 83:15, 84:14
**admit** [2] - 23:9, 72:7
**admitted** [3] - 3:15, 38:10, 49:10
**advancing** [1] - 57:18
**advantage** [1] - 29:16
**advertised** [1] - 34:11
**advertising** [2] - 31:20, 41:14
**affect** [1] - 84:4
**afoul** [2] - 75:15, 75:17
**afraid** [1] - 68:5
**afternoon** [14] - 2:19, 2:20, 2:22, 2:24, 3:2, 3:3, 3:7, 3:9, 3:12, 3:13, 3:20, 10:9, 10:10, 37:21
**AGILENT** [1] - 1:6
**Agilent** [123] - 3:10, 3:19, 7:17, 7:21, 7:23, 8:14, 8:16, 8:21, 9:3, 9:14, 9:18, 9:21, 9:22, 19:18, 25:10, 27:4, 27:7, 28:2, 28:6, 28:12, 29:1, 29:9, 30:5, 31:7, 31:14, 31:21, 32:24, 33:17, 34:11, 36:13, 36:15, 37:18, 39:1, 39:5, 39:17, 39:21, 40:3, 40:11, 40:13, 40:19, 40:25, 41:1, 41:9, 41:17, 42:7, 42:22, 44:2, 44:3, 44:15, 44:18, 44:20, 44:22, 45:3, 45:5, 45:7, 45:14, 45:17, 45:19, 45:23, 45:24, 46:1, 46:16,

46:17, 46:23, 47:1, 47:7, 47:10, 47:12, 47:18, 47:20, 47:22, 47:23, 48:1, 49:21, 49:23, 51:10, 55:20, 55:24, 56:3, 62:18, 64:14, 64:16, 64:24, 65:2, 65:4, 65:23, 66:9, 66:21, 67:8, 67:12, 68:11, 68:15, 68:22, 68:24, 69:21, 69:24, 70:4, 70:8, 70:12, 70:15, 70:24, 71:5, 71:13, 71:16, 71:20, 71:21, 73:3, 77:11, 78:7, 78:9, 78:24, 79:3, 79:9, 79:24, 80:5, 82:11, 84:15

**Agilent 's** [16] - 14:16, 15:1, 16:3, 19:15, 22:6, 29:13, 29:16, 29:21, 30:2, 43:8, 48:11, 67:14, 68:21, 69:10, 69:23, 77:12

**agnostic** [2] - 41:4, 82:25

**ago** [4] - 6:10, 6:11, 36:19, 67:20

**agree** [8] - 40:9, 45:19, 47:1, 55:7, 69:21, 69:22, 71:13, 79:4

**agreeing** [1] - 17:24

**agreement** [1] - 6:14

**ahead** [6] - 8:11, 37:12, 38:23, 48:4, 48:6, 52:12

**Ajinomoto** [9] - 5:4, 5:11, 21:13, 22:7, 22:12, 22:14, 43:7, 62:15, 62:21

**Ajinomoto 's** [1] - 65:9

**al** [1] - 1:3

**alert** [2] - 55:20, 55:24

**aligned** [1] - 6:6

**allegation** [1] - 20:3

**allege** [1] - 60:14

**alleged** [1] - 52:2

**alleging** [1] - 67:15

**allowance** [1] - 56:1

**allowed** [6] - 11:17, 20:24, 32:12, 45:20, 46:9, 70:24

**allows** [2] - 15:24, 16:11

**almost** [1] - 57:3

**alone** [3] - 34:15, 34:21, 69:17

**ambiguous** [5] - 17:1, 17:6, 17:11, 53:22

**analogous** [1] - 61:4

**analogy** [3] - 24:12, 74:7, 75:1

**analysis** [17] - 9:25, 11:7, 11:17, 11:25, 12:18, 16:23, 17:16, 20:19, 23:4, 23:21, 24:4, 25:9, 25:23, 26:15, 39:14, 46:4

**analytical** [2] - 4:18, 4:24

**analyzed** [1] - 11:11

**analyzes** [1] - 10:1

**analyzing** [1] - 29:4

**ANNE** [1] - 2:7

**Anne** [1] - 3:11

**announced** [5] - 27:7, 29:10, 38:10, 39:1, 66:22

**answer** [8] - 7:23, 8:1, 18:8, 35:9, 36:21, 36:23, 36:25, 65:23

**answered** [2] - 45:10, 45:11

**anti** [1] - 69:4

**anticipated** [1] - 23:18

**antithetical** [1] - 27:15

**anyway** [1] - 37:14

**apiece** [1] - 30:9

**apologize** [4] - 36:22, 48:9, 62:12, 64:4

**apparent** [2] - 4:15, 28:21

**appear** [1] - 59:12

**APPEARANCES** [2] - 1:16, 2:1

**apple** [1] - 77:4

**applicant** [1] - 57:24

**application** [11] - 20:2, 20:15, 20:16, 21:10, 21:15, 38:17, 55:12, 55:16, 55:22, 59:10, 59:17

**applications** [1] - 22:8

**applied** [2] - 5:18, 19:16

**applies** [2] - 23:15, 61:11

**apply** [3] - 23:17, 63:25, 64:5

**appreciate** [1] - 83:22

**approach** [4] - 17:14, 31:9, 66:25, 84:11

**appropriate** [1] - 36:10

**approval** [7] - 35:18, 48:14, 48:17, 49:4, 49:6

**approved** [1] - 35:12

**arduous** [1] - 11:8

**areas** [1] - 4:25

**arguably** [1] - 73:19

**argue** [3] - 24:9, 27:13, 51:16

**arguing** [2] - 25:11, 55:9

**argument** [28] - 4:15, 14:4, 16:10, 16:14, 16:19, 18:14, 22:6, 24:7, 25:7, 28:2, 33:20, 34:23, 35:1, 42:10, 43:6, 52:12, 52:13, 53:11, 61:4, 61:5, 63:21, 72:7, 76:9, 76:11, 80:15, 82:10, 83:4

**arguments** [5] - 16:21, 21:20, 52:6, 63:22, 63:25

**ARIAS** [1] - 2:8

**Arias** [2] - 3:14, 3:15

**armrest** [2] - 24:15, 24:16

**ARNOLD** [1] - 1:20

**aromatic** [8] - 13:4, 15:4, 55:3, 58:8, 60:4, 61:23, 63:11, 80:17

**art** [8] - 17:3, 19:20, 54:3, 55:21, 60:1, 80:25, 81:1

**aspects** [5] - 25:19, 25:25, 26:1, 26:6, 26:7

**assay** [1] - 31:14

**assert** [4] - 6:8, 6:19, 45:15, 57:6

**asserting** [1] - 33:6

**assertion** [1] - 41:21

**assertions** [2] - 34:9, 42:18

**assigned** [1] - 7:11

**assignee** [3] - 42:3, 42:5, 62:12

**assigning** [1] - 43:22

**assignment** [3] - 5:7, 41:25, 65:4

**assume** [4] - 9:16, 48:23, 63:3, 63:4

**assuming** [2] - 54:19, 67:16

**assure** [1] - 36:15

**assuredly** [1] - 8:5

**atom** [1] - 74:24

**atoms** [1] - 53:2

**attached** [5] - 55:4, 63:23, 76:17, 81:19,

81:23

**attempt** [1] - 78:3

**attention** [3] - 20:20, 40:14, 67:3

**August** [6] - 5:7, 5:8, 7:11, 39:23, 42:8

**avoid** [2] - 69:15, 71:7

**avoiding** [2] - 68:3, 71:10

**aware** [9] - 12:13, 13:18, 13:25, 44:16, 55:25, 64:23, 64:25, 75:8, 76:21

## B

**backbone** [1] - 55:8

**background** [2] - 10:13, 53:13

**bad** [1] - 5:15

**balance** [2] - 37:3, 67:21

**bar** [2] - 3:16, 78:10

**barrier** [1] - 47:15

**base** [4] - 11:13, 29:14, 29:16, 30:3

**based** [5] - 5:12, 65:8, 66:20, 83:24, 84:5

**basis** [10] - 6:18, 6:24, 26:13, 33:6, 47:4, 63:2, 63:9, 63:12, 64:2, 64:8

**beads** [2] - 74:12, 74:13

**bear** [2] - 37:11, 48:5

**beat** [1] - 43:14

**became** [4] - 5:20, 6:7, 28:20, 66:21

**become** [3] - 4:15, 6:4, 28:4

**becomes** [2] - 43:20, 66:10

**BEFORE** [1] - 1:13

**began** [2] - 5:5, 6:9

**beginning** [1] - 44:21

**behalf** [2] - 3:10, 84:21

**belabor** [1] - 13:17

**belies** [1] - 21:17

**benchmark** [1] - 36:7

**benefit** [2] - 35:21, 46:9

**best** [3] - 4:9, 14:16, 79:21

**better** [6] - 11:17, 34:20, 36:13, 47:5, 51:5

**between** [20] - 4:3, 40:1, 40:10, 44:24, 47:15, 52:1, 53:3, 54:1, 54:2, 55:3, 58:8, 60:6, 60:25, 61:22, 63:10, 75:3, 80:17, 80:18, 80:22, 81:14

**bevy** [1] - 79:11

**bid** [1] - 33:15

**bifurcated** [1] - 46:4

**big** [6] - 4:18, 7:18, 35:10, 48:13, 77:25, 83:15

**binding** [1] - 5:17

**biopharma** [3] - 29:19, 30:6, 69:12

**biopharmaceutical** [1] - 49:5

**biotherapeutics** [1] - 11:5

**bit** [8] - 28:8, 28:15, 37:17, 38:12, 40:17, 43:13, 65:15, 74:5

**black** [1] - 72:9

**blade** [3] - 30:1, 53:5, 82:16

**blades** [1] - 60:23

**blue** [1] - 62:13

**boat** [2] - 18:16, 18:19

# C

**bodily** [2] - 10:22, 11:3
**body** [5] - 10:21, 11:3, 61:8, 75:9, 76:22
**boils** [1] - 13:19
**bond** [1] - 60:4
**bonded** [1] - 15:3
**bore** [1] - 32:24
**borne** [1] - 41:23
**bottom** [1] - 74:12
**bought** [5] - 27:9, 39:17, 45:24, 65:10, 79:14
**bound** [4] - 15:4, 15:7, 15:16, 55:8
**bounds** [1] - 60:16
**brand** [1] - 71:19
**branding** [1] - 8:25
**breach** [1] - 64:19
**Breeman** [6] - 16:25, 18:24, 53:12, 57:21, 60:2, 64:11
**Breeman 's** [1] - 58:1
**brief** [10] - 4:16, 22:23, 23:9, 25:2, 62:6, 76:19, 76:20, 77:1, 77:21, 78:3
**briefed** [5] - 12:18, 16:17, 25:6, 45:17, 76:24
**briefly** [8] - 10:4, 10:11, 10:12, 12:2, 24:8, 26:25, 43:25, 72:3
**bring** [1] - 80:2
**bringing** [2] - 29:21, 33:21
**broad** [7] - 19:23, 54:16, 60:14, 60:21, 61:13, 75:22, 76:5
**broader** [8] - 13:15, 17:13, 25:5, 59:17, 63:6, 64:1, 73:8, 73:21
**brought** [7] - 6:3, 27:19, 27:23, 28:4, 35:14, 43:9, 67:2
**Brousmiche** [3] - 55:13, 57:24, 59:17
**Brousmiche 's** [6] - 12:22, 55:15, 55:22, 56:9, 57:1, 81:1
**buckets** [1] - 12:9
**bucks** [1] - 78:15
**build** [3] - 38:23, 53:20, 60:3
**building** [1] - 38:21
**bullet** [3] - 29:12, 34:25, 49:10
**bundle** [1] - 70:11
**bundling** [6] - 29:23, 68:25, 70:22, 78:5, 83:10
**burden** [4] - 12:10, 32:11, 32:17, 67:16
**burdens** [1] - 12:13
**bus** [1] - 56:3
**business** [7] - 8:21, 38:21, 38:24, 44:5, 69:12, 70:4, 77:10
**buy** [20] - 9:14, 27:8, 29:24, 40:19, 49:21, 49:24, 50:22, 67:4, 68:21, 70:6, 70:15, 70:20, 78:15, 78:20, 78:22, 79:3, 79:6, 79:13, 79:18
**buyer** [1] - 79:18
**buying** [9] - 30:8, 30:9, 34:16, 39:22, 40:21, 40:24, 50:5, 50:10, 67:4
**BY** [8] - 1:18, 1:21, 1:21, 1:22, 2:4, 2:7, 2:7, 2:8

## C

**C.A** [1] - 1:5
**cahoots** [1] - 47:19
**calculable** [1] - 79:17
**calculated** [1] - 64:14
**California** [7] - 7:16, 38:9, 44:5, 44:17, 45:9, 45:10
**cancer** [3] - 75:10, 75:13, 80:22
**cannot** [6] - 28:12, 44:8, 60:22, 65:23, 71:5, 71:16
**carbocyclic** [2] - 13:4, 15:3
**carbohydrate** [1] - 5:17
**carbohydrates** [1] - 10:18
**carbonate** [2] - 55:7, 60:4
**care** [1] - 54:1
**carry** [1] - 12:10
**cars** [1] - 72:13
**carve** [1] - 36:17
**case** [38] - 4:22, 5:1, 5:11, 7:13, 16:17, 17:10, 17:15, 22:25, 27:12, 27:15, 28:16, 31:22, 34:8, 37:13, 38:4, 40:17, 43:23, 44:16, 45:24, 52:20, 53:5, 59:17, 59:23, 60:23, 60:25, 61:3, 61:6, 61:8, 61:16, 66:3, 73:19, 74:19, 75:9, 75:14, 76:12, 77:8
**cases** [7] - 21:22, 22:13, 22:17, 25:2, 25:3, 83:8, 83:9
**caught** [1] - 40:14
**causality** [2] - 32:2, 32:18
**causation** [1] - 32:18
**causing** [1] - 44:3
**CCPM** [1] - 22:25
**certain** [2] - 10:18, 17:12
**certainly** [9] - 6:16, 14:7, 15:24, 18:12, 25:4, 48:19, 58:22, 59:25, 65:8
**cetera** [3] - 10:2, 67:14, 70:8
**chain** [2] - 9:23, 9:24
**chainsaw** [1] - 28:5
**chair** [2] - 24:13, 24:15
**challenges** [1] - 12:12
**chance** [1] - 69:22
**change** [7] - 18:9, 67:24, 71:6, 71:7, 71:10, 74:25
**changed** [1] - 31:6
**changes** [4] - 18:10, 68:12, 74:20, 75:20
**channel** [3] - 29:14, 29:17, 34:14
**characterize** [1] - 45:12
**charged** [1] - 29:15
**check** [1] - 48:19
**chemical** [3] - 53:5, 60:24, 74:24
**chemistry** [16] - 16:1, 17:4, 18:5, 20:11, 69:10, 75:9, 75:14, 75:18, 75:24, 76:20, 76:22
**China** [1] - 78:2
**choose** [1] - 25:20
**choosing** [1] - 26:13
**Christmas** [1] - 83:12
**chromatography** [4] - 4:19, 7:20, 10:1,

29:18, 31:15, 31:16, 69:14
**chromatography /mass** [1] - 29:18
**Circuit** [3] - 16:13, 29:2, 66:16
**circumstances** [3] - 6:13, 74:18, 74:20
**cite** [3] - 17:15, 22:18, 52:20
**cited** [2] - 22:25
**claim** [46] - 6:18, 12:18, 12:19, 13:18, 13:19, 13:21, 13:24, 14:8, 14:9, 16:11, 17:8, 17:11, 17:16, 18:3, 19:8, 20:22, 20:24, 21:1, 21:17, 23:1, 24:13, 25:19, 26:1, 52:15, 53:10, 53:16, 54:11, 55:1, 55:10, 59:25, 60:15, 60:16, 60:21, 61:23, 66:17, 72:9, 72:11, 72:12, 74:9, 74:10, 76:14, 81:2, 81:6, 81:9, 81:13, 81:18
**claimed** [4] - 22:22, 25:13, 55:14, 60:14
**claiming** [2] - 61:1, 72:15
**claims** [22] - 12:19, 15:11, 16:6, 16:13, 17:21, 18:22, 20:17, 23:18, 24:17, 24:23, 24:25, 25:4, 53:9, 54:15, 57:6, 57:22, 59:13, 62:8, 63:16, 64:9, 77:5, 77:9
**clear** [17] - 6:7, 9:2, 14:14, 14:19, 14:24, 29:1, 37:11, 57:19, 64:9, 65:20, 66:20, 71:4, 73:23, 77:8, 80:13, 81:15, 83:23
**cleared** [1] - 66:24
**clearest** [2] - 70:19, 70:22
**clearly** [7] - 18:21, 19:23, 28:19, 39:20, 56:2, 56:4, 79:16
**click** [1] - 35:15
**client** [5] - 4:17, 11:9, 12:3, 68:5, 71:24
**clock** [3] - 41:25, 42:5, 42:7
**close** [4] - 22:16, 28:5, 29:12, 67:5
**closed** [5] - 28:13, 58:12, 58:13, 59:8, 65:24
**closely** [1] - 20:15
**closer** [1] - 40:17
**co** [1] - 3:1
**co-counsel** [1] - 3:1
**code** [1] - 10:21
**coextensive** [2] - 77:3, 77:5
**coffer** [1] - 69:5
**cognizant** [1] - 4:2
**Cohen** [5] - 25:14, 25:19, 25:24, 26:13
**collapsed** [1] - 13:2
**college** [1] - 32:10
**column** [5] - 14:23, 15:8, 15:16, 58:15, 59:2
**columns** [2] - 4:20, 83:16
**combination** [1] - 50:12
**combine** [2] - 25:20, 26:9
**combined** [1] - 26:17
**coming** [1] - 71:6
**commercialized** [1] - 11:13
**common** [7] - 16:1, 18:4, 18:21, 23:8, 32:22, 66:19, 70:7
**commonly** [3] - 18:5, 18:7, 18:22
**companies** [5] - 30:7, 45:16, 46:24, 47:15, 62:23
**company** [16] - 4:18, 4:24, 7:17, 8:6,

8:17, 30:15, 36:11, 39:17, 45:6, 45:25, 62:18, 69:17, 71:11, 71:19, 79:10, 82:17
**compensable** [2] - 52:3, 79:16
**compete** [1] - 7:17
**competing** [2] - 50:18, 50:20
**competition** [5] - 29:5, 30:12, 33:2, 40:10, 42:23
**competitor** [4] - 9:22, 28:6, 29:1, 35:5
**complaint** [4] - 27:10, 31:3, 44:16, 45:11
**complete** [6] - 9:16, 29:17, 34:13, 49:4, 69:13, 70:6
**completed** [5] - 3:16, 28:14, 65:25, 66:9, 71:17
**completely** [2] - 58:6, 78:23
**completes** [1] - 7:14
**composition** [1] - 24:20
**compound** [11] - 24:23, 24:25, 25:15, 25:16, 56:19, 56:20, 56:23, 57:3, 60:24, 74:24, 81:6
**comprises** [4] - 16:5, 24:18, 52:22, 76:7
**comprising** [3] - 52:20, 52:21, 76:22
**Conaway** [1] - 2:25
**CONAWAY** [1] - 1:18
**concede** [1] - 76:9
**conceding** [1] - 82:6
**conceivable** [1] - 76:14
**concern** [3] - 23:24, 74:3, 74:4
**conclusionary** [1] - 26:10
**conduct** [3] - 65:8, 65:9, 74:1
**confident** [3] - 9:3, 9:4, 34:11
**confused** [1] - 46:13
**confusing** [1] - 53:20
**connected** [1] - 53:21
**consideration** [1] - 12:15
**considered** [1] - 26:13
**Constantine** [1] - 3:18
**constituent** [2] - 52:22, 52:23
**construction** [6] - 13:18, 13:19, 17:9, 17:16, 19:8, 21:17
**construed** [4] - 55:1, 57:23, 58:5
**consumables** [1] - 69:12
**consuming** [1] - 11:8
**consummate** [1] - 37:10
**consummated** [1] - 6:10
**consummating** [1] - 67:6
**contact** [4] - 28:11, 42:15, 64:19, 65:22
**contain** [10] - 14:14, 18:15, 18:20, 53:17, 53:18, 59:14, 63:5, 63:6, 64:1
**contained** [2] - 14:18, 52:11
**contains** [42] - 10:20, 13:5, 13:7, 13:16, 13:21, 14:8, 14:9, 14:17, 15:23, 16:4, 17:2, 17:3, 18:12, 18:16, 18:25, 24:9, 24:18, 52:12, 52:14, 52:16, 52:19, 52:23, 52:24, 53:1, 53:13, 53:14, 53:16, 53:19, 53:22, 54:8, 54:11, 55:2, 59:7, 59:8, 59:11, 59:12, 63:22, 73:21, 74:10, 75:22, 76:7

**contemplating** [1] - 56:2
**context** [2] - 16:18, 71:18
**continue** [1] - 45:21
**CONTINUED** [1] - 2:1
**contract** [4] - 34:5, 37:8, 46:7, 64:20
**contracts** [1] - 82:15
**contradict** [1] - 22:23
**contrary** [1] - 16:9
**contrast** [1] - 14:25
**conventional** [1] - 76:20
**conversation** [1] - 64:21
**conversations** [1] - 67:1
**convince** [1] - 35:22
**convoyed** [5] - 8:8, 31:12, 32:18, 79:8, 83:17
**convoying** [1] - 29:20
**copied** [2] - 55:15
**copy** [1] - 6:25
**corporate** [4] - 8:23, 9:7, 9:17, 69:5
**corporation** [1] - 44:5
**CORPORATION** [1] - 1:3
**correct** [7] - 41:24, 42:24, 52:18, 57:13, 62:9, 66:4, 66:5
**correspondence** [1] - 7:15
**cost** [2] - 33:16, 82:19
**counsel** [8] - 3:1, 3:5, 3:11, 38:3, 39:5, 44:1, 67:13, 83:13
**Counsel** [2] - 1:23, 2:9
**counsel's** [2] - 83:3, 83:22
**couple** [6] - 3:17, 6:9, 16:22, 27:7, 31:1, 49:1, 65:18, 66:23, 83:12
**course** [4] - 13:22, 20:23, 72:9, 76:2
**COURT** [123] - 1:1, 2:19, 2:21, 3:3, 3:7, 3:13, 3:20, 4:6, 4:13, 5:22, 5:24, 6:14, 6:20, 7:5, 7:8, 8:2, 8:12, 9:11, 9:20, 10:8, 10:10, 14:3, 14:10, 15:12, 15:19, 17:18, 17:21, 19:6, 19:13, 19:15, 20:14, 20:25, 21:18, 24:11, 24:22, 26:21, 27:16, 28:22, 30:2, 31:10, 32:6, 32:9, 33:6, 34:8, 34:23, 35:24, 37:1, 37:19, 37:25, 39:11, 39:19, 40:9, 41:7, 41:19, 42:13, 42:20, 43:16, 44:20, 45:19, 46:2, 46:13, 47:25, 48:8, 48:22, 50:7, 51:21, 52:15, 53:7, 53:25, 54:14, 56:13, 56:19, 56:21, 57:7, 58:10, 58:20, 59:1, 61:3, 61:10, 62:5, 62:15, 63:2, 63:9, 63:15, 63:20, 64:14, 64:24, 65:12, 65:16, 66:2, 67:19, 68:8, 68:17, 69:21, 70:12, 71:9, 72:1, 72:4, 72:14, 73:3, 73:7, 73:15, 73:18, 74:22, 75:6, 75:21, 76:1, 77:15, 77:18, 77:23, 78:9, 78:19, 79:8, 80:7, 81:15, 81:19, 81:24, 82:1, 82:9, 83:20, 84:9, 84:18, 84:23
**court** [4] - 4:3, 20:4, 45:10, 84:22
**Court** [14] - 1:14, 10:7, 10:16, 12:12, 13:18, 13:25, 19:4, 20:9, 21:11, 22:4, 26:19, 41:22, 45:15, 84:24
**Court's** [1] - 37:16
**Courtroom** [1] - 1:10
**courtroom** [1] - 3:5

**courts** [2] - 23:23, 66:16
**cover** [14] - 17:22, 19:24, 20:17, 24:23, 39:3, 39:9, 45:7, 52:10, 61:13, 62:3, 62:4, 62:7, 73:14
**covered** [24] - 18:3, 54:9, 54:10, 54:15, 54:17, 54:18, 54:19, 54:20, 54:21, 55:10, 55:11, 56:11, 57:5, 61:21, 61:23, 62:20, 64:12, 65:11, 73:1, 73:3, 80:19, 80:23, 80:24
**covers** [9] - 24:24, 52:10, 56:4, 56:18, 57:1, 57:18, 59:25, 65:3, 81:20
**create** [1] - 62:17
**credibility** [1] - 21:20
**criticize** [1] - 76:6
**cross** [2] - 8:25, 47:22
**cross-branding** [1] - 8:25
**CROWELL** [1] - 2:6
**Crowell** [1] - 3:15
**cull** [3] - 58:18, 81:12, 81:22
**culling** [1] - 72:6
**cumbersome** [1] - 6:5
**cure** [2] - 75:10, 75:13
**cured** [1] - 80:22
**curious** [1] - 27:21
**current** [4] - 29:14, 30:2, 48:1, 50:13
**customary** [1] - 13:22
**customer** [17] - 29:14, 29:22, 30:2, 30:11, 30:13, 30:14, 33:17, 49:12, 49:16, 49:17, 50:1, 70:20, 78:7, 78:13, 82:20, 83:6
**customers** [16] - 6:6, 30:3, 34:25, 35:1, 35:6, 35:17, 36:18, 36:23, 36:24, 49:3, 50:2, 50:4, 50:8, 50:13, 50:14, 79:12
**cut** [1] - 81:13

# D

**damages** [9] - 31:22, 32:7, 32:13, 32:16, 51:15, 51:19, 52:3, 79:16, 83:14
**dangle** [1] - 79:19
**date** [4] - 23:25, 41:18, 59:16, 59:19
**daughter** [1] - 74:7
**DAVID** [1] - 1:22
**David** [1] - 3:4
**days** [13] - 27:11, 40:1, 40:5, 40:6, 42:1, 42:2, 42:11, 43:12, 43:16, 55:10, 83:12
**dead** [1] - 43:14
**deal** [5] - 10:17, 47:16, 48:13, 77:11, 77:25
**December** [1] - 1:9
**decided** [1] - 39:2
**decision** [1] - 7:3
**declarant** [1] - 18:24
**declarants** [1] - 51:14
**declaration** [14] - 12:22, 13:10, 16:23, 16:25, 23:17, 33:23, 49:11, 56:10, 57:16, 58:2, 58:3, 70:8, 73:8, 81:1
**declarations** [2] - 3:23, 73:11

**deemed** [1] - 82:6
**deep** [1] - 10:14
**DEFCON** [1] - 67:6
**Defendant** [2] - 1:7, 2:9
**defined** [1] - 18:6
**definitely** [1] - 13:12
**definition** [2] - 13:24, 59:9
**definitive** [1] - 46:25
**deftly** [1] - 52:25
**DELAWARE** [1] - 1:2
**Delaware** [6] - 1:12, 30:14, 30:16, 33:16, 44:6, 50:4
**delay** [7] - 22:6, 27:2, 27:15, 35:22, 66:14, 66:15
**delayed** [1] - 33:20
**delaying** [1] - 77:22
**demand** [1] - 49:12
**deposition** [1] - 18:24
**depositions** [1] - 56:12
**describe** [4] - 25:3, 74:16, 76:13, 76:16
**described** [3] - 19:24, 75:13, 78:7
**description** [15] - 16:10, 16:18, 24:6, 53:8, 54:23, 58:6, 58:7, 60:10, 74:6, 74:15, 75:17, 76:11, 76:18, 80:14, 80:15
**desperate** [1] - 28:6
**detail** [4] - 37:3, 72:25, 76:24, 83:18
**detected** [1] - 11:25
**detection** [3] - 11:17, 25:21, 26:4
**developed** [2] - 7:13, 11:12
**developing** [1] - 11:4, 12:3
**development** [2] - 11:4, 35:12
**develops** [1] - 41:13
**device** [1] - 24:20
**DI-12-1** [1] - 68:4
**dialkylamino** [6] - 13:16, 15:2, 18:1, 18:10, 19:18, 54:6
**dictionary** [1] - 18:15
**difference** [4] - 40:10, 40:14, 40:16, 57:4
**differences** [3] - 20:11, 20:23, 22:1
**different** [26] - 4:25, 7:25, 19:18, 21:16, 24:1, 25:16, 26:3, 26:4, 26:16, 26:17, 27:14, 38:6, 39:16, 45:3, 54:10, 55:17, 62:23, 65:5, 69:3, 69:5, 69:19, 80:4, 81:16, 81:18, 81:20
**differently** [1] - 21:3
**difficult** [2] - 31:23, 32:7
**dig** [2] - 10:13, 23:16
**diligently** [3] - 47:20, 47:21, 84:19
**diminish** [1] - 83:3
**direct** [5] - 9:22, 29:1, 29:5, 64:6, 71:1
**directions** [1] - 83:11
**directly** [8] - 7:14, 9:5, 15:3, 15:4, 53:21, 68:15, 70:25, 71:19
**disagreeing** [1] - 17:24
**disavowal** [2] - 13:24, 14:1
**disclaimer** [2] - 62:10, 62:25
**disclose** [7] - 55:23, 56:5, 56:8, 56:16,

57:2, 72:16, 73:7
**disclosed** [9] - 20:19, 21:4, 55:19, 56:7, 65:2, 72:23, 72:25, 73:5, 73:6
**discount** [2] - 70:21, 79:20
**discovery** [1] - 9:7
**discuss** [3] - 38:3, 38:13, 59:11
**discussed** [2] - 45:17, 80:16
**discussion** [1] - 67:10
**disentangle** [1] - 31:23
**dismiss** [1] - 44:15
**disposals** [1] - 4:21
**dispute** [4] - 12:25, 13:20, 28:25, 66:13
**disputed** [2] - 13:1, 13:2
**distinction** [3] - 45:4, 45:6, 46:19
**DISTRICT** [2] - 1:1, 1:2
**district** [1] - 29:3
**District** [3] - 1:14, 44:6, 44:17
**divide** [1] - 12:9
**division** [1] - 69:11
**DNA** [3] - 10:20, 10:25, 53:14
**document** [5] - 65:21, 68:6, 68:7, 68:9, 69:9
**documents** [2] - 8:24, 8:25
**Dolittle** [1] - 28:22
**dollar** [9] - 31:16, 40:21, 50:22, 51:18, 78:16, 79:6, 79:15, 79:19, 79:20
**dollars** [2] - 30:8, 79:5
**done** [8] - 11:15, 20:21, 24:4, 33:19, 34:20, 43:18, 43:19, 58:14
**door** [6] - 30:19, 30:21, 30:24, 70:10, 70:15
**double** [14] - 22:20, 22:21, 23:11, 23:12, 62:1, 62:22, 62:24, 63:3, 63:4, 63:17, 63:21, 76:25, 77:2
**doubt** [1] - 32:12
**down** [5] - 13:19, 31:14, 33:4, 36:20, 76:20
**downstream** [2] - 51:22, 51:23
**Dr** [15] - 12:22, 16:25, 18:23, 28:22, 53:12, 55:13, 55:22, 56:9, 57:1, 57:20, 57:24, 58:1, 60:2, 64:10, 81:1
**draft** [1] - 68:8
**drive** [2] - 82:22, 82:23
**drives** [1] - 4:22
**drug** [2] - 11:3, 35:12
**drugs** [1] - 11:4
**due** [2] - 27:3, 41:22
**during** [4] - 26:14, 28:9, 28:10, 38:18
**dwarf** [1] - 83:6

**E**

**early** [1] - 43:2
**easily** [1] - 79:16
**effort** [1] - 29:16
**egregious** [1] - 22:5
**either** [6] - 7:1, 23:17, 34:20, 64:7, 70:25, 82:22
**elapsed** [1] - 40:6

**ELISE** [1] - 2:7
**embodiments** [1] - 25:5
**employees** [1] - 44:6
**enable** [1] - 74:16
**enabled** [1] - 11:15
**enablement** [5] - 53:8, 53:9, 53:11, 75:17, 75:19
**enables** [2] - 29:17, 34:12
**enabling** [1] - 69:13
**encompass** [1] - 16:11
**encompassed** [1] - 16:7
**encompasses** [1] - 24:9
**encourages** [1] - 35:25
**encouraging** [1] - 9:19
**end** [6] - 4:4, 18:2, 19:19, 33:5, 43:3
**ended** [3] - 58:12, 59:6, 59:9
**ends** [1] - 65:17
**energy** [1] - 38:20
**enforceability** [1] - 19:4
**engage** [1] - 38:24
**enhances** [1] - 69:12
**enjoin** [7] - 8:16, 44:14, 44:25, 45:5, 45:14, 46:20, 77:14
**enjoined** [2] - 45:4, 46:16
**enjoying** [1] - 68:12
**enter** [1] - 36:10
**entered** [3] - 28:7, 46:7, 64:19
**entire** [2] - 48:17, 74:1
**entirely** [1] - 42:8
**entitled** [2] - 59:16, 59:18
**entity** [1] - 44:4
**equipment** [21] - 40:19, 41:4, 41:18, 49:8, 49:21, 49:24, 50:16, 50:21, 50:23, 51:3, 51:7, 51:24, 69:24, 69:25, 70:1, 78:16, 78:24, 79:11, 79:19, 82:12
**eroded** [1] - 34:1
**erosion** [12] - 29:7, 32:23, 33:7, 33:9, 51:9, 51:10, 51:13, 51:15, 51:19, 79:13, 79:15
**especially** [4] - 26:2, 33:7, 81:18, 83:12
**ESQ** [8] - 1:18, 1:21, 1:21, 1:22, 2:4, 2:7, 2:7, 2:8
**essentially** [1] - 19:17
**et** [4] - 1:3, 10:2, 67:14, 70:8
**evaluate** [2] - 21:20, 49:25
**event** [3] - 7:8, 23:22, 28:3
**eventually** [1] - 5:20
**evidence** [17] - 8:24, 14:3, 14:6, 17:4, 21:6, 43:1, 47:5, 49:9, 51:7, 51:12, 51:14, 58:3, 73:18, 73:20, 83:24, 84:3
**evidencing** [1] - 8:25
**evidentiary** [2] - 66:17, 72:21
**exact** [4] - 18:11, 20:22, 41:10, 81:6
**exacting** [1] - 14:1
**exactly** [6] - 18:8, 57:13, 57:14, 63:24, 64:21, 83:9
**examiner** [1] - 26:14
**example** [13] - 9:13, 14:21, 14:22, 15:8,

18:16, 28:9, 30:11, 42:23, 50:9, 70:5, 70:19, 70:22, 72:12
**examples** [22] - 14:13, 14:24, 14:25, 15:8, 15:11, 15:21, 15:24, 17:8, 17:12, 19:2, 29:8, 29:11, 52:21, 58:23, 59:3, 59:21, 59:22, 59:23, 59:24, 60:8
**exceed** [2] - 82:19, 83:8
**except** [1] - 40:16
**exception** [1] - 23:22
**exchange** [1] - 9:18
**exclude** [1] - 67:17
**excluded** [1] - 16:7
**exclusion** [1] - 14:2
**exclusive** [7] - 5:22, 6:12, 27:17, 27:19, 38:13, 39:6, 64:22
**exercise** [1] - 67:17
**existing** [4] - 29:16, 30:11, 30:13, 31:20
**expensive** [1] - 83:5
**expert** [12] - 12:22, 16:23, 23:16, 31:23, 32:13, 32:16, 55:16, 55:14, 57:23, 58:2, 64:10, 83:14
**expert's** [1] - 13:10
**experts** [3] - 51:20, 73:13, 73:15
**expire** [2] - 23:24, 62:11
**explain** [2] - 15:19, 26:7
**explaining** [1] - 73:13
**explains** [1] - 73:8
**expression** [1] - 14:2
**extend** [1] - 24:1
**extent** [1] - 8:16
**extra** [1] - 33:20
**extreme** [1] - 83:4
**eyes** [2] - 5:15, 37:9

### F

**face** [1] - 33:12
**fact** [11] - 4:2, 4:25, 23:8, 27:2, 28:2, 29:3, 35:13, 47:17, 47:18, 53:12, 56:15
**factor** [3] - 12:7, 12:14, 66:18
**factoring** [1] - 27:24
**factors** [7] - 10:6, 12:8, 26:25, 29:4, 29:5, 32:3, 75:18
**facts** [5] - 40:17, 41:24, 51:2, 51:8, 84:6
**factual** [2] - 82:2, 84:7
**factually** [1] - 52:1
**fair** [1] - 68:14
**faith** [2] - 6:2, 22:12
**fallacy** [1] - 24:8
**familiar** [3] - 10:20, 61:10, 61:19
**family** [7] - 12:3, 21:16, 22:10, 38:16, 55:18, 72:25, 78:2
**FAQ's** [1] - 28:10
**far** [3] - 36:8, 36:24, 40:18
**fast** [3] - 30:6, 33:8, 49:19
**faster** [1] - 35:23
**favor** [1] - 19:9
**FDA** [35] - 35:11, 35:12, 35:17, 35:18,

35:22, 36:6, 36:18, 36:24, 48:14, 48:17, 49:4, 49:18
**fear** [1] - 44:3
**feature** [1] - 77:5
**features** [3] - 10:23, 24:21, 24:25
**February** [1] - 33:14
**Federal** [3] - 16:13, 29:2, 66:16
**feed** [1] - 38:8
**few** [5] - 6:11, 20:1, 27:10, 65:17, 77:20
**field** [3] - 10:17, 11:6, 68:23
**fifty** [2] - 30:10, 70:21
**fight** [1] - 59:19
**fighting** [1] - 73:12
**figure** [11] - 15:13, 20:8, 20:10, 20:12, 20:17, 21:7, 21:9, 21:15, 22:2, 36:1, 54:14
**file** [5] - 28:20, 39:24, 43:12, 55:11, 57:14
**filed** [23] - 5:8, 5:9, 6:11, 8:11, 27:10, 27:12, 31:2, 32:20, 33:13, 34:1, 38:12, 38:14, 38:17, 40:2, 42:12, 44:13, 45:1, 55:17, 55:19, 56:5, 56:7, 56:9, 59:13
**finally** [5] - 5:6, 5:7, 6:10, 25:7, 42:8
**fine** [1] - 37:19
**FINEMAN** [3] - 2:4, 3:9, 3:14
**Fineman** [2] - 3:8, 3:10
**FINGER** [1] - 2:4
**fingers** [1] - 49:19
**finish** [1] - 4:8
**Fink** [1] - 3:10
**first** [16] - 12:10, 14:7, 14:13, 20:7, 22:21, 27:1, 29:12, 30:16, 32:20, 33:21, 34:24, 49:2, 65:20, 66:14, 74:3, 78:4
**firstly** [1] - 64:18
**five** [5] - 4:10, 4:25, 31:18, 35:23, 82:8
**fix** [1] - 62:22
**flavored** [1] - 69:19
**flavors** [1] - 22:21
**flawed** [1] - 25:14
**flights** [1] - 77:23
**flow** [2] - 69:5, 83:11
**focus** [1] - 40:13
**focused** [3] - 12:20, 28:1, 29:3
**folks** [6] - 30:3, 48:12, 48:24, 50:8, 50:9, 69:23
**follow** [1] - 45:23
**followed** [1] - 27:8
**following** [1] - 72:8
**food** [1] - 5:16
**foot** [5] - 30:18, 30:19, 30:21, 70:9, 70:15
**FOR** [1] - 1:2
**forces** [1] - 33:23
**foremost** [1] - 14:7
**formed** [1] - 21:8
**formula** [1] - 55:7
**forth** [2] - 7:10, 21:25
**forward** [1] - 74:2

**four** [4] - 18:16, 18:17, 51:14, 54:8
**Fournier** [1] - 33:22
**framed** [1] - 40:18
**frankly** [2] - 10:14, 30:12, 77:9
**free** [1] - 71:18
**free-standing** [1] - 71:18
**Friday** [3] - 1:9, 2:22, 45:12
**front** [3] - 61:7, 67:25, 71:12
**full** [6] - 4:23, 7:20, 9:1, 32:24, 78:22
**function** [1] - 76:14
**functional** [8] - 55:5, 55:10, 58:8, 61:22, 63:11, 74:25, 80:17, 81:3
**functions** [2] - 10:23, 11:3
**fundamentally** [1] - 74:20
**funny** [2] - 18:13, 78:17
**future** [3] - 50:13, 51:17, 68:4
**fuzziness** [1] - 7:10
**fuzzy** [1] - 55:16

### G

**general** [1] - 69:10
**generally** [1] - 11:20
**genetic** [1] - 10:21
**genous** [7] - 72:9, 72:12, 72:16, 72:17, 72:19, 72:24
**Gillet** [1] - 53:5
**Gillette** [1] - 60:23
**given** [9] - 6:5, 6:17, 7:25, 8:8, 27:3, 60:21, 62:13, 73:19
**glad** [1] - 43:18
**glasses** [1] - 37:24
**glutamate** [1] - 5:14
**glycan** [9] - 11:23, 29:19, 39:14, 41:12, 48:18, 69:13, 79:24, 80:3, 80:5
**glycans** [2] - 10:19, 11:7
**glyco** [1] - 10:17
**glycobiology** [1] - 10:17
**glycosylation** [1] - 10:24
**GlycoWorks** [1] - 11:13
**God** [1] - 51:10
**goodness** [1] - 40:20
**goof** [1] - 72:23
**Googled** [1] - 18:14
**gorilla** [1] - 66:21
**gosh** [1] - 46:20
**granted** [1] - 5:3
**greater** [1] - 69:11
**group** [20] - 13:4, 13:15, 13:16, 15:2, 15:4, 15:7, 18:1, 18:11, 19:19, 54:6, 54:7, 55:5, 55:10, 58:8, 61:22, 63:11, 74:25, 80:17
**groups** [5] - 13:6, 13:8, 15:21, 18:2, 81:3
**Grover** [1] - 49:11
**growing** [4] - 30:6, 30:7, 33:8, 50:7
**growth** [1] - 30:10
**guess** [4] - 27:16, 44:23, 45:2, 71:1
**guessing** [1] - 83:24

gun [1] - 28:18
guy [2] - 28:7, 29:15
guys [2] - 46:5, 50:20

# H

half [3] - 4:10, 30:8, 31:15
hand [5] - 23:7, 23:14, 23:21, 25:10, 28:16
handle [1] - 61:16
handles [1] - 74:10
hands [3] - 20:3, 20:4, 61:18
happy [5] - 4:4, 6:17, 6:23, 76:19, 84:22
Happy [1] - 84:23
hard [2] - 33:4, 35:19
hardship [1] - 37:4
hardships [1] - 67:22
harm [17] - 26:25, 28:2, 29:6, 29:11, 32:4, 32:6, 52:2, 52:4, 52:8, 66:18, 66:19, 69:15, 69:16, 71:23, 71:24, 78:6, 79:7
haste [1] - 41:22
hay [1] - 53:12
head [2] - 9:23
head-to-head [1] - 9:23
heads [1] - 37:8
hear [2] - 5:12, 8:13
heard [5] - 12:25, 37:23, 38:3, 38:8, 39:21
hearing [1] - 45:12
heart [1] - 52:13
held [1] - 7:16
helpful [4] - 7:3, 7:6, 26:21, 58:19
HEROLD [1] - 2:7
heterocyclic [1] - 13:4
high [2] - 22:5, 22:8
highlighted [1] - 80:11
highly [3] - 29:13, 34:13, 68:5
history [1] - 22:11
holiday [2] - 2:22, 77:24
holidays [3] - 4:3, 84:22, 84:23
home [1] - 78:1
honestly [1] - 48:18
Honor [83] - 2:24, 3:2, 3:9, 3:19, 4:1, 4:9, 4:16, 5:1, 5:23, 6:1, 6:17, 6:24, 7:2, 7:9, 8:4, 8:18, 10:3, 10:9, 10:20, 26:24, 28:23, 31:9, 33:3, 33:11, 37:15, 37:20, 37:21, 38:19, 39:13, 39:24, 40:15, 40:23, 41:11, 42:24, 43:19, 43:23, 44:8, 44:16, 45:22, 45:24, 46:12, 48:3, 48:16, 49:2, 50:12, 52:5, 52:18, 52:25, 54:24, 57:13, 58:18, 61:17, 64:13, 64:18, 65:14, 65:15, 66:5, 68:2, 68:14, 71:3, 71:15, 72:2, 72:7, 73:22, 75:5, 75:8, 75:25, 76:6, 76:12, 76:21, 77:7, 77:16, 79:15, 80:2, 81:17, 81:25, 82:3, 83:19, 83:21, 84:8, 84:12, 84:17
Honor's [4] - 4:5, 5:15, 27:1, 36:21,

48:20
HONORABLE [1] - 1:13
hook [2] - 44:18, 44:19
horribles [1] - 71:5
horse [1] - 43:15
hour [2] - 4:7, 4:10
house [2] - 3:5, 54:8
huge [1] - 41:6, 79:9
human [1] - 11:3
hundred [6] - 40:21, 50:22, 78:15, 79:6, 79:14, 79:18
hundred-thousand-dollar [1] - 50:22
hundreds [1] - 40:22
hypothetical [1] - 7:22

# I

idea [4] - 54:10, 61:19, 79:17, 81:13
identical [5] - 22:24, 23:3, 23:9, 23:10, 57:3
identify [1] - 19:19
identifying [1] - 31:6
IDS [4] - 55:19, 56:8, 57:15, 73:12
ignored [1] - 67:3
illustrative [1] - 59:24, 60:9
imagine [1] - 47:6
imminence [1] - 28:14
imminent [3] - 28:20, 28:21, 29:11
impact [3] - 48:11, 48:24, 75:3
impacting [1] - 36:1, 71:11
important [11] - 10:19, 10:22, 11:1, 11:22, 16:2, 17:2, 29:19, 44:7, 66:13, 81:8, 81:11
importantly [1] - 70:10
improperly [1] - 16:22
imputed [1] - 65:9
IN [1] - 1:1
in-house [1] - 3:5
INC [1] - 1:6
include [5] - 16:6, 19:1, 57:15, 58:24, 59:4
included [1] - 56:21, 56:23, 57:10
includes [9] - 13:7, 13:16, 14:13, 15:25, 16:4, 18:21, 24:13, 24:18, 63:6
including [2] - 12:22, 39:18
inconsistent [3] - 20:5, 56:14, 73:24
incorporate [1] - 46:18
incorporating [1] - 29:20
increase [1] - 49:13
indefinite [1] - 54:4
indefiniteness [12] - 53:10, 53:25, 60:11, 61:4, 61:5, 61:9, 61:11, 61:14, 61:15, 74:15, 75:16, 80:20
indefiniteness/written [1] - 74:6
independence [1] - 9:17
independent [1] - 81:12
independently [1] - 77:10
indication [1] - 42:15
indicator [1] - 29:6

indisputably [1] - 13:10
inducement [3] - 68:15, 70:25, 71:2
inducing [1] - 9:4, 9:11, 9:19
industry [1] - 5:16, 41:16
inequitable [1] - 74:1
inextricably [1] - 50:17
inferring [1] - 56:15
inform [1] - 60:1
information [2] - 28:12, 65:23
infringe [3] - 50:25, 68:15, 70:25
infringed [2] - 12:20, 23:2
infringement [7] - 9:4, 12:11, 12:17, 12:24, 19:10, 24:14, 44:9, 50:25, 57:21, 67:16, 69:18, 71:23, 71:24, 74:14, 76:8, 76:9, 77:8
infringes [1] - 55:2
infringing [13] - 7:13, 23:2, 30:22, 31:3, 31:25, 32:19, 38:25, 42:16, 42:18, 51:24, 60:20, 67:18, 71:22
initial [1] - 79:20
initiating [1] - 39:22
injunction [26] - 3:22, 5:10, 7:24, 8:9, 8:12, 8:15, 10:6, 12:8, 27:12, 29:4, 29:5, 32:20, 33:5, 36:16, 36:17, 37:11, 40:2, 42:12, 42:14, 42:21, 44:14, 45:7, 45:14, 56:6, 69:6, 84:7
injury [1] - 28:20
insignificant [1] - 43:4
instances [1] - 27:17
instant [1] - 38:8
InstantAB [1] - 50:24
InstantPC [58] - 7:14, 31:20, 38:21, 39:8, 39:12, 39:16, 40:20, 40:24, 41:3, 41:9, 41:12, 41:14, 41:17, 44:22, 45:20, 46:6, 47:2, 47:3, 47:10, 47:12, 47:13, 47:23, 48:1, 48:25, 49:19, 50:1, 50:3, 51:1, 51:4, 51:6, 51:11, 55:1, 57:22, 62:3, 62:4, 68:18, 68:22, 68:23, 68:25, 69:24, 70:1, 70:16, 70:18, 70:21, 78:14, 78:21, 78:25, 79:4, 79:14, 79:21, 80:4, 80:6, 80:9, 80:10, 81:9, 82:12, 84:2
integrated [2] - 79:24, 80:5
integration [5] - 28:13, 31:12, 65:25, 66:9, 71:17
intellectual [1] - 12:4
intended [1] - 15:7
intending [1] - 20:21
intent [1] - 29:10
intention [3] - 27:7, 27:8, 77:12
interact [1] - 11:2
interest [3] - 25:6, 48:11, 52:8
interested [5] - 39:3, 39:21, 48:10, 78:24, 82:9
interesting [2] - 40:4, 49:9
interests [2] - 6:5, 6:6
internal [3] - 8:20, 62:10, 62:25
internally [1] - 49:17
interpret [2] - 21:16, 76:4
interpretation [4] - 21:8, 21:19, 60:15,

61:24

**interrelated** [1] - 5:16
**intervening** [1] - 15:3
**intrinsic** [5] - 14:3, 14:6, 15:5, 21:12, 21:13
**introduce** [1] - 3:1
**introductions** [2] - 2:23, 4:16
**invalid** [5] - 23:20, 58:6, 60:11, 63:14, 63:16
**invalidate** [1] - 59:18
**invalidity** [3] - 24:7, 25:7, 77:9
**invented** [1] - 74:9
**invention** [7] - 22:22, 25:13, 60:13, 61:2, 62:19, 62:23, 75:20
**inventions** [1] - 23:5
**invested** [1] - 38:20
**involuntary** [1] - 43:10
**involve** [1] - 48:18
**involvement** [1] - 20:7
**ironically** [1] - 18:23
**irreparable** [13] - 26:25, 28:2, 29:6, 29:11, 32:4, 32:6, 52:4, 52:8, 66:18, 66:19, 69:15, 69:16, 78:6
**issue** [26] - 4:21, 5:1, 5:19, 8:1, 9:25, 19:8, 22:16, 23:23, 27:1, 27:20, 31:13, 38:18, 42:13, 43:20, 45:23, 49:5, 56:7, 62:9, 62:10, 66:14, 66:21, 72:21, 73:2, 74:6, 76:25, 78:4
**issued** [3] - 29:9, 38:22, 42:11
**issues** [13] - 6:20, 8:8, 10:15, 12:13, 13:3, 19:4, 22:19, 25:6, 45:22, 69:2, 72:3, 76:21, 83:17
**items** [1] - 7:18
**itself** [5] - 14:9, 25:4, 45:20, 53:22, 66:18

## J

**JAMES** [1] - 2:7
**Jamie** [1] - 3:6
**January** [1] - 38:11
**Japan** [2] - 5:12, 7:11
**JENNIFER** [1] - 1:21
**Jennifer** [2] - 3:4, 10:12
**jeopardy** [1] - 62:22
**Jim** [1] - 3:14
**job** [3] - 46:6, 71:25, 72:1
**John** [1] - 3:19
**join** [2] - 46:10, 46:14
**joke** [1] - 78:9
**Judge** [1] - 1:14
**jump** [11] - 74:8, 74:9, 74:10, 74:11, 74:12, 75:1, 76:14, 76:15, 76:16, 80:14
**jumping** [1] - 28:18
**June** [1] - 55:19
**jurisdiction** [1] - 45:15

## K

**Karen** [1] - 2:24
**KAREN** [1] - 1:18
**KARLA** [1] - 2:8
**Karla** [1] - 3:14
**keep** [3] - 58:21, 79:23, 79:25
**keeper** [1] - 29:25
**keeps** [1] - 78:5
**kept** [1] - 50:9
**kids** [1] - 28:24
**kind** [10] - 28:14, 40:10, 45:16, 53:24, 57:19, 60:16, 70:23, 72:20, 81:21, 82:25
**kinds** [6] - 39:16, 81:2, 81:16, 81:18, 81:20, 83:16
**King** [1] - 1:11
**kit** [23] - 5:3, 29:24, 30:22, 31:20, 31:21, 33:19, 36:5, 36:13, 36:15, 40:22, 41:3, 43:1, 43:2, 50:17, 50:18, 78:14, 79:12, 79:13, 82:13, 82:14, 82:24, 83:1, 83:7
**kits** [14] - 4:21, 29:25, 30:11, 30:23, 31:24, 31:25, 50:11, 79:14, 82:7, 82:16, 82:18, 82:22, 83:2, 83:5
**knobs** [1] - 74:10
**knowing** [1] - 71:18
**known** [4] - 41:16, 54:22, 80:25
**knows** [6] - 5:2, 21:11, 22:4, 33:3, 40:23, 68:18

## L

**labeling** [4] - 5:17, 11:14, 11:22, 26:3
**laches** [4] - 19:12, 22:4, 22:16, 43:20
**lack** [1] - 58:6
**laid** [2] - 12:21, 13:9
**language** [16] - 13:21, 14:8, 14:22, 15:19, 17:14, 52:22, 58:10, 58:12, 58:13, 58:22, 59:1, 59:5, 59:8, 59:15, 76:4
**large** [2] - 61:8, 82:12, 82:17
**largest** [1] - 5:13
**last** [8] - 3:17, 13:6, 25:7, 43:14, 45:11, 76:25, 84:2, 84:10
**laugh** [1] - 78:17
**launch** [1] - 37:13
**laundry** [1] - 58:24
**law** [22] - 3:16, 13:17, 16:9, 16:17, 17:10, 22:24, 37:10, 43:23, 52:20, 59:23, 61:3, 61:6, 61:8, 61:10, 61:16, 72:9, 75:9, 75:14, 75:16, 76:13, 76:18, 76:22
**laws** [1] - 21:17
**lawsuit** [3] - 5:9, 6:3, 43:12
**Layton** [1] - 3:10
**LAYTON** [1] - 2:4
**learned** [2] - 27:11, 44:10
**least** [7] - 9:4, 19:9, 23:18, 60:23, 62:5,

72:11, 72:21
**leave** [1] - 46:5
**leaving** [1] - 78:2
**left** [2] - 31:2, 74:8
**leg** [1] - 30:23
**legal** [1] - 51:2
**legally** [2] - 52:1, 66:24
**legs** [2] - 24:13, 24:15
**less** [2] - 4:8, 11:16
**letter** [3] - 48:20, 61:8, 72:9
**letting** [1] - 37:22
**level** [4] - 9:23, 72:20, 76:18, 76:23
**leverage** [1] - 30:20
**lexicographer** [1] - 13:24
**lexicography** [1] - 59:9
**LI** [57] - 2:7, 3:12, 6:25, 37:21, 38:1, 39:13, 39:20, 40:15, 41:11, 41:21, 42:17, 42:24, 43:18, 45:5, 45:22, 46:3, 46:23, 48:3, 48:16, 49:1, 50:12, 51:23, 52:18, 53:9, 54:8, 54:24, 56:17, 56:20, 56:23, 57:13, 58:15, 58:22, 59:5, 61:6, 61:17, 62:9, 62:17, 63:8, 63:12, 63:18, 64:4, 64:18, 65:1, 65:14, 66:5, 77:17, 77:19, 78:1, 78:13, 79:2, 79:9, 80:12, 81:17, 81:20, 81:25, 82:4, 83:21
**Li** [6] - 3:11, 4:1, 66:3, 69:22, 75:2, 84:21
**Li's** [1] - 82:9
**liable** [3] - 62:20, 62:21, 62:23
**license** [6] - 5:4, 5:22, 5:25, 6:12, 12:5, 38:14
**licensed** [1] - 5:20
**licensee** [5] - 6:12, 27:18, 27:19, 39:7, 64:22
**likelihood** [5] - 10:5, 12:8, 12:11, 12:15, 29:6
**likely** [4] - 12:23, 13:12, 19:10, 82:24
**limit** [3] - 17:7, 17:11, 58:13
**limitation** [6] - 13:6, 13:13, 13:14, 23:7, 57:22
**limitations** [2] - 13:1, 24:19
**limited** [2] - 15:22, 75:23
**limiting** [2] - 14:15, 18:3
**line** [4] - 40:20, 58:16, 59:2, 70:6
**lines** [2] - 15:9, 71:4
**link** [1] - 64:6
**linked** [1] - 50:17
**linker** [21] - 17:23, 17:25, 19:17, 24:10, 24:23, 25:1, 53:1, 55:4, 55:9, 60:16, 60:17, 63:10, 64:3, 64:6, 75:20, 81:5, 81:10, 81:21
**linkers** [10] - 18:4, 18:6, 57:10, 59:22, 63:7, 75:14, 80:25, 81:16, 81:21
**liquid** [8] - 4:19, 7:19, 10:1, 29:17, 29:18, 31:14, 31:16, 69:13
**list** [1] - 58:25
**literally** [7] - 18:17, 23:2, 27:10, 53:17, 60:24, 81:3
**litigation** [6] - 6:4, 39:22, 40:18, 56:3, 56:17, 57:18

**live** [1] - 66:13
**LLP** [1] - 2:6
**locked** [4] - 35:13, 36:20, 36:21, 36:25
**locking** [1] - 36:23
**Lockwood** [1] - 25:3
**long-term** [3] - 35:2, 35:7, 82:15
**long-time** [1] - 34:25
**look** [16] - 15:10, 25:12, 25:17, 25:18, 26:6, 33:15, 34:11, 35:1, 35:4, 40:16, 44:25, 60:5, 62:6, 63:22, 72:15, 83:14
**looked** [2] - 21:7, 65:4
**looking** [5] - 30:10, 52:23, 59:3, 63:5, 65:7
**looks** [2] - 47:6, 57:3
**loose** [1] - 65:17
**lose** [2] - 35:3, 46:8
**losing** [1] - 84:13
**loss** [2] - 34:9, 34:21
**lost** [5] - 35:7, 42:25, 50:19, 51:4, 51:6
**Lowe** [1] - 3:19
**lower** [1] - 33:16
**Lynn** [1] - 3:6

# M

**machine** [10] - 30:5, 31:15, 31:16, 31:17, 40:22, 50:5, 79:6, 79:15, 82:19, 84:14
**machinery** [1] - 50:10
**machines** [4] - 4:19, 4:20, 7:20, 30:8, 30:9, 30:15, 40:22, 40:25, 41:1, 83:8, 83:16
**maintain** [1] - 67:22
**maintained** [1] - 69:4
**maintaining** [1] - 68:10
**managed** [2] - 32:10, 39:22
**manager** [1] - 69:10
**manifest** [2] - 14:1, 14:2
**manner** [2] - 26:9, 26:17
**manufacturers** [1] - 5:13
**manufacturing** [1] - 79:10
**marginal** [1] - 35:21
**market** [23] - 7:25, 8:3, 29:7, 30:6, 32:24, 33:8, 33:23, 34:9, 34:21, 35:6, 35:8, 35:11, 41:5, 42:25, 43:3, 43:4, 47:7, 50:8, 50:14, 50:19, 51:4, 51:11, 67:23
**marketing** [7] - 9:13, 9:14, 38:11, 38:20, 41:7, 43:2, 68:9
**MARYELLEN** [1] - 1:13
**mass** [25] - 4:19, 7:19, 9:25, 11:24, 25:17, 25:22, 29:24, 30:16, 30:25, 31:17, 31:25, 40:21, 41:6, 47:8, 49:22, 49:24, 50:5, 51:6, 68:18, 68:24, 69:14, 70:20, 79:3, 82:11, 84:4
**material** [6] - 55:21, 55:23, 55:24, 56:5, 56:25, 57:2
**materials** [3] - 9:24, 41:7, 41:15
**Matt** [2] - 33:24, 71:25

**matter** [9] - 27:6, 29:4, 32:2, 46:15, 46:19, 52:13, 64:9, 66:17, 77:2
**matters** [3] - 21:12, 82:2, 82:3
**MATTHEW** [1] - 1:21
**Matthew** [1] - 3:1
**McMullen** [2] - 1:22, 3:4
**mean** [18] - 7:8, 13:20, 15:23, 18:7, 18:13, 24:19, 28:9, 34:22, 41:5, 55:1, 60:23, 63:12, 65:1, 68:17, 76:16, 77:23, 78:17, 80:6
**meaning** [5] - 13:22, 14:5, 17:4, 18:21, 52:24
**meaningfully** [2] - 26:15, 66:10
**means** [18] - 14:17, 18:17, 18:20, 34:16, 35:20, 52:14, 53:16, 54:4, 54:11, 55:2, 63:5, 63:23, 64:1, 68:20, 68:22, 68:24, 75:22, 76:23
**meant** [1] - 38:15
**mechanically** [1] - 70:3
**mechanisms** [1] - 43:10
**medical** [1] - 4:24
**meet** [3] - 32:11, 49:12, 67:16
**meets** [2] - 57:22, 60:15
**member** [1] - 72:25
**mention** [2] - 39:7, 39:8
**mentioned** [1] - 80:9
**mentioning** [1] - 80:9
**merely** [2] - 14:25, 15:24
**merge** [3] - 46:9, 46:14, 46:23
**merits** [5] - 10:5, 12:9, 12:16, 52:6, 72:3
**methodology** [1] - 49:6
**middle** [1] - 57:5
**might** [19] - 2:25, 3:24, 9:8, 9:9, 39:3, 40:11, 42:21, 42:22, 54:21, 59:2, 65:18, 69:18, 69:25, 73:8, 73:18, 73:19, 75:12, 78:25, 79:3
**Mike** [1] - 3:6
**mill** [1] - 75:14
**million** [2] - 30:8, 31:16
**mind** [1] - 72:6
**minute** [2] - 4:15, 5:5
**minutes** [3] - 4:11, 11:16, 35:23
**misconduct** [1] - 22:5
**mispronounce** [1] - 31:18
**miss** [1] - 77:23
**missing** [1] - 25:19
**misunderstood** [2] - 63:18, 64:4
**mockery** [1] - 83:11
**modification** [1] - 10:25
**modifications** [2] - 11:2, 76:2
**moiety** [1] - 55:4
**molecule** [4] - 60:3, 60:14, 74:20, 75:11
**molecules** [6] - 53:14, 53:17, 53:18, 61:22
**money** [3] - 9:18, 52:3, 79:16
**monosodium** [1] - 5:14
**month** [13] - 5:8, 27:9, 34:4, 37:7, 39:24, 49:12, 49:14, 49:15, 66:8, 66:12, 82:17

**months** [5] - 6:11, 33:13, 33:21, 34:5, 35:23
**MORING** [1] - 2:6
**Moring** [1] - 3:15
**most** [2] - 13:1, 82:24
**motion** [11] - 3:21, 5:10, 12:21, 27:12, 30:13, 33:13, 33:21, 44:14, 69:3, 69:7, 84:9
**motions** [2] - 28:17, 31:4
**move** [4] - 16:20, 19:3, 22:15, 42:13
**moved** [1] - 44:15
**MPEP** [2] - 22:25, 23:1
**MR** [60] - 3:2, 3:9, 3:14, 4:1, 4:9, 4:14, 5:23, 6:1, 6:16, 6:23, 7:2, 7:7, 7:9, 8:4, 8:18, 9:13, 9:21, 26:24, 27:25, 28:23, 30:4, 31:11, 32:8, 32:12, 33:11, 34:10, 35:9, 36:3, 37:2, 37:20, 37:24, 58:18, 65:15, 65:17, 66:7, 68:2, 68:14, 68:20, 70:3, 70:19, 71:15, 72:2, 72:5, 72:20, 73:5, 73:10, 73:17, 73:22, 75:5, 75:8, 75:25, 76:6, 77:16, 77:25, 78:11, 82:2, 82:5, 82:14, 84:11, 84:21
**MS** [75] - 2:24, 3:4, 3:12, 6:25, 10:9, 10:11, 14:7, 14:12, 15:18, 15:20, 17:20, 18:4, 19:7, 19:14, 20:1, 20:18, 21:5, 21:23, 24:12, 24:24, 26:23, 37:21, 38:1, 39:13, 39:20, 40:15, 41:11, 41:21, 42:17, 42:24, 43:18, 45:5, 45:22, 46:3, 46:23, 48:3, 48:16, 49:1, 50:12, 51:23, 52:18, 53:9, 54:8, 54:24, 56:17, 56:20, 56:23, 57:13, 58:15, 58:22, 59:5, 61:6, 61:17, 62:9, 62:17, 63:8, 63:12, 63:18, 64:4, 64:18, 65:1, 65:14, 66:5, 77:17, 77:19, 78:1, 78:13, 79:2, 79:9, 80:12, 81:17, 81:20, 81:25, 82:4, 83:21
**multiple** [5] - 11:20, 14:18, 17:9, 25:22, 30:9
**must** [4] - 15:2, 15:4, 16:12, 78:9

# N

**name** [2] - 5:12, 71:19
**nature** [4] - 18:9, 18:10, 42:23, 75:20
**nauseam** [1] - 80:16
**near** [1] - 76:19
**necessarily** [5] - 6:6, 21:18, 33:9, 71:11, 78:19
**necessary** [2] - 10:14, 20:11
**need** [11] - 6:7, 6:8, 8:13, 16:8, 16:14, 25:3, 27:5, 30:14, 30:16, 33:9, 44:23
**needs** [2] - 13:7, 77:2
**negotiate** [1] - 6:2
**negotiations** [2] - 5:5, 6:9
**never** [5] - 38:22, 42:17, 65:1, 65:2, 66:25
**new** [19] - 11:4, 19:25, 33:17, 36:4, 36:7, 38:4, 41:18, 42:3, 42:5, 49:7, 50:3, 50:5, 50:8, 57:11, 59:14, 62:8, 77:6,

79:11, 80:23
**next** [6] - 9:9, 13:14, 39:5, 66:8, 78:21, 79:22
**nexus** [4] - 51:1, 51:2, 52:1, 78:5
**nitrogen** [3] - 55:8, 60:18, 81:8
**nobody** [4] - 17:3, 48:14, 50:22, 54:21
**noise** [1] - 74:12
**non** [4] - 44:21, 51:24, 57:21, 76:8
**non-infringement** [2] - 57:21, 76:8
**non-infringing** [1] - 51:24
**non-party** [1] - 44:21
**none** [2] - 51:13, 59:21
**nonetheless** [1] - 44:12
**NOREIKA** [1] - 1:13
**normal** [1] - 75:9
**Northern** [1] - 44:17
**note** [5] - 17:17, 28:1, 37:4, 66:15, 82:7
**nothing** [8] - 14:10, 15:3, 22:1, 22:14, 43:5, 43:7, 43:18, 77:6
**notice** [6] - 31:19, 56:1, 60:12, 60:19, 65:6, 74:2
**notion** [1] - 21:14
**November** [1] - 56:9
**nowhere** [1] - 76:19

## O

**obtained** [1] - 19:16
**obviate** [1] - 74:4
**obviated** [1] - 71:24
**obvious** [4] - 23:19, 63:10, 63:16, 64:3
**obviously** [11] - 6:12, 8:20, 9:6, 12:10, 12:14, 18:18, 21:24, 37:7, 45:22, 62:3, 62:11
**obviousness** [11] - 23:12, 25:8, 26:11, 61:25, 62:24, 63:3, 63:4, 63:13, 63:16, 63:21, 76:25
**occur** [1] - 10:25
**occurred** [1] - 22:14
**October** [1] - 38:11
**oddity** [1] - 18:19
**OF** [1] - 1:2
**offer** [2] - 45:20, 51:10
**offered** [2] - 47:5, 51:12
**offering** [3] - 9:3, 47:23, 71:1
**offers** [2] - 34:5, 80:5
**office** [8] - 19:20, 20:23, 21:25, 55:20, 56:24, 57:17, 62:7, 73:12
**old** [3] - 4:18, 32:10, 36:6
**once** [7] - 32:23, 33:3, 33:5, 35:11, 35:18, 36:20, 79:14
**one** [55] - 5:13, 7:15, 9:23, 12:7, 13:3, 13:5, 13:7, 13:8, 14:21, 16:2, 17:2, 17:9, 18:2, 18:16, 19:13, 19:18, 22:7, 22:17, 23:1, 23:14, 23:15, 23:18, 23:19, 27:15, 28:16, 34:10, 36:8, 36:12, 39:18, 40:20, 40:22, 41:3, 41:14, 41:19, 43:13, 43:16, 45:13, 46:4, 51:3, 51:25, 54:25, 55:7, 62:1,

67:21, 68:12, 69:20, 70:14, 72:9, 74:19, 80:7, 80:12, 80:19, 82:2
**one-for-one** [1] - 7:15
**one-to-one** [1] - 9:23
**one-way** [2] - 23:14, 62:1
**ones** [2] - 9:15, 65:19
**online** [1] - 18:15
**oOo** [1] - 2:13
**open** [6] - 15:19, 18:25, 37:9, 58:12, 59:6, 59:9
**open-ended** [3] - 58:12, 59:6, 59:9
**openings** [1] - 4:10
**opined** [1] - 53:19
**opinion** [4] - 57:1, 57:21, 64:10, 84:20
**opportunity** [1] - 3:24
**opposed** [1] - 28:6
**opposite** [1] - 83:9
**opposition** [1] - 44:18
**order** [9] - 28:11, 30:13, 44:13, 45:23, 47:3, 48:10, 65:22, 68:8, 71:21
**orders** [2] - 28:12, 65:24
**ordinary** [4] - 13:22, 14:4, 17:5, 60:1
**original** [1] - 15:10
**originally** [2] - 5:3, 7:13
**otherwise** [1] - 34:18
**outrageous** [2] - 79:1, 79:2
**outside** [1] - 75:24
**overlap** [1] - 64:8
**overlapping** [3] - 23:10, 77:1, 77:3
**overlaps** [1] - 63:8
**overturned** [1] - 22:18
**own** [17] - 6:8, 12:6, 13:23, 18:24, 20:6, 20:8, 21:9, 21:13, 22:23, 27:18, 39:9, 44:4, 47:2, 47:8, 55:12, 55:14, 81:12
**owned** [1] - 44:4
**owner** [3] - 5:21, 13:23, 27:20
**ownership** [2] - 6:18, 27:13
**owning** [1] - 28:2
**oxygen** [2] - 60:18, 81:10

## P

**p.m** [2] - 1:9, 84:24
**Pachivas** [1] - 3:18
**package** [2] - 51:11, 82:24
**page** [1] - 31:5
**pages** [1] - 80:12
**panning** [1] - 48:6
**panoply** [2] - 39:13, 41:12
**paper** [1] - 75:16
**papers** [10] - 3:22, 6:14, 12:19, 15:12, 19:15, 23:5, 27:21, 44:20, 45:10, 67:21
**parades** [1] - 71:5
**paragraph** [2] - 16:24, 17:6
**paragraphs** [1] - 19:2
**parameters** [1] - 76:23
**pardon** [1] - 7:10
**parent** [2] - 22:7, 72:23

**part** [12] - 11:23, 17:22, 17:23, 18:13, 20:2, 25:14, 31:6, 31:22, 36:9, 41:12, 54:6
**particular** [8] - 10:24, 11:14, 26:1, 29:3, 32:3, 64:25, 72:13, 75:11
**particularly** [2] - 5:1, 61:1
**parties** [1] - 4:7
**parts** [1] - 26:17
**party** [4] - 5:11, 7:12, 44:21, 67:12
**PASCALE** [2] - 2:24, 3:4
**Pascale** [1] - 2:25
**PASQUALE** [1] - 1:18
**pass** [3] - 5:6, 5:7, 61:17
**patent** [130] - 5:3, 5:6, 5:18, 5:20, 5:21, 6:8, 6:9, 6:19, 7:11, 8:7, 12:1, 12:2, 12:6, 13:23, 14:20, 17:11, 17:22, 18:22, 19:16, 19:17, 19:20, 19:22, 19:23, 19:25, 20:8, 20:15, 20:16, 20:20, 20:23, 21:3, 21:9, 21:12, 21:16, 21:23, 21:25, 22:2, 22:16, 24:17, 25:3, 27:3, 27:9, 27:14, 27:20, 37:6, 37:9, 37:12, 38:12, 38:14, 38:17, 38:22, 39:3, 39:7, 39:10, 39:23, 40:2, 40:7, 41:23, 41:25, 42:3, 42:9, 42:11, 42:16, 42:19, 43:21, 43:22, 44:9, 50:25, 52:9, 55:2, 55:12, 55:13, 55:18, 55:20, 55:21, 56:8, 56:11, 56:18, 56:24, 57:1, 57:6, 57:10, 57:12, 57:16, 57:17, 57:24, 57:25, 58:4, 58:7, 58:15, 58:17, 59:6, 59:10, 59:11, 59:12, 59:13, 59:18, 59:21, 60:2, 60:21, 62:7, 62:20, 62:21, 63:3, 63:13, 63:17, 64:16, 64:23, 65:3, 65:7, 65:10, 67:4, 67:15, 67:17, 67:18, 68:16, 70:25, 72:9, 72:17, 72:19, 72:24, 73:5, 73:12, 73:25, 76:2, 81:4
**patent-in-suit** [1] - 42:9
**patentability** [1] - 57:3
**patented** [3] - 10:16, 11:10, 51:25
**patentee** [1] - 15:6
**patenting** [13] - 22:20, 22:21, 23:11, 23:13, 62:1, 62:24, 63:3, 63:5, 63:17, 63:21, 63:22, 77:1, 77:2
**patents** [10] - 22:10, 23:24, 24:1, 24:4, 62:3, 62:4, 62:11, 64:7, 77:3, 81:15
**path** [1] - 36:20
**paying** [1] - 12:6
**pegging** [1] - 80:6
**pending** [3] - 20:1, 21:15, 21:23
**people** [11] - 18:16, 18:17, 33:18, 35:24, 36:1, 40:19, 40:23, 49:20, 50:6, 69:25, 77:23
**percent** [12] - 8:2, 8:4, 30:10, 33:16, 35:5, 35:8, 42:25, 43:4, 49:13, 50:19, 67:23, 70:21
**perfect** [2] - 4:13, 36:9
**perfected** [1] - 42:9
**perfectly** [1] - 71:4
**perhaps** [1] - 49:3
**period** [2] - 22:13, 24:1

permanent [6] - 29:5, 33:5, 36:16, 36:17, 45:14, 47:15
permission [1] - 52:5
person [11] - 21:7, 25:12, 26:6, 54:3, 60:1, 60:12, 60:19, 62:18, 67:18, 72:10, 78:23
Pfizer [7] - 35:22, 36:11, 36:12, 50:9, 50:10, 70:5, 79:17
pharma [1] - 30:7
pharmaceutical [1] - 48:17
phase [3] - 31:22, 73:13, 73:14
phone [1] - 40:7
phosphoric [1] - 54:6
phrases [1] - 67:13
PI [8] - 12:19, 12:21, 30:12, 33:21, 36:10, 69:3, 69:19
pick [5] - 25:20, 25:25, 26:2, 26:7
picking [1] - 36:12
picture [5] - 7:23, 28:7, 56:21, 56:24, 81:2
pictures [1] - 8:23
piece [7] - 49:7, 50:22, 51:3, 51:24, 78:16, 79:19, 82:12
pieces [2] - 50:16, 75:12
place [4] - 32:21, 33:21, 44:5, 45:1
plain [2] - 17:5, 52:24
plaintiff [2] - 4:17, 43:10
plaintiff 's [1] - 3:21
Plaintiffs [2] - 1:4, 1:23
plan [2] - 8:21, 70:6
planning [1] - 77:13
play [2] - 32:14, 83:18
player [1] - 7:12
players [1] - 4:16
playing [2] - 74:7, 74:8
pleadings [1] - 38:9
pleases [1] - 10:6
pockets [1] - 34:18
podium [1] - 84:11
point [49] - 5:19, 6:4, 14:5, 16:3, 19:15, 19:21, 20:2, 20:9, 20:10, 20:12, 24:22, 26:5, 31:2, 33:11, 34:12, 34:25, 35:2, 37:4, 43:14, 48:10, 49:10, 50:15, 51:21, 53:7, 53:8, 53:10, 53:24, 54:13, 57:19, 60:9, 62:6, 65:25, 66:7, 66:8, 66:9, 66:11, 67:21, 68:14, 72:15, 72:18, 73:10, 73:12, 74:23, 76:10, 80:16, 81:6, 82:10, 84:12
pointed [4] - 13:11, 22:17, 51:3, 52:25
pointing [2] - 20:9, 33:12
points [4] - 15:14, 49:1, 77:20, 83:17
poisoning [1] - 74:1
policy [1] - 66:15
PORTER [1] - 1:20
portfolio [2] - 9:1, 67:2
portion [3] - 17:25, 39:15, 43:4
position [21] - 14:16, 15:1, 16:3, 17:18, 18:20, 20:14, 20:16, 21:2, 27:22, 44:23, 52:15, 54:1, 54:17, 54:19,

57:14, 57:18, 59:15, 62:5, 63:13, 69:23, 73:16
positions [6] - 20:5, 21:21, 28:19, 56:14, 73:19, 73:24
possibility [1] - 15:25
possible [1] - 70:3
possibly [2] - 52:2, 53:2
potentially [2] - 34:24, 67:20
pound [1] - 66:20
practice [1] - 60:20
practicing [2] - 60:13, 62:19
pre [1] - 27:13
pre-ownership [1] - 27:13
precipice [1] - 36:23
precisely [4] - 28:20, 65:25, 66:7, 83:13
prediction [1] - 34:7
prefer [1] - 43:24
preference [1] - 4:5
prejudicial [1] - 49:25
preliminary [19] - 3:22, 5:10, 7:24, 8:9, 8:12, 8:15, 12:8, 27:12, 29:4, 32:20, 40:2, 42:12, 42:14, 42:21, 44:14, 45:13, 56:6, 69:6, 84:7
preparation [1] - 21:9
prepared [2] - 11:16, 21:7
preparing [2] - 9:24, 11:7
present [1] - 43:23
presented [4] - 10:15, 43:1, 51:7, 84:3
press [3] - 29:8, 34:12, 46:7
presumably [1] - 76:11
pretty [4] - 29:12, 37:10, 71:25, 83:23
prevent [3] - 32:4, 71:5, 71:13
price [18] - 29:7, 32:23, 33:2, 33:7, 33:9, 51:9, 51:10, 51:13, 51:15, 51:19, 78:22, 79:13, 79:15, 82:22, 82:24, 83:3, 83:17
prices [2] - 33:4, 34:1
priest [1] - 78:11
primarily [1] - 66:20
principles [1] - 75:24
priorities [1] - 40:12
priority [3] - 59:16, 59:19, 62:11
privately [1] - 7:16
problem [14] - 11:6, 25:22, 32:4, 33:19, 43:8, 43:11, 46:2, 46:3, 62:22, 63:1, 64:17, 67:14, 74:16, 76:3
problems [1] - 17:9
proceeded [2] - 38:23, 67:3
process [18] - 8:22, 9:8, 11:10, 11:15, 11:20, 11:23, 28:10, 28:12, 35:16, 35:17, 35:18, 35:21, 35:25, 37:6, 49:3, 65:23, 67:4, 71:16
processes [2] - 36:6, 36:18
produce [1] - 7:2
product [40] - 7:14, 9:3, 9:6, 9:25, 10:16, 10:17, 11:13, 12:6, 16:12, 16:13, 16:15, 28:11, 31:3, 32:19, 36:4, 37:13, 38:8, 38:19, 38:21, 39:8, 40:20, 40:24, 41:3, 41:17, 47:20, 48:18, 49:5,

49:16, 55:2, 55:25, 65:23, 70:9, 70:10, 70:16, 70:17, 71:14, 79:21, 80:19, 81:7, 81:10
production [1] - 49:13
products [22] - 12:4, 25:4, 28:11, 28:13, 36:4, 38:25, 39:11, 39:14, 39:15, 39:17, 47:7, 47:8, 47:9, 47:21, 49:20, 65:11, 65:22, 65:24, 70:13, 80:10, 84:14, 84:16
profits [1] - 69:4
projection [1] - 62:13
promise [2] - 43:14, 77:21
properly [1] - 57:23
properties [1] - 41:9
property [1] - 12:5
propose [1] - 46:5
proposed [1] - 44:13
proposition [2] - 29:22, 69:13
prosecuted [2] - 5:18, 22:11
prosecuting [2] - 20:5, 20:7
prosecution [8] - 19:12, 20:20, 21:24, 22:3, 22:6, 22:11, 22:16, 26:14
prosecutor [1] - 73:20
prosecutors [2] - 72:21, 72:22
protein [3] - 53:3, 54:2, 75:2
proteins [5] - 10:21, 10:22, 10:25, 11:1, 11:18
prove [9] - 32:1, 32:2, 32:7, 32:17, 33:17, 33:25, 34:2, 34:4, 52:2
provide [1] - 17:10
provider [1] - 7:20
provides [2] - 4:23, 69:11
proving [1] - 12:11
ProZyme [94] - 7:12, 7:23, 8:10, 8:14, 8:16, 8:22, 9:17, 9:19, 27:4, 27:9, 28:3, 28:7, 28:11, 28:12, 29:14, 31:21, 34:15, 35:5, 35:25, 36:8, 37:10, 37:13, 38:7, 38:10, 38:19, 38:22, 38:23, 39:2, 39:11, 39:13, 39:22, 40:11, 40:13, 41:13, 42:2, 42:7, 42:14, 42:16, 42:18, 42:21, 42:25, 43:2, 44:7, 44:8, 44:19, 44:21, 45:1, 45:2, 45:4, 45:5, 45:6, 45:14, 45:20, 46:1, 46:5, 46:8, 46:18, 46:20, 46:21, 47:7, 47:9, 47:12, 47:18, 47:20, 47:24, 50:18, 50:20, 57:6, 60:13, 62:18, 64:15, 64:20, 65:4, 65:22, 65:24, 66:25, 67:11, 67:12, 67:19, 67:23, 67:25, 68:12, 69:1, 69:17, 70:13, 70:16, 71:13, 71:18, 77:10, 80:3, 84:13, 84:16
ProZyme 's [5] - 34:17, 39:15, 50:24, 67:2, 69:4
public [3] - 9:14, 48:11, 52:8
pulled [1] - 68:6
pulling [1] - 28:15
purchased [2] - 64:15, 70:1
purely [1] - 51:16
purposes [4] - 12:20, 69:1, 69:3, 82:6
pursue [1] - 42:15
push [1] - 79:20

**pushing** [1] - 28:15
**put** [18] - 8:9, 18:8, 33:15, 34:18, 41:8, 46:20, 47:14, 53:3, 54:5, 58:11, 60:16, 60:17, 60:18, 60:19, 61:22, 63:10
**putting** [2] - 73:20, 79:23

## Q

**questions** [6] - 19:5, 26:19, 37:17, 64:13, 65:13, 65:18
**quick** [1] - 77:20
**quickly** [8] - 11:15, 19:11, 22:3, 31:7, 34:2, 83:6, 83:8, 83:21
**quite** [1] - 28:18
**quo** [7] - 67:22, 67:24, 68:3, 68:10, 68:13, 69:4
**quote** [3] - 69:10, 71:16, 77:1
**quotes** [2] - 41:10, 68:6

## R

**rabbi** [1] - 78:11
**raise** [7] - 16:21, 22:20, 23:12, 24:7, 26:10
**raised** [7] - 12:12, 19:11, 25:8, 33:11, 73:2, 78:5
**randomly** [1] - 36:12
**range** [1] - 82:8
**rapid** [1] - 49:19
**rapidly** [1] - 50:7
**RapiFluor** [5] - 5:2, 7:15, 11:14, 81:7, 82:3
**rare** [1] - 74:19
**rarely** [2] - 35:2, 35:7
**rather** [5] - 40:13, 56:14, 70:2, 71:10, 76:7
**rational** [1] - 26:13
**rationale** [1] - 26:8
**razor** [4] - 29:25, 53:5, 60:23, 82:15
**RCE** [1] - 56:7
**read** [8] - 19:23, 24:20, 43:24, 52:19, 62:13, 69:8, 71:16, 75:21
**reading** [7] - 15:13, 19:22, 21:2, 37:24, 54:22, 59:6, 60:2
**reads** [1] - 52:19
**ready** [2] - 11:11, 18:14
**reagent** [6] - 5:3, 11:14, 30:11, 30:21, 30:22
**reagents** [5] - 4:20, 11:22, 30:5, 41:13, 82:18
**real** [2] - 45:4, 48:21
**really** [42] - 4:23, 13:2, 23:4, 23:7, 25:9, 25:23, 26:7, 26:14, 33:4, 38:2, 40:4, 41:22, 42:17, 43:8, 44:1, 44:2, 44:12, 45:3, 45:25, 46:11, 46:14, 46:21, 46:23, 47:19, 48:4, 48:13, 50:14, 52:11, 52:13, 52:15, 54:18, 61:1, 61:20, 62:17, 74:23, 78:17, 79:7,

80:20, 81:5, 82:11, 84:6
**reason** [8] - 35:9, 36:9, 37:3, 42:20, 66:15, 66:19, 72:8, 84:15
**reasonable** [1] - 54:3
**reasons** [1] - 54:16
**rebuttal** [3] - 4:11, 37:17, 83:22
**received** [1] - 56:1
**recently** [2] - 44:10, 57:14
**recited** [3] - 13:6, 16:6, 24:25
**reconcile** [1] - 28:19
**record** [12] - 15:5, 21:12, 21:14, 28:1, 36:3, 43:24, 51:2, 51:8, 66:24, 83:24, 84:3, 84:6
**recoup** [1] - 33:3
**reducing** [2] - 82:22, 82:24
**reevaluate** [1] - 49:7
**reference** [1] - 25:14
**references** [4] - 25:11, 25:18, 26:9, 26:15
**referring** [1] - 9:12
**regardless** [2] - 63:8, 72:1
**regulated** [3] - 35:11, 36:18, 36:24
**reissue** [1] - 23:21
**rejected** [1] - 16:14
**rejection** [1] - 22:12
**relate** [2] - 52:21, 57:2
**related** [1] - 8:15
**relationship** [1] - 44:24
**relative** [1] - 8:8
**release** [3] - 29:8, 34:12, 46:8
**relevant** [6] - 6:17, 6:19, 6:22, 7:12, 7:18, 7:25, 19:20, 57:11, 66:15, 66:24, 67:11
**relief** [2] - 45:16, 45:18
**rely** [1] - 33:24
**relying** [3] - 14:6, 36:5, 61:16
**remedy** [1] - 63:1
**remember** [4] - 15:13, 66:2, 67:7, 67:15
**remind** [1] - 36:19
**repeated** [1] - 50:15
**reply** [1] - 58:3
**request** [4] - 6:25, 28:11, 65:22, 71:17
**requested** [1] - 71:12
**required** [3] - 74:16, 76:13, 76:16
**requires** [4] - 22:5, 22:22, 22:24
**requiring** [1] - 14:1
**reserve** [1] - 4:11
**resolution** [1] - 10:15
**resolved** [1] - 19:8
**resolves** [1] - 23:23
**resources** [1] - 38:20
**respect** [3] - 12:4, 12:18, 15:16
**respectful** [1] - 83:22
**respectfully** [1] - 68:2
**respond** [2] - 48:15, 58:1
**responded** [1] - 56:6
**responding** [1] - 31:4
**response** [2] - 34:1, 48:11
**responsible** [2] - 10:22, 27:11

**rest** [1] - 13:21
**restricted** [1] - 16:1
**results** [1] - 10:2
**reviewed** [1] - 3:22
**Rhoades** [1] - 3:6
**RICHARDS** [1] - 2:4
**Richards** [1] - 3:10
**rid** [1] - 46:19
**rights** [8] - 8:7, 12:5, 38:14, 38:15, 39:9, 39:23, 40:1, 42:2
**rigorous** [3] - 23:4, 25:9, 25:23
**ring** [10] - 15:5, 15:7, 15:17, 55:3, 55:8, 58:8, 60:4, 61:23, 63:11, 80:17
**risk** [8] - 24:1, 24:3, 37:11, 37:12, 42:6, 62:17, 64:15, 73:25
**roof** [2] - 54:9
**rope** [11] - 74:8, 74:9, 74:10, 74:11, 75:1, 76:14, 76:15, 76:16, 80:14
**Roth** [3] - 25:18, 25:25, 26:3
**routine** [1] - 75:18
**royalty** [1] - 34:17
**rule** [1] - 42:4
**run** [10] - 40:22, 41:4, 50:23, 71:19, 74:1, 75:14, 75:15, 75:17, 78:16
**running** [1] - 51:7
**runs** [1] - 43:20

## S

**sale** [7] - 9:3, 30:23, 30:25, 32:3, 48:2, 51:3
**sales** [23] - 8:8, 9:19, 29:14, 29:16, 29:17, 31:12, 32:1, 32:18, 34:13, 34:15, 51:6, 51:22, 51:24, 70:7, 78:20, 79:8, 82:11, 82:22, 82:23, 83:15, 84:1, 84:4, 84:13
**salesman** [3] - 78:7, 78:10, 78:12
**salespeople** [1] - 68:22
**salesperson** [2] - 30:24, 70:4
**sample** [1] - 11:7
**samples** [2] - 11:11, 11:16
**Samsung** [1] - 77:4
**sat** [1] - 22:14
**save** [3] - 37:16, 59:19, 79:5
**savvy** [1] - 79:18
**saw** [4] - 33:24, 34:3, 65:5, 80:14
**scale** [1] - 69:12
**scenario** [1] - 78:6
**scene** [1] - 67:9
**schemes** [3] - 26:3, 26:5, 26:16
**school** [1] - 3:16
**science** [2] - 4:18, 4:24
**scope** [9] - 13:24, 23:10, 47:3, 54:10, 59:17, 59:25, 60:15, 60:21, 64:9
**screen** [3] - 31:9, 68:4, 69:9
**seated** [1] - 2:19
**second** [2] - 31:9, 41:19
**secondary** [1] - 26:15
**secondly** [1] - 64:20

**secured** [1] - 21:11
**see** [22] - 8:19, 8:23, 8:24, 8:25, 14:22, 18:15, 22:13, 23:13, 27:6, 29:12, 31:2, 31:5, 31:8, 31:11, 33:2, 46:13, 57:16, 62:15, 63:18, 80:9, 81:17, 81:19
**seeing** [1] - 6:15
**seeking** [7] - 8:13, 8:15, 36:17, 44:13, 45:13, 69:15, 77:14
**seem** [7] - 18:5, 27:22, 33:8, 67:20, 67:24, 77:12, 78:25
**segment** [2] - 29:19, 35:10
**selected** [1] - 26:17
**sell** [26] - 9:1, 38:21, 42:5, 45:19, 45:20, 46:6, 46:18, 46:22, 47:1, 47:2, 47:7, 47:8, 47:9, 47:11, 47:13, 47:20, 47:21, 47:23, 48:1, 68:17, 70:8, 70:10, 71:1, 78:24, 83:1
**selling** [11] - 9:5, 9:15, 34:3, 38:7, 47:22, 68:23, 68:24, 70:9, 71:14, 82:12, 82:13
**sells** [2] - 79:12, 81:7
**send** [1] - 48:19
**sense** [5] - 17:7, 32:22, 42:11, 66:19, 70:7
**sent** [1] - 28:10
**separate** [3] - 44:4, 45:6, 47:24
**separated** [1] - 11:24
**September** [1] - 56:2
**service** [2] - 4:23, 7:20
**services** [2] - 4:23, 5:16
**set** [2] - 4:4, 18:6
**sets** [1] - 41:4
**seventeen** [1] - 26:4
**shall** [1] - 68:15
**share** [5] - 29:7, 34:9, 34:21, 62:11, 62:12
**short** [4] - 36:22, 36:23, 48:22, 48:23
**shorthand** [2] - 5:2, 29:22
**shortly** [1] - 5:5
**show** [12] - 7:15, 12:10, 12:23, 16:12, 19:9, 23:17, 24:10, 26:16, 32:17, 47:19, 52:4, 83:14
**showed** [3] - 56:22, 80:8, 83:13
**showing** [4] - 13:12, 15:6, 22:9, 79:25
**shown** [7] - 12:2, 13:10, 13:11, 13:14, 22:24, 24:4, 26:16
**side** [3] - 7:3, 12:12, 13:1
**signed** [1] - 37:8
**significance** [1] - 30:12
**significant** [5] - 8:5, 29:6, 68:12, 75:3, 75:9
**significantly** [1] - 74:25
**silent** [1] - 24:18
**similar** [4] - 57:5, 59:2, 62:19, 77:5
**simple** [2] - 56:13, 72:8
**simply** [7] - 16:9, 17:8, 39:9, 48:15, 67:1, 72:23, 73:20
**single** [2] - 17:15, 20:12
**sit** [1] - 9:2

**sitting** [2] - 42:1, 62:2
**situation** [4] - 18:11, 61:12, 67:6, 82:16
**six** [1] - 35:23
**sixty** [5] - 4:18, 39:25, 40:5, 40:6
**sixty-year-old** [1] - 4:18
**sizes** [2] - 7:25, 8:8
**skeptical** [1] - 83:13
**skill** [2] - 54:3, 60:1
**skilled** [2] - 25:11, 26:6
**skip** [2] - 48:6, 52:12
**skipped** [2] - 37:2, 48:4
**sklenar** [1] - 4:14
**SKLENAR** [18] - 1:21, 10:9, 10:11, 14:7, 14:12, 15:18, 15:20, 17:20, 18:4, 19:7, 19:14, 20:1, 20:18, 21:5, 21:23, 24:12, 24:24, 26:23
**Sklenar** [6] - 3:4, 10:3, 10:12, 58:11, 72:13, 74:23
**slide** [7] - 15:15, 31:8, 31:11, 35:14, 72:5, 79:23, 80:1
**slides** [4] - 16:18, 31:1, 48:7, 58:17
**small** [2] - 7:16, 39:15
**snap** [1] - 49:18
**software** [4] - 4:22, 10:1, 10:25, 83:16
**sold** [3] - 7:13, 31:24, 38:19
**sole** [2] - 46:6, 66:10
**solution** [2] - 79:25, 80:5
**solutions** [4] - 29:19, 34:13, 69:14, 80:3
**someday** [1] - 76:15
**someone** [9] - 29:10, 35:4, 68:18, 72:10, 74:11, 74:13, 75:10, 78:20
**sometimes** [2] - 58:11, 58:12
**somewhere** [1] - 75:23
**soon** [7] - 8:6, 8:7, 39:21, 41:23, 41:24, 61:18, 84:20
**sorry** [4] - 41:20, 59:10, 63:18, 82:4
**sort** [30] - 11:24, 12:14, 16:2, 18:19, 19:21, 21:8, 21:17, 22:9, 22:14, 22:23, 23:20, 23:23, 24:2, 25:12, 36:25, 38:1, 43:11, 46:4, 48:22, 56:14, 57:7, 57:16, 61:19, 61:25, 65:1, 66:2, 74:22, 80:14, 82:9, 83:24
**sought** [3] - 45:18, 69:6, 69:18
**space** [1] - 4:24
**speaking** [1] - 66:10
**spec** [8] - 25:22, 40:21, 49:25, 50:5, 51:6, 68:18, 79:3, 82:12
**special** [2] - 17:3, 81:5
**species** [3] - 71:1, 72:11, 72:15
**specific** [3] - 14:2, 25:5, 76:22
**specifically** [8] - 4:21, 5:8, 70:18, 80:8, 81:5, 81:9, 81:12, 81:22
**specification** [9] - 14:11, 14:13, 14:19, 14:23, 16:8, 16:16, 17:14, 24:17
**specified** [1] - 17:23
**specs** [1] - 49:22
**spectometry** [4] - 29:18, 31:17, 47:8, 69:14
**spectrometer** [11] - 9:25, 29:25, 30:17,

30:25, 31:25, 68:24, 70:20, 82:23, 83:2, 84:4
**spectrometers** [3] - 4:19, 7:19, 41:6
**spectrometry** [1] - 25:17
**speculation** [2] - 34:6, 83:23
**speculative** [3] - 33:10, 51:16, 79:21
**speed** [1] - 27:3
**spent** [1] - 52:7
**split** [1] - 4:14
**spun** [1] - 30:15
**stability** [1] - 19:10
**staff** [1] - 4:3
**stand** [2] - 32:15, 69:17
**stand-alone** [1] - 69:17
**standalone** [3] - 8:6, 8:11, 8:17
**standard** [5] - 14:1, 22:5, 22:8, 75:23, 76:3
**standing** [7] - 4:3, 27:18, 27:19, 34:15, 34:21, 61:6, 71:18
**STARGATT** [1] - 1:18
**start** [14] - 2:22, 10:11, 10:12, 24:8, 25:24, 29:23, 29:24, 36:11, 36:12, 41:25, 42:6, 67:3
**started** [7] - 9:9, 31:4, 38:4, 38:7, 38:10, 42:8, 43:2
**starting** [5] - 8:24, 8:25, 9:9, 27:1, 31:13
**starts** [1] - 58:16
**startup** [1] - 30:15
**statement** [1] - 20:13
**statements** [1] - 20:10
**STATES** [1] - 1:1
**States** [1] - 1:14
**status** [7] - 67:22, 67:24, 68:3, 68:10, 68:13, 69:3
**statutory** [2] - 22:21, 23:11
**stay** [1] - 35:10
**step** [1] - 74:3
**steps** [2] - 11:19, 11:20
**Steve** [1] - 3:9
**STEVEN** [1] - 2:4
**stick** [2] - 54:11, 60:5
**still** [9] - 9:18, 47:24, 48:24, 56:12, 57:15, 66:3, 66:5, 72:8
**stop** [3] - 36:14, 56:3, 71:21
**story** [1] - 38:6
**straightforward** [2] - 36:22, 37:4
**stream** [1] - 34:17
**Street** [1] - 1:11
**strengthens** [1] - 29:21
**strong** [2] - 26:10, 34:6
**strongly** [1] - 75:15
**STRONSKI** [1] - 2:7
**Stronski** [1] - 3:14
**structure** [8] - 8:14, 8:23, 16:13, 19:17, 19:24, 53:6, 55:14, 55:16
**structured** [1] - 6:2
**stuck** [2] - 51:18, 80:21
**studies** [1] - 3:16
**study** [3] - 10:18, 20:15, 20:18

**stuff** [3] - 14:5, 29:23, 31:21
**stylish** [1] - 37:25
**subject** [3] - 21:24, 64:9, 77:2
**submission** [1] - 12:21
**submit** [11] - 6:17, 6:23, 7:5, 12:23, 16:9, 16:23, 17:13, 19:7, 19:8, 25:9, 61:7
**submitted** [3] - 3:23, 45:11, 73:11
**subsequently** [1] - 72:10
**subsidiaries** [5] - 44:15, 45:8, 46:16, 68:11, 71:13
**subsidiary** [3] - 9:16, 44:4, 47:2
**substituent** [19] - 13:5, 13:11, 13:20, 14:8, 14:24, 15:21, 15:23, 15:25, 17:22, 18:9, 18:12, 54:5, 59:11, 59:12, 59:14, 60:4, 63:6, 63:22, 63:23
**substituents** [4] - 13:3, 13:15, 58:24, 59:3
**succeed** [1] - 13:13
**succeeds** [1] - 70:7
**success** [3] - 10:5, 12:8, 12:15
**sudden** [1] - 42:7
**suddenly** [11] - 39:3, 41:6, 42:2, 43:21, 43:22, 49:21, 50:3, 59:13, 59:16, 62:18, 79:11
**sue** [8] - 5:24, 27:18, 27:19, 43:7, 45:2, 55:24, 65:4, 67:5
**sued** [10] - 6:21, 7:22, 8:6, 24:3, 43:9, 44:10, 66:11, 67:19, 69:18, 77:4
**suffered** [1] - 51:13
**suggest** [6] - 18:25, 19:22, 64:1, 72:18, 75:15, 77:8
**suggested** [6] - 4:7, 24:2, 48:13, 67:13, 73:24, 83:5
**suggesting** [3] - 20:25, 57:7, 57:9
**suggestion** [4] - 21:6, 66:25, 67:10, 75:19
**suit** [7] - 6:11, 8:11, 27:23, 28:4, 38:4, 39:24, 42:9
**suitable** [1] - 59:3
**suite** [1] - 9:2
**super** [1] - 29:15
**supervisor** [1] - 72:22
**supplement** [1] - 27:25
**supplemental** [1] - 6:24
**supplies** [1] - 82:18
**supply** [3] - 9:23, 69:11, 83:1
**support** [14] - 14:6, 16:8, 16:12, 16:15, 17:15, 24:10, 24:16, 24:21, 61:3, 64:7, 84:6
**supports** [1] - 14:4
**suppose** [1] - 76:7
**surprisingly** [1] - 29:2
**switch** [4] - 35:2, 35:7, 35:19, 48:15
**synergies** [1] - 70:23
**synergistic** [4] - 29:13, 34:13, 34:22, 68:5
**synergize** [1] - 34:19
**synergy** [3] - 34:16, 41:9, 83:10

**synonymous** [1] - 76:10
**system** [2] - 36:13, 46:1

## T

**table** [1] - 3:11
**tactic** [1] - 78:20
**tag** [2] - 11:23, 11:24
**talks** [3] - 14:11, 14:24, 33:23
**target** [1] - 66:10
**TAYLOR** [1] - 1:18
**technique** [1] - 25:22
**techniques** [1] - 11:9
**TECHNOLOGIES** [1] - 1:6
**technology** [7] - 5:17, 7:18, 10:4, 10:13, 11:12, 48:6, 53:13
**teeny** [1] - 51:25
**tends** [1] - 66:16
**term** [12] - 14:14, 14:20, 16:4, 17:3, 17:11, 18:15, 18:21, 18:23, 24:9, 35:2, 35:7, 82:15
**terms** [4] - 16:24, 16:25, 51:9, 56:13
**terrible** [1] - 78:19
**test** [17] - 23:1, 23:14, 23:15, 23:17, 41:3, 41:4, 49:17, 49:18, 49:22, 49:23, 49:25, 50:23, 50:24, 51:25, 62:1, 79:6
**testing** [4] - 41:12, 48:18, 49:6, 49:7
**tests** [1] - 40:23
**text** [2] - 21:15, 21:16
**THE** [125] - 1:1, 1:2, 1:13, 2:19, 2:21, 3:3, 3:7, 3:13, 3:20, 4:6, 4:13, 5:22, 5:24, 6:14, 6:20, 7:5, 7:8, 8:2, 8:12, 9:11, 9:20, 10:8, 10:10, 14:3, 14:10, 15:12, 15:19, 17:18, 17:21, 19:6, 19:13, 19:15, 20:14, 20:25, 21:18, 24:11, 24:22, 26:21, 27:16, 28:22, 30:2, 31:10, 32:6, 32:9, 33:6, 34:8, 34:23, 35:24, 37:1, 37:19, 37:25, 39:11, 39:19, 40:9, 41:7, 41:19, 42:13, 42:20, 43:16, 44:20, 45:19, 46:2, 46:13, 47:25, 48:8, 48:22, 50:7, 51:21, 52:15, 53:7, 53:25, 54:14, 56:13, 56:19, 56:21, 57:7, 58:10, 58:20, 59:1, 61:3, 61:10, 62:5, 62:15, 63:2, 63:9, 63:15, 63:20, 64:14, 64:24, 65:12, 65:16, 66:2, 67:19, 68:8, 68:17, 69:21, 70:12, 71:9, 72:1, 72:4, 72:14, 73:3, 73:7, 73:15, 73:18, 74:22, 75:6, 75:21, 76:1, 77:15, 77:18, 77:23, 78:9, 78:19, 79:8, 80:7, 81:15, 81:19, 81:24, 82:1, 82:9, 83:20, 84:9, 84:18, 84:23
**themselves** [1] - 44:22
**thereafter** [1] - 5:5
**thinking** [5] - 40:5, 48:9, 57:11, 65:7, 72:19
**thinks** [1] - 49:14
**third** [1] - 49:10
**thirty** [2] - 4:10, 11:16
**thirty-five** [1] - 4:10

**thousand** [11] - 40:21, 50:22, 77:4, 78:15, 79:5, 79:6, 79:14, 79:15, 79:19, 79:20
**threatened** [1] - 69:16
**three** [11] - 10:6, 12:9, 24:13, 24:15, 25:11, 30:14, 46:5, 51:5, 51:12, 60:23, 84:2
**throughout** [1] - 14:19
**throughput** [3] - 35:23, 82:17, 83:7
**throw** [3] - 32:13, 64:3, 81:14
**ticket** [1] - 7:18
**ticking** [1] - 42:1
**tie** [3] - 46:11, 51:23, 70:17
**tied** [3] - 32:19, 41:6, 76:15
**timeline** [5] - 27:5, 38:2, 38:5, 46:24, 46:25
**timely** [1] - 7:2
**title** [1] - 42:9
**today** [20] - 3:18, 9:2, 31:18, 32:4, 32:13, 34:5, 37:22, 38:2, 38:9, 43:19, 44:2, 45:13, 68:3, 69:1, 69:20, 70:14, 71:5, 71:22, 71:25, 84:15
**together** [3] - 25:20, 29:21, 82:25
**tolerate** [1] - 40:12
**tomorrow** [3] - 30:13, 32:25, 42:5
**tone** [1] - 83:13
**tons** [1] - 51:24
**took** [2] - 12:5, 43:3
**toward** [1] - 82:18
**towards** [1] - 42:18
**transaction** [4] - 6:10, 37:5, 37:10, 67:6
**transfer** [2] - 31:5, 44:17
**transition** [1] - 28:10
**translated** [1] - 11:1
**translates** [1] - 10:21
**transmissions** [1] - 72:12
**tree** [2] - 28:5, 74:1
**trial** [3] - 33:5, 36:15, 69:2
**tried** [1] - 28:19
**true** [4] - 32:8, 47:19, 62:9, 67:1
**trunk** [1] - 28:5
**truth** [1] - 33:22
**try** [13] - 4:7, 4:10, 23:17, 24:14, 24:19, 32:10, 33:17, 49:23, 49:24, 49:25, 65:17, 72:11
**trying** [20] - 9:1, 15:1, 15:13, 18:19, 19:21, 20:25, 35:15, 36:1, 45:25, 51:23, 54:14, 60:20, 61:11, 61:15, 64:2, 65:3, 70:8, 71:6, 71:7, 71:9
**turn** [8] - 12:7, 12:17, 14:12, 26:20, 37:17, 52:6, 66:14, 72:5
**twenty** [2] - 82:16, 83:2
**two** [35] - 5:9, 12:11, 13:3, 13:5, 19:11, 23:15, 26:5, 26:6, 26:9, 28:19, 32:13, 32:15, 33:13, 33:20, 34:5, 36:14, 36:19, 44:24, 47:15, 49:12, 49:14, 49:15, 52:1, 53:3, 53:18, 60:6, 62:1, 62:7, 62:23, 80:22, 82:2, 82:17
**two-way** [2] - 23:15, 62:1

**type** [9] - 10:18, 10:24, 17:15, 23:12, 59:9, 61:25, 62:24, 63:3, 63:4
**types** [2] - 16:21, 26:3
**typically** [1] - 82:8

## U

**UD** [1] - 70:5
**ultimate** [1] - 8:23
**ultimately** [3] - 9:15, 38:18, 67:4
**unable** [1] - 49:11
**unclean** [2] - 20:3, 20:4
**under** [8] - 5:25, 9:19, 24:3, 44:9, 46:4, 61:23, 62:21, 74:14
**undermined** [1] - 66:17
**understood** [2] - 7:9, 27:25
**unfair** [4] - 42:6, 42:7, 67:14, 67:17
**UNITED** [1] - 1:1
**United** [1] - 1:14
**universities** [1] - 30:7
**University** [4] - 30:14, 30:16, 33:16, 50:4
**unless** [5] - 19:4, 26:19, 27:13, 37:17, 77:7
**unlike** [1] - 7:17
**unlikely** [1] - 79:4
**unrebutted** [1] - 64:10
**up** [25] - 10:4, 11:10, 25:12, 29:11, 30:23, 33:4, 34:25, 35:14, 37:9, 37:16, 38:21, 38:23, 44:1, 46:20, 47:14, 48:3, 58:18, 61:17, 66:25, 70:23, 72:6, 72:13, 75:10, 79:23, 80:2
**urgent** [2] - 8:10, 28:4
**USC** [1] - 44:9
**useful** [1] - 6:24
**uses** [3] - 18:24, 19:18, 51:25

## V

**vacation** [1] - 77:22
**valid** [1] - 54:16
**validate** [2] - 49:16, 49:17
**validation** [4] - 35:16, 35:17, 35:20, 35:25
**validity** [2] - 19:4, 22:19
**value** [3] - 29:22, 51:19, 69:13
**values** [1] - 83:8
**Van** [1] - 64:10
**van** [6] - 16:25, 18:23, 53:12, 57:20, 58:1, 60:2
**vanish** [1] - 43:22
**various** [1] - 83:17
**venue** [1] - 44:11
**versa** [2] - 29:25, 30:5
**versus** [2] - 75:9, 75:24
**viability** [1] - 73:25
**vice** [2] - 29:25, 30:5
**view** [2] - 23:19, 23:20

**vis** [2] - 21:21
**vis-a-vis** [1] - 21:21

## W

**wait** [6] - 43:11, 43:21, 56:4, 57:16
**waited** [2] - 22:7, 42:4
**waiting** [1] - 28:17
**waive** [1] - 43:22
**walks** [2] - 78:7, 78:10
**walls** [1] - 54:8
**WAN's** [1] - 75:18
**wants** [4] - 46:17, 46:22, 46:23, 77:10
**warrant** [1] - 84:7
**warts** [1] - 65:10
**WATERS** [1] - 1:3
**Waters** [61] - 2:25, 3:5, 4:17, 9:22, 10:17, 11:12, 12:3, 19:16, 19:19, 19:22, 19:24, 20:3, 20:7, 20:13, 21:15, 27:2, 27:21, 29:1, 33:18, 35:1, 38:9, 38:11, 38:22, 38:23, 39:6, 39:20, 40:10, 40:11, 40:24, 40:25, 41:21, 41:24, 43:9, 44:12, 44:18, 49:10, 50:17, 50:19, 50:20, 50:21, 51:13, 51:21, 52:4, 52:9, 52:19, 56:1, 62:20, 64:1, 64:15, 65:6, 65:9, 69:24, 70:1, 70:2, 78:6, 78:11, 79:10, 80:18, 80:22, 81:7
**Waters'** [10] - 21:9, 30:5, 38:3, 39:5, 44:1, 46:2, 49:22, 49:23, 65:8
**Waters's** [1] - 30:3
**waving** [4] - 23:8, 23:14, 23:21, 25:10
**ways** [1] - 13:23
**web** [2] - 31:5, 80:12
**website** [8] - 47:11, 47:18, 47:25, 65:20, 65:21, 66:6, 68:21, 79:24
**week** [5] - 5:9, 9:9, 27:9, 32:25, 66:8
**weekend** [1] - 77:24
**weeks** [3] - 3:17, 27:7, 27:10
**weeny** [1] - 51:25
**welcome** [1] - 3:20
**well-known** [3] - 41:16, 80:25
**wet** [1] - 18:18
**whatsoever** [1] - 21:16
**whence** [1] - 81:1
**whereas** [2] - 6:12, 42:22
**whichever** [1] - 43:24
**whipsaw** [1] - 33:12
**white** [1] - 62:13
**whole** [10] - 11:14, 34:12, 38:2, 38:19, 45:25, 49:24, 53:3, 58:24, 66:11, 84:12
**wholly** [2] - 44:3, 47:2
**wide** [1] - 37:9
**wildly** [1] - 82:19
**willing** [1] - 40:12
**Wilmington** [1] - 1:12
**win** [1] - 36:15
**wiped** [1] - 42:3

**wish** [1] - 58:4
**withdrew** [1] - 56:7
**wolf** [4] - 12:2, 26:22, 48:13, 57:8
**WOLF** [59] - 1:21, 3:2, 4:1, 4:9, 4:14, 5:23, 6:1, 6:16, 6:23, 7:2, 7:7, 7:9, 8:4, 8:18, 9:13, 9:21, 26:24, 27:25, 28:23, 30:4, 31:11, 32:8, 32:12, 33:11, 34:10, 35:9, 36:3, 37:2, 37:20, 37:24, 58:18, 65:15, 65:17, 66:7, 68:2, 68:14, 68:20, 70:3, 70:19, 71:15, 72:2, 72:5, 72:20, 73:5, 73:10, 73:17, 73:22, 75:5, 75:8, 75:25, 76:6, 77:16, 77:25, 78:11, 82:2, 82:5, 82:14, 84:11, 84:21
**Wolf** [4] - 3:1, 26:20, 33:24, 37:25
**wonderful** [1] - 79:25
**wondering** [2] - 21:1, 33:10
**word** [14] - 14:18, 17:5, 34:6, 52:11, 52:14, 52:24, 53:1, 53:13, 53:16, 53:22, 54:11, 73:20, 83:11, 84:10
**words** [6] - 14:5, 14:15, 29:20, 32:13, 36:6, 76:10
**workflow** [3] - 29:19, 31:13, 69:14
**works** [5] - 11:21, 61:14, 70:4, 75:1, 75:4
**world** [3] - 71:6, 77:13, 80:6
**world's** [1] - 5:13
**worse** [1] - 67:8
**worst** [1] - 67:7
**worthy** [1] - 7:25
**write** [1] - 29:11
**written** [17] - 16:8, 16:10, 16:15, 16:18, 24:6, 24:16, 24:21, 53:8, 54:22, 58:6, 60:9, 74:15, 75:17, 76:11, 76:18, 80:14, 80:15

## Y

**year** [7] - 4:18, 5:7, 30:10, 32:16, 82:19, 83:1
**years** [11] - 6:9, 32:14, 32:15, 36:14, 36:19, 50:3, 50:18, 51:5, 51:12, 67:20, 84:2
**yesterday** [2] - 33:1, 74:8
**YOUNG** [1] - 1:18
**Young** [1] - 2:25
**yourself** [1] - 65:8

## Z

**zero** [4] - 44:6, 51:14, 59:22, 67:25

# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| WATERS CORPORATION AND WATERS TECHNOLOGIES CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> AGILENT TECHNOLOGIES INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> )   Civil Action No. 18-1450-MN <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFFS WATERS CORPORATION AND WATERS TECHNOLOGIES CORPORATION'S INITIAL IDENTIFICATION OF THE ASSERTED PATENT, ACCUSED PRODUCTS, AND DAMAGES MODEL

Pursuant to Paragraph (7)(a) of the Scheduling Order submitted by the parties (D.I. 54), Plaintiffs Waters Corporation and Waters Technologies Corporation (collectively, "Waters" or "Plaintiffs") make the following initial identification of accused products and methods, its damages model, as well as an identification of the asserted patent to Defendant Agilent Technologies Inc. ("Agilent" or "Defendant").  Waters' investigation of Agilent's infringement is ongoing, and these identifications are based solely on publically available information as discovery is only just beginning in this litigation and Waters has not yet received any disclosure or discovery material from Agilent.  Accordingly, Waters makes these identifications in good faith and without prejudicing its rights, consistent with its obligations under the Federal Rules of Civil Procedure, the Local Rules of this District, to modify, amend, retract, and/or supplement the disclosures made herein as additional evidence and information become available, or as otherwise appropriate.

## I.   INITIAL IDENTIFICATION OF ASSERTED PATENTS

Agilent, either alone or in conjunction with others, has infringed, continues to infringe, and/or will infringe U.S. Patent No. 9,658,234 ("the '234 Patent") via the manufacture, use, sale, offer to sell, exportation, and/or importation, in whole or in part, of the InstantPC reagent. Agilent has produced a copy of the file history for the '234 Patent along with these disclosures.

## II.   INITIAL IDENTIFICATION OF ACCUSED PRODUCTS

Waters identifies, the InstantPC reagent, which Agilent has made, sold, offered for sale, used, and/or imported into the United States, as infringing, literally or under the doctrine of equivalents, directly or indirectly, at least claims 1-4, 6, 9-12, 14, and 15 of the '234 Patent under 35 U.S.C. § 271.  Upon information and belief, the chemical structure of the InstantPC reagent is:

Agilent has actively induced, continues to induce, and/or will actively induce others to infringe at least claims 1-4, 6, 9-12, 14, and 15 of the '234 patent in violation of 35 U.S.C. § 271(b) by causing, instructing, urging, encouraging, and/or aiding its customers to directly infringe at least claims 1-4, 6, 9-12, 14, and 15 of the '234 patent by making, using, offering to sell, selling, and/or importing in and into the United States the infringing InstantPC reagent. Further, Agilent also has contributed, continues to contribute, and/or will contribute to its customers' direct infringement of the '234 Patent in violation of 35 U.S.C. § 271(c) by providing products that are used in the infringing methods and that are not suitable for any substantial non-infringing use.

Upon information and belief, Agilent has marketed, continues to market, and/or will market several infringing products containing the InstantPC reagent or products prepared using infringing methods, including, but not limited to, product nos. GP96NG-PC, GP24NG-PC, GS96-PC, GS24-PC, GPPNG-PC, GKPC-005, GKPC-103, GKPC-104, GKPC-105, GKPC-106, GKPC-107, GKPC-233, GKPC-234, GKPC-263, GKPC-264, GKPC-301, GKPC-302, GKPC-304, GKPC-305, GKPC-311, GKPC-312, GKPC-313, GKPC-315, GKPC-316, GKPC-317, GKPC-319, GKPC-320, GKPC-321, GKPC-322, GKPC-323, GKPC-325, GKPC-329, GKPC-330, GKPC-401, GKPC-402, GKPC-503, GX24-101, GX24-IPC, GX24-201PC, GX96-101, GX96-201PC, GX96-IPC.

Waters reserves the right to supplement or amend this identification of infringing products as discovery and its investigation in this case proceed.

## III.    INITIAL IDENTIFICATION OF DAMAGES MODEL

Based on currently available information, Waters makes the following preliminary identification of its damages model. Waters intends to seek damages in the form of lost profits in an amount to be proven at trial including, but not limited to the extent Waters would have had increased market share, could have charged higher prices, and would have made additional sales of Waters' GlycoWorks kit and related reagents and instruments used in conjunction with, or downstream of, the infringing products and methods. Under 35 U.S.C. § 284, Waters is entitled to recover lost-profit damages for the lost sales and price erosion attributable to Agilent. Waters further intends to seek damages under a reasonable royalty basis for sales and use of the InstantPC reagent, kits containing the InstantPC reagent, as well as reagents and instruments used in conjunction with, or downstream of, the infringing products and methods. Waters also seeks and is entitled to a permanent injunction against the InstantPC reagent due to Agilent's

infringement or, in lieu of an injunction, an ongoing royalty.  Waters also intends to seek treble

damages against Agilent for Agilent's willful infringement of the '234 Patent.  Waters intends to

seek pre-judgment and post-judgment interest on the damages awarded, costs, and attorneys' fees

as provided by 35 U.S.C. § 285.

Because discovery in this case is ongoing, Waters reserves the right to further supplement

these disclosures as discovery and its investigation of the facts pertaining to this case proceeds.

DATED:  March 29, 2019          */s/ Karen L. Pascale*
                               *An Attorney for Plaintiffs Waters Corporation and*
                               *Waters Technologies Corporation*

                               Karen L. Pascale (DE Bar No. 2903)
                               Robert M. Vrana (DE Bar No. 5666)
                               **YOUNG CONAWAY STARGATT & TAYLOR LLP**
                               Rodney Square
                               1000 North King Street
                               Wilmington, DE  19801
                               (302) 571-6600
                               kpascale@ycst.com
                               rvrana@ycst.com

                               Matthew M. Wolf
                               David McMullen, Ph.D.
                               **ARNOLD & PORTER KAYE SCHOLER LLP**
                               601 Massachusetts Ave., NW
                               Washington, DC 20001
                               Telephone: (202) 942-5000
                               Matthew.Wolf@arnoldporter.com
                               David.McMullen@arnoldporter.com

                               Jennifer A. Sklenar
                               **ARNOLD & PORTER KAYE SCHOLER LLP**
                               777 South Figueroa St., 44th Floor
                               Los Angeles, CA 90015
                               Telephone: (213) 243-4000
                               Jennifer.Sklenar@arnoldporter.com

                               *(Continued . . . .)*

Jeffrey A. Miller
**ARNOLD & PORTER KAYE SCHOLER LLP**
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306
Telephone: (605) 319-4500
Jeffrey.Miller@arnoldporter.com

## <u>CERTIFICATE OF SERVICE</u>

I, Karen L. Pascale, Esquire, hereby certify that on March 29, 2019, I caused a true and correct copy of the foregoing discovery document to be served upon the following counsel of record by electronic mail:

| | |
|---|---|
| **Attorneys for Defendant Agilent Technologies, Inc.:** | |
| Chad M. Shandler | shandler@rlf.com |
| Travis S. Hunter | hunter@rlf.com |
| **RICHARDS LAYTON & FINGER, P.A.** | |
| One Rodney Square | |
| 920 North King Street | |
| Wilmington, Delaware 19801 | |
| | |
| Anne Elise Herold Li | ali@crowell.com |
| James K. Stronski | jstronski@crowell.com |
| **CROWELL & MORING LLP** | |
| 590 Madison Avenue, 20th Floor | |
| NewYork, NY 10022-2524 | |
| | |
| Chiemi D. Suzuki | csuzuki@crowell.com |
| **CROWELL & MORING LLP** | |
| 515 South Flower St., 40th Floor | |
| Los Angeles, CA 90071-2201 | |
| | |
| Mark T. Jansen | mjansen@crowell.com |
| Molly A. Jones | mojones@crowell.com |
| **CROWELL & MORING LLP** | |
| 3 Embarcadero Center, 26th Floor | |
| San Francisco, CA 94111 | |

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Karen L. Pascale*

March 29, 2019
_____
Karen L. Pascale (No. 2903) *[kpascale@ycst.com]*
Robert M. Vrana (#5666) *[rvrana@ycst.com]*
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  302-571-6600

*Attorneys for Plaintiffs, Waters Corporation and Waters Technologies Corporation*